1   JAMES L. COOPER (*pro hac vice*)
    MICHAEL A. RUBIN (*pro hac vice*)
2   ARNOLD & PORTER KAYE SCHOLER LLP
    601 Massachusetts Ave., N.W.
3   Washington, D.C. 20001
    Telephone:   202.942.5000
4   Facsimile:    202.942.4999
    Email: james.cooper@arnoldporter.com
5   Email: michael.rubin@arnoldporter.com

6   DANIEL B. ASIMOW (SBN 165661)
    BENJAMIN T. HALBIG (SBN 321523)
7   ARNOLD & PORTER KAYE SCHOLER LLP
    Three Embarcadero Center, 10th Floor
8   San Francisco, CA 94111-4024
    Telephone:   415.471.3100
9   Facsimile:    415.471.3400
    Email: daniel.asimow@arnoldporter.com
10  Email: benjamin.halbig@arnoldporter.com

11  Attorneys for Defendants
    TAIYO YUDEN CO. LTD. & TAIYO YUDEN (USA) INC.
12

13                    **UNITED STATES DISTRICT COURT**

14                  **NORTHERN DISTRICT OF CALIFORNIA**

15                           **SAN JOSE DIVISION**

16

| | |
|---|---|
| 17   FLEXTRONICS INTERNATIONAL USA, INC. | Case No. 5:19-cv-00078-EJD |
| 18                          Plaintiff, | **DECLARATION OF BENJAMIN HALBIG IN SUPPORT OF TAIYO YUDEN, TDK AND MURATA DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT** |
| 19           v. | |
| 20   MURATA MANUFACTURING CO., LTD., et. al. | Date:       May 7, 2020 |
| 21                          Defendants. | Time:       9:00 a.m. Place:      Courtroom 4, 5th Floor Judge:      Hon. Edward J. Davila |
| 22 | |

23

24

25

26

27

28

1    I, Benjamin T. Halbig, declare and state as follows:

2         1.      I am an attorney licensed in the State of California and admitted to the United

3    States District Court for the Northern District of California.  I am an associate at Arnold & Porter

4    Kaye Scholer LLP, counsel for Defendants Taiyo Yuden Co., Ltd. and Taiyo Yuden (U.S.A.)

5    Inc. (collectively "Taiyo Yuden").

6         2.      I submit this declaration in support of the Taiyo Yuden, TDK, and Murata

7    Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint.

8         3.      A true and correct copy of a Redlined Third Amended Complaint ("TAC") is

9    attached as **Exhibit A**.  This document was generated by comparing the TAC (ECF No. 91-5) to

10   the original Complaint, ECF No. 1.  The Redlined TAC was then redacted to conform to the

11   pending administrative motion to redact the TAC (ECF No. 91) consistent the Court's Order

12   permitting the same redactions to the Second Amended Complaint (ECF No. 78).  The redacted

13   text is not cited in the Motion to Dismiss.

14        I declare under penalty of perjury under the laws of the United States and the State of

15   California that the foregoing is true and correct to the best of my knowledge.

16        Executed this 15th day of January, 2020 in San Francisco, California

17

18                              /s/ *Benjamin T. Halbig*
                                BENJAMIN T. HALBIG

19

20

21

22

23

24

25

26

27

28

DECLARATION OF BENJAMIN HALBIG ISO TAIYO YUDEN, TDK AND MURATA          Case No. 5:19-cv-00078-EJD
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT

# EXHIBIT A

Charles E. Tompkins (admitted *pro hac vice* ~~motion forthcoming~~
~~cet@willmont.com~~)**WILLIAMS MONTGOMERY & JOHN LTD.**
1200 18th Street NW, Suite 325 Washington, D.C. 20008 Telephone: (202) 791-9951 Facsimile: (312) 630-8586 cet@willmont.com

~~Eric R. Lifvendahl (*pro hac vice* motion forthcoming) erl@willmont.com~~
~~**WILLIAMS MONTGOMERY & JOHN LTD.**~~
~~233 S. Wacker Drive, Suite 6800 Chicago, IL 60606 Telephone: (312) 443-3200 Facsimile:~~
~~(312) 630-8500~~

Whitney E. Street (State Bar No. 223870)~~Block~~
**BLOCK** & ~~Leviton~~**LEVITON** **LLP**~~610 16th~~
100 Pine Street, ~~Suites 214-216 Oakland, CA 94612~~Suite 1250 San Francisco, CA 94111
Telephone: (415) 968-~~8999~~1852 Facsimile: (617) 507-6020 whitney@blockesq.com~~*Attorneys*~~
*Counsel* for ~~*Plaintiff*~~*Plaintiff* Flextronics International USA, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

~~FLEXTRONICS INTERNATIONAL USA, INC.,~~

~~Plaintiff,~~

~~v.~~

~~MURATA MANUFACTURING CO., LTD.;
MURATA ELECTRONICS NORTH AMERICA,
INC.; MURATA POWER SOLUTIONS, INC.;
PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
PANASONIC ELECTRONIC DEVICES CO. LTD;
PANASONIC INDUSTRIAL DEVICES
CORPORATION OF AMERICA; SAGAMI ELEC-
CO., LTD.; SAGAMI AMERICA, LTD.; SUMIDA
CORPORATION; SUMIDA ELECTRIC CO., LTD.;
SUMIDA AMERICA COMPONENTS, INC.;
TAIYO YUDEN CO., LTD.; TAIYO YUDEN
(U.S.A.) INC.; TDK CORPORATION; TDK EPC
CORPORATION; TDK CORPORATION OF
AMERICA; TDK U.S.A. CORPORATION; TOKIN
CORPORATION; and TOKIN AMERICA, INC.~~

~~Defendants.~~

~~Case No.~~

~~COMPLAINT~~

~~JURY TRIAL DEMANDED~~

1

| | |
|---|---|
| FLEXTRONICS INTERNATIONAL USA, INC., | Case No. 5:19-cv-00078-EJD |
| Plaintiff, | **THIRD AMENDED COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| MURATA MANUFACTURING CO., LTD.; MURATA ELECTRONICS NORTH AMERICA, INC.; MURATA POWER SOLUTIONS, INC.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; PANASONIC ELECTRONIC DEVICES CO. LTD; PANASONIC INDUSTRIAL DEVICES CORPORATION OF AMERICA; SAGAMI ELEC CO., LTD.; SAGAMI AMERICA, LTD.; SUMIDA CORPORATION; SUMIDA ELECTRIC CO., LTD.; SUMIDA AMERICA COMPONENTS, INC.; TAIYO YUDEN CO., LTD.; TAIYO YUDEN (U.S.A.) INC.; TDK CORPORATION; TDK-EPC CORPORATION; TDK CORPORATION OF AMERICA; TDK U.S.A. CORPORATION; TOKIN CORPORATION; TOKIN AMERICA, INC.; and TOKO INC. | |
| Defendants. | |

## TABLE OF CONTENTS

I    NATURE OF THE ACTION
1

II   PARTIES
6

    A.    ~~Plaintiff~~Plaintiff Flextronics International USA, Inc
6

    B.    ~~ee~~The Murata Defendants
7

    C.    ~~ee~~The Panasonic Defendants
8

    D.    ~~ee~~The Sagami Defendants
10

    E.    ~~ee~~The Sumida Defendants
11

    F.    ~~ee~~The Taiyo Yuden Defendants

2

14

G.    ~~Ee~~The TDK Defendants
15

H.    ~~Ee~~The Tokin Defendants
18

I.    Agents and Co-Conspirators
19

III.  JURISDICTION AND VENUE
20

IV.   TRADE AND COMMERCE
21

A.    ~~Ee~~The Defendants' Conduct Involved Import Trade or Import
      Commerce and Had a Direct, Substantial and Reasonably Foreseeable
      ~~Effect~~Effect on U.S. Domestic and Import Trade or Commerce that
      Gave Rise to Flex's Antitrust
      Claims.............................................................................................................
      23

B.    ~~Ee~~The Defendants Targeted the United States ~~26~~ 25

V.    FACTUAL ALLEGATIONS
31

A.    Inductors Generally and Types of Inductors
31

B.    ~~Ee~~The Structure of the Inductor Market Is Conducive to Collusion
35

      1.    Market Concentration
            ~~36~~35

      2.    Product Commoditization
            ~~37~~36

      3.    Entry Barriers
            ~~38~~37

      4.    Demand Inelasticity
            ~~40~~39

      5.    Declining Demand and Excess Capacity
            ~~41~~40

C.    ~~Ee~~The Conduct of Defendants, the Investigation by the DOJ, and the

3

Use of Trade Associations Strongly Support ~~the~~ The Assertion ~~that~~ That
Defendants Colluded ~~42~~ 41

1.    Summary of Defendants' Unlawful Conduct
      ~~42~~41

2.    Conspiratorial Acts Conducted ~~through~~ Through JEITA ~~45~~ 41

## TABLE OF CONTENTS (cont.)

3.    Subpoenas Issued by DOJ
      ~~53~~55

4.    Involvement of Some Defendants in Other Conspiracies
      ~~54~~64

5.    Use of Trade Associations Other than JEITA to Facilitate and
      Organize the
      Conspiracy..............................................................................................
      ~~57~~67

6.    Other Interactions
      ~~60~~69

VI.   FRAUDULENT CONCEALMENT
      ~~60~~70

VII.  EFFECTS OF THE CONSPIRACY
      ~~63~~73

VIII. CLAIM FOR RELIEF
      ~~65~~75

IX.   DEMAND FOR JUDGMENT
      ~~66~~75

X.    JURY TRIAL DEMANDED
      ~~66~~76

## THIRD AMENDED COMPLAINT

1.    ~~Plaintiff~~Plaintiff Flextronics International USA, Inc., on behalf of itself and all

~~affiliated~~affiliated entities (collectively, "Flex"), which are ~~identified~~identified in Exhibit A,

brings this action for damages ~~and injunctive relief~~ under Sections 4 and 16 of the Clayton Act for the Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. ~~§ 1.¹ Numerous other persons injured by the Defendants' and their co-conspirators' price-fixing conspiracy have filed Section 1 Sherman Act claims in this Court.~~

§ 1.¹

2.    Based on its counsel's investigation ~~of its counsel~~, Flex alleges on information and belief as follows:

## I.    NATURE OF THE ACTION

3.    ~~is~~This action arises from a scheme between and among Defendants² to ~~fix~~fix, raise, stabilize, and maintain the price of Inductors, as ~~defined~~defined herein, at supra-competitive levels from at least January

1, 2003 through December ~~1, 2016 (the "Relevant Period").²~~31, 2017 (the "Relevant Period").³ The Defendants participated in multilateral meetings and bilateral contacts to exchange commercially sensitive information and coordinate future behavior in order to avoid price competition. In particular, the companies exchanged information on future supply, demand, and price information. The conspirators also reached broad directional agreements on current and future pricing levels.

~~4.As used herein, the term "Inductors" refers to electronic components that store energy in the form of a magnetic field, taking many forms and arrangements, including: beads; coils; chokes; "chip inductors"; "chip coils"; and wire-wound, air core, and multi-layer Inductors for power applications, EMI (Electromagnetic Interference) filtering/suppression and oscillation matching. Along with resistors (a~~

---

¹ Flextronics International USA, Inc. has been assigned the claims associated with this action, including ~~specifically~~specifically claims pursuant to the Sherman Act, of all the Flex entities ~~identified~~identified in Exhibit A. ~~e~~The assignments of these claims are in writing.

² Murata Manufacturing Co., Ltd.~~;~~, Murata Electronics North America, Inc.~~;~~, Murata Power Solutions, Inc., TOKO Inc. ("Toko") (now known as Saitama Murata Manufacturing Co.,

Ltd.) (collectively, "Murata" or the "Murata Defendants"); Panasonic Corporation; Panasonic Corporation of North America; Panasonic Electronic Devices Co. Ltd.; Panasonic Industrial Devices Corporation of North America (collectively, "Panasonic" or the "Panasonic Defendants"); Sagami Elec Co., Ltd.; Sagami America, Ltd. (collectively, "Sagami" or the "Sagami Defendants"); Sumida Corporation; Sumida Electric Co., Ltd.; Sumida America Components, Inc. (collectively, "Sumida" or the "Sumida Defendants"); Taiyo Yuden Co., Ltd.; Taiyo Yuden (U.S.A.) Inc. (collectively, "Taiyo Yuden" or the "Taiyo Yuden Defendants"); TDK Corporation; TDK-EPC Corporation; TDK Corporation of America; TDK U.S.A. Corporation (collectively, "TDK" or the "TDK Defendants"); Tokin Corporation; and Tokin America, Inc. Investigation(collectively, "Tokin" or the "Tokin Defendants"). Flex's investigation remains ongoing, and Flex reserves the right to add additional defendants and/or co-conspirators.

³ eeThe Relevant Period alleged here differs from the potential Conspiracy Period. As explained below, it is possible that the Conspiracy Period ended by September of 2014, but the effects of Defendants' conspiracy lingered on, causing injury and damage to Flex for a period thereafterdiffers from the period during which the Defendants actively conspired (the "Conspiracy Period"). Flex's investigation is ongoing, and Flex has conservatively chosen a Relevant Period that commences in 2003. Flex purchased millions of dollars of Inductors from Defendants prior to January 1, 2003, and formal discovery may reveal that prices from 19991997 through 20012003 were supracompetitivesupra-competitive. Flex reserves the right to further amend this Complaint with respect to the Relevant Period following further investigation.

4.    The conspirators also reached specific price agreements targeting certain Original Equipment Manufacturer ("OEM") supply chains and products and monitored the agreements' implementation. These agreements included agreements to rig bids and implement specific prices.

5.    Certain of the specific conspiratorial agreements among the conspirators targeted Plaintiff Flex and OEM customers of Flex.

6.    TDK Corporation has provided information to Flex about its conspiratorial activities in connection with the Inductors market. The activities involved information sharing and/or price-fixing agreements among at least the TDK, Murata, and Taiyo Yuden entities.

7.    All of the Defendants, including Defendants Sumida and Sagami, participated in multilateral meetings at which current and future production and pricing information was

6

exchanged.

8.      Various Defendants, including Defendants Panasonic and Tokin, have acknowledged the illegality of the multilateral meetings among competitors. Various Defendants took steps to conceal their conspiratorial activity from Flex and other customers.

9.      As used herein, the term "Inductors" refers to electronic components that store energy in the form of a magnetic field, taking many forms and arrangements, including: beads; coils; chokes; common mode filters; "chip inductors"; "chip coils"; and wire-wound, air core, and multi-layer Inductors for power applications, EMI (Electromagnetic Interference) filtering/suppression and oscillation matching.

10.      This applicable definition of Inductors includes Inductors manufactured for a specific application or customer. Although certain Inductors are manufactured in response to specific customer requests, all Inductors are reasonably interchangeable because, among other reasons, they all can easily be manufactured by any of the Defendants upon request.

11.      Along with resistors (a component having a ~~specifie~~specific amount of resistance to the ~~flow~~flow of an electrical current) and capacitors (a two-terminal electronic component that stores potential energy in the form of an electrical ~~field~~field), Inductors are viewed as part of the category of "passive electronic components."

12.      Along with capacitors and resistors, Inductors are one of the most common passive linear elements in electronic circuits and ~~thus~~ are ubiquitous in thousands of products that rely on electronic circuits for power. As explained in more detail below, Inductors are now found in a wide variety of electronic equipment, including: (a) smartphones, laptop and desktop computers, video game consoles, wireless LAN (Local Area Network) boxes, power supplies (*i.e.*, phone chargers), and other types of consumer electronic equipment; (b) televisions; (c) advanced driver assistance systems ("ADAS") used in vehicles; and (d)

induction motors that are used in industry to convert electrical energy into mechanical energy.

13.    5. In 2015, the global market for Inductors was estimated to be worth $2.599 billion. As explained below, the Defendants control over 75% of the global Inductor market, and during the Relevant Period controlled as high as 80% of the global Inductors market. The Defendants control roughly 75% of the global Inductor market, and during the Relevant Period controlled as high as 80% of the global Inductors market.

6. As alleged herein, the Defendants formed a cartel to fix and stabilize the prices for Inductors sold or shipped to the United States, its territories and the District of Columbia and world-wide. Defendants acted to stabilize prices of Inductors as a reaction to a series of shocks to the Inductors market that began in the late 1990s resulting from increased competition from Chinese, Korean and Taiwanese manufacturers. The global recession of 2001 exacerbated these effects, as demand for the consumer electronics goods plummeted.

7. The Defendants' cartel activity arose out of a need to protect profits of these Japan-based companies from the competition created by the entry in December of 1997 of twenty-nine nations (including Japan and the United States) into the Information Technology Agreement ("ITA"), which eliminated tariffs on world trade of various IT products, including Inductors. The situation worsened for Japan-based manufacturers in 2003, when China agreed to enter into the ITA. The need to stabilize prices

became especially prominent following the global recession in 2001, when sales of Inductors to North America dropped by 35%.

8. Despite these dramatic changes, prices for Inductors remained stubbornly high during the Relevant Period. This is because the Defendants exchanged competitively sensitive information, such as price and anticipated volume of sales, with their competitors for the purpose of reaching agreements to maintain artificially high prices.

9. The following chart, taken from Federal Reserve Economic Data ("FRED") maintained on a database by the Federal Reserve Bank of St. Louis, shows the effects of the Defendants'



conspiracy.[4]

10. The chart depicts a Price Index for imported Inductors (as well as related types of electronic equipment, such as transformers)[5] using the data from the year 2000 as a baseline. As can be seen, import

prices for Inductors started to plummet drastically in January of 1998 and reached a nadir by October of 2003, six months after China agreed to enter into the ITA. Thereafter, the import prices of Inductors increased radically, including two major price spikes in July of 2008 and April of 2009, the period of the worldwide recession. Import prices of Inductors climbed steadily, reaching a peak in August of 2014.

[4] https://fred.stlouisfed.org/series/IP8504 (last visited January 4, 2019).
[5] A transformer is a device that makes use of two coupled Inductors to increase or decrease voltage levels, so Inductors are significant components of transformers.

While prices have since declined slightly, they never returned to their pre-2003 levels, spiking

again in August of 2017.

11.Increased costs of raw materials do not explain the increases in the Import Price Index for Inductors.  The following chart depicts how the Raw Material Price Index for passive electronic components stabilized for much of the period between November of 2012 and January of 2016 and declined in the latter portion of that period to the point where it was below



its levels in 2012.[6]

12.Increases in demand do not explain the huge increases in the Import Price Index for Inductors. For example, analysts noted that in March of 2009, the global market for passive electronic components generally had declined by 18% compared to the previous year and that by March of 2010, demand for passive electronic components had declined by an additional 13%. As noted above, contrary to sliding Inductor demand in these years, the Import Price Index for Inductors spiked. In Japan, exports of passive components fell from 1,130,000 million yen in 2007 to 705,372 million yen in 2009, according to data available from MITI, the Japanese Ministry of International Trade & Industry.

13.While use of Inductors in smartphones and ADAS increased in the years that followed, the costs of manufacturing these products declined. For example, by 2015, Air Core Inductors (Inductors

<del>https://www.ttiine.com/content/ttiinc/en/resources/marketeye/categories/passives/me-zogbi-20160315.html (last visited January 4, 2019).</del>

<del>consisting of a coil wrapped around a ceramic core) occupied approximately 40% of the market and were much easier to manufacture than other types of Inductors. Yet the Import Price Index for Inductors in 2014-15 was at levels that vastly exceeded those of 2009-10.</del>

14. <del>The only plausible explanation for the discrepancy between higher or stabilized Inductor prices during times of decreasing global demand and decreasing manufacturing costs is conspiratorial activity.</del>Defendants' cartel was intended to, and did, fix, stabilize and inflate the prices for Inductors sold or imported to the United States, its territories and the District of Columbia and world-wide.

15. TDK is a leniency applicant with the United States Department of Justice ("DOJ"). In order to seek leniency from criminal prosecution, TDK was required to admit to a criminal violation of the antitrust laws.

16. TDK has admitted that it and other Defendants named in this Complaint took actions in furtherance of the conspiracy in the United States and fixed prices of Inductors sold in the United States.

17. Specifically, TDK's admitted anticompetitive activities involved information sharing and/or price-fixing agreements among at least the TDK, Murata, and Taiyo Yuden entities.

18. <del>15.The same opportunities to conspire that fostered this conspiracy also fostered opportunities for some of the same Defendants to collude in the market for capacitors. The United States Department of Justice ("DOJ")</del>Defendants Panasonic and Tokin also participated in a conspiracy to inflate the price of capacitors, another ubiquitous passive component. The DOJ obtained a series of guilty pleas with respect to <del>a</del>the capacitors

11

conspiracy that extended from as long as September of 1997 through January ~~of 2014.⁷ see conduct in question included~~

of 2014.[4] Resulting civil actions have culminated in a multidistrict litigation: *In re Capacitors Antitrust Litig.*, Case No. 3:17-md-02801-JD (N.D. Cal.).

19.  NEC Tokin (the predecessor of Tokin) pleaded guilty to participating in a global conspiratorial agreements to inflate the price of capacitors. Panasonic applied for amnesty from the DOJ in connection with agreements with its competitors to inflate the price of capacitors.

20.  Mr. Tomohide Date of NEC Tokin, who was indicted for his role in the capacitors conspiracy and is currently a fugitive, participated in and performed acts in furtherance of the Inductors conspiracy.

21.  The conduct involved in both the capacitors and Inductors conspiracies includes, *inter alia*: (a) face-to-face meetings at which agreements to ~~fix the~~fix prices ~~of capacitors~~ were reached; (b) collusive bidding to individual customers ~~who asked for pricing on capacitors~~; (c) exchanges and monitoring of price, sales, bid, supply, demand, shipping and production ~~of capacitors~~; and (d) acts of fraudulent concealment of the conspiracy. ~~The Honorable District Judge James Donato has rejected some of the fines with respect to corporate plea takers as being too low.~~

~~16.ee  DOJ's actions with respect to capacitors and its investigation into antitrust violations with respect to resistors, another passive electronics component, have led to the filing of two follow-on class action proceedings centralized before Judge Donato: *In re Capacitors Antitrust Litig.*, No. 14-3264 (N.D. Cal.) ("*Capacitors*"), and *In re Resistors Antitrust Litig.*, No. 15-3820 (N.D. Cal.) ("*Resistors*"). Defendant Panasonic Corporation is a defendant in both cases.~~

12

~~17.It has been publicly reported that Panasonic Corporation approached the DOJ and~~
~~sought leniency with respect to the conspiracy regarding capacitors. Both NEC Tokin (the~~
~~predecessor of Defendant Tokin Corporation) and Taiyo Yuden Co., Ltd. also acknowledged~~
~~publicly that they were~~

22.    The information exchanged among the conspirators in this case is remarkably
similar in manner and substance to the confidential information exchanged in the capacitors
conspiracy. For example, and as set forth in greater detail below, Defendants Sumida, Tokin,
Sagami, Taiyo Yuden, TDK, Toko, Panasonic, and Murata shared confidential information
about their future production estimates in writing.

23.    The image below, of a chart exchanged among the competitors in 2003, is just
one example of the type of spreadsheets that captured individual company estimates for
Inductor products in terms of units, money value of those units, and a percentage compared to
the previous year for the same period:

---

[4] [7]~~https~~https://www.justice.gov/opa/pr/seventh-company-agrees-plead-guilty-~~fixing~~fixing-
prices-electrolytic- capacitors (last visited January 4, 2019).

24.	The first eight lines are individual company estimates of future projections, while the four lines near the end of the chart represent an average of the reported estimate, the highest reported estimate, the lowest reported estimate, and another type of calculation that is an adjusted average, respectively. The last line represents results in 2002 to serve as a comparison to the 2003 and 2004 estimates.

25.	Similarly, the capacitors conspirators, including NEC Tokin, exchanged confidential information about future production estimates for aluminum and tantalum capacitors. The Inductors conspirators, who exchanged quantity and monetary value information and projections in addition to baseline percentages, often shared more confidential information in their exchanges than capacitors conspirators, several of which pleaded guilty to price-fixing.

26.	The information exchange above is merely exemplary of exchanges of confidential information that occurred throughout the conspiracy period. More examples of exchanges of confidential information among the Defendants are set forth below.

27.	An employee of Panasonic acknowledged in 2012 that the information exchanges such as the exemplar above would be considered a violation of Panasonic's antitrust compliance regulations.

28.     In addition to the capacitors conspiracy, DOJ's investigation into antitrust violations with respect to resistors, another passive electronics component, revealed a similar conspiracy involving some of the same conspirators.

~~cooperating with investigators with respect to the capacitors conspiracy. Taiyo Yuden Co., Ltd. is also a defendant in this case.~~

29.     ~~18.~~As was the case in the capacitors and resistors conspiracies, the conspiracy regarding Inductors was carried out, in part, under the auspices of the Japan Electronics & Information Technology Association ("JEITA"), which was formed in ~~2000. Each of the Japanese Defendants is an active member of JEITA. Through attendance at formal JEITA meetings and other meetings, as well as meetings of other trade associations described below, the Defendants exchanged competitively sensitive information and reached agreements, just as some defendants did in cartels concerning capacitors and resistors~~2000, and its associated committees and subcommittees.

~~19.On January 4, 2018, the legal media organization MLex first reported that certain Japanese companies received investigative subpoenas from a grand jury empaneled in the Northern District of California relating to an investigation of price-fixing activity in the Inductors market. Globally, the Inductors market was several billion dollars or more in each year of the Relevant Period. In the United States, hundreds of millions of dollars of Inductors were sold during the Relevant Period.~~

30.     Each of the Defendants is an active member of JEITA. Defendants took acts in furtherance of the conspiracy at both formal and informal "social" meetings of JEITA, both in the U.S. and abroad.

## II.   PARTIES

15

A.    ~~Plaintiff~~Plaintiff Flextronics International USA, Inc.

31.    ~~20.~~Flextronics International USA, Inc., is a California corporation with its principal place of business located at 6201 America Center Drive, San Jose, CA 95002. Flextronics International USA, Inc. and its ~~affiliates~~affiliates (collectively, "Flex") manufacture electronic products and other goods at locations around the world, including in the United States.

32.    ~~21.~~Flex directly purchased Inductors ~~for the purpose of manufacturing~~to manufacture electronic products for Flex's customers. Many of Flex's customers are United States-based ~~customers and by~~companies that sell their products in large part to United States end-users. Flex's products are sold for consumer, medical, automotive, aerospace, and defense applications, among others.

33.    ~~22.~~Flex purchased ~~more than~~ hundreds of millions of dollars ~~worth~~ of Inductors directly from the Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and ~~affiliates, or~~affiliates, and agents controlled by Defendants during the Relevant Period, and has ~~suffered~~suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

34.    ~~23.~~During the Relevant Period, Flex held frequent negotiations with certain Defendants ~~and their co-conspirators~~ on the price and volume of Inductors it purchased. ~~These negotiations began with Requests for Quotation ("RFQs") which were issued to the Defendants by Flex. Flex then~~Flex held negotiations via multiple methods, including face-to-face negotiations in the United States. Agreed-upon prices that resulted from the negotiation process were approved by Flex's executives in the United States.

35.    During the Relevant Period, Flex also purchased certain Inductors pursuant to prices negotiated by Flex's customers, including Flex's U.S. based customers. Defendants reached bid-

rigging agreements targeting the price paid by some of those Flex customers. Flex purchased Inductors at the artificially inflated prices.

36.  24. Flextronics International USA, Inc. is the designated assignee of the claims of its relevant affiliates affiliates, pursuant to an agreement whereby any of the antitrust claims described in this Complaint against the Defendants and their co-conspirators that are held by Flex affiliates affiliates are assigned to Flextronics International USA, Inc.

**B.    Ke The Murata Defendants**

37.  25. Defendant Murata Manufacturing Co., Ltd. ("Murata Manufacturing") is a Japanese corporation with its principal place of business located at 10-1, Higashikotari 1-chome, Nagaokakyo- shi, Kyoto 617-8555, Japan. Murata Manufacturing—directly and/or through its predecessors and subsidiaries, which it wholly owns and/or controls—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Relevant Period. For example, industry data shows that Murata Manufacturing had $15 million in sales of one type of Inductors (ceramic chip Inductors) in North America in 2007 alone. Murata Manufacturing is one of the largest global manufacturers of passive electronic components. Murata Manufacturing annually has revenues in excess of $5 billion from sales of passive electronic components, including Inductors.

38.  26. In March of 2014, Murata Manufacturing acquired a controlling interest in Defendant TOKO, Inc. ("TOKO Toko"), a Japanese company that was a leading Inductor manufacturer that sold hundreds of millions of dollars of Inductors in the United States, its territories and the District of Columbia during the Relevant Period. According to estimates from one industry expert, TOKO Toko had $47 million of sales of one type of Inductors (ceramic chip Inductors), in North America in 2007 alone. By April of 2015, Murata Manufacturing had assumed all aspects of TOKO Toko's business, including its assets, sales, service, and technical support for the portfolio of TOKO Toko products, including Inductors.

17

To the extent Murata Manufacturing assumed, in whole or in part, the assets and liabilities of ~~TOKO~~Toko, Flex intends to hold Murata Manufacturing liable for any violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1,~~3)~~ 3) by ~~TOKO~~Toko that occurred during the Relevant Period. Flex named Toko as a separate Defendant in this Complaint.

39.     ~~27.~~Defendant Murata Electronics North America, Inc. ("MENA") is a wholly owned subsidiary of Murata Manufacturing. MENA is a Texas corporation with its principal place of business located at 2200 Lake Park Drive SE, Smyrna, Georgia 30080-7604. MENA— directly and/or through its subsidiaries, which it wholly owned and/or controlled— manufactured, marketed, and/or sold Inductors that were purchased throughout the United States, its territories and the District of Columbia during the Relevant Period.

40.     ~~28.~~Murata Power Solutions, Inc. ("Murata Power") is a wholly owned subsidiary of Murata Manufacturing that was created in 2007 when Murata Manufacturing acquired a division of C&D Technologies, a United States company with its headquarters in Pennsylvania. Murata Power has its headquarters at 129 Flanders Road, Westborough MA, 01581. Murata Power sells Inductors to customers located in the United States. Murata Power had $5 million of sales of Inductors in the United States in 2007.

41.     ~~29.~~Murata Manufacturing also operates Murata Americas RF Product Department ("Murata RF") in the United States, with ~~offices~~offices in Carrollton, Texas and Duluth, Georgia.

42.     Defendant Toko (now known as Saitama Murata Manufacturing Co., Ltd. ("Saitama Murata")) was once an independent company that had substantial market share in sales of Inductors. Toko's headquarters are at 18, Gomigaya, Tsurugashima-shi, Saitama, 350-2281, Japan. As alleged in greater detail below, Toko—both before and after its acquisition by Murata Manufacturing—attended meetings of competitors and participated in

anticompetitive activity with Defendants. The current Toko entity is a subsidiary of Murata Manufacturing. Toko continues to manufacture and perform research and development for Inductors under the direction of Murata Manufacturing. In 2019, Toko was renamed Saitama Murata.

43.    30.Defendants Murata Manufacturing, MENA, and Murata Power, and Toko (now known as Saitama Murata) will be referred to collectively herein as "Murata" or the "Murata Defendants."

C.    KeThe Panasonic Defendants

44.    31.Defendant Panasonic Corporation ("Panasonic Corporation") is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Panasonic Corporation—directly and/or through its predecessors and subsidiaries, which it

wholly owns and/or controls—manufactured, marketed, and/or sold Inductors and products containing Inductors in the United States, its territories and the District of Columbia during the Relevant Period. Panasonic Electronic Devices Co. Ltd. ("PED") was a former Japanese subsidiary of Panasonic Corporation that was a leading manufacturer of Inductors. It was founded in 1982 and was headquartered in Knoxville, Tennessee. PED had substantial sales of Inductors in the United States, its territories and the District of Columbia during the Relevant Period. For example, industry data shows that in 2007, PED sold $10 million worth of one type of Inductors (ceramic chip inductorsInductors) in North America. In August of 2011, Panasonic Corporation announced that it was dissolving and absorbing PED in April of 2012. Panasonic Corporation is responsible for the acts of its wholly owned and controlled subsidiary PED, and Flex will seek to hold Panasonic Corporation liable for any violations of Section 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3) by PED that occurred during the

Relevant Period.

45.   32 Panasonic Corporation of North America ("PCNA") was founded in 1959 and operated in the United States under the name "Matsushita Electric Corporation of America" until 2005. PCNA is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102. PCNA was, throughout the Relevant Period, a wholly owned subsidiary of Panasonic Corporation. On December 22, 2016, PCNA became a subsidiary of Panasonic Holding (Netherlands) B.V. Investment ("Panasonic Holding"), which is wholly owned by Panasonic Corporation. According to Panasonic Corporation's Annual Report for the fiscal fiscal year ending March 31, 2017, Panasonic Holding is one of Panasonic Corporation's major consolidated subsidiaries and owns 100 percent of the voting rights in PCNA. Panasonic Consumer Electronics Company ("PCEC") is a division of PCNA, and Panasonic Broadcast and Television Systems Company is a unit of PCNA. During the Relevant Period, PCNA— either directly or through its business units, subsidiaries, agents, or affiliates affiliates, which it wholly owned and/or controlled— sold and distributed Inductors to purchasers in the United States, its territories and the District of Columbia. ese These included Inductors manufactured by business units, subsidiaries, agents, or affiliates affiliates of its corporate parent, Panasonic Corporation. Also, during the Relevant Period, PCNA—either directly or through its business units, subsidiaries, agents, or affiliates affiliates—sold and distributed to purchasers in the United States, its territories and the District of

Columbia products containing Inductors manufactured by Panasonic Corporation or its business units, subsidiaries, agents, or affiliates, ese affiliates. These included such items as televisions, stereo equipment, Blu- Ray/DVD players, and cameras/camcorders. e The Inductors contained in these products are identifiable identifiable by part number in the records

20

of Panasonic entities and can be traced either to an entity owned or controlled by Panasonic Corporation or an entity owned or controlled by one of the other Defendants.

46      33.Defendant Panasonic Industrial Devices Corporation of America ("Panasonic Industrial"), a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, 7th Floor, Newark, New Jersey 07102. On or about January 12, 2012, PED changed its name to Panasonic Industrial. Panasonic Industrial sold Inductors and products containing Inductors manufactured by Panasonic Corporation or its business units, subsidiaries, agents, or affiliates affiliates, which it wholly owned and/or controlled, to purchasers in the United States, its territories and the District of Columbia during the Relevant Period.

47      34.Defendants Panasonic Corporation, PED, Panasonic Industrial, and PCNA are hereinafter referred to as "Panasonic" or the "Panasonic Defendants."

**D.    KeThe Sagami Defendants**

48      35.Defendant Sagami Elec Co., Ltd. ("Sagami Japan") is a Japanese company that has its principal place of business at 10-30, Ichibashimo-Cho, Tsurumi-ku, Yokohama Kanagawa 230-0024, Japan. Sagami Japan—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Relevant Period.

49      36.Defendant Sagami America Ltd. ("Sagami America") is a wholly owned subsidiary of Sagami Japan. Sagami America has its principal place of business at 1854 South Elmhurst Road, Mt. Prospect, Illinois 60056. On its website, Sagami Japan lists Sagami America as part of its "Global

Network."[85] Sagami Japan manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Relevant Period.

21

<u>5 8</u>http://www.sagami-elec.co.jp/en/company/network.php (last visited January 4, 2019).

50.    37.Defendants Sagami Japan and Sagami America are hereinafter referred to as "Sagami" or the "Sagami Defendants."

E.    KeThe Sumida Defendants

51.    38.Defendant Sumida Corporation ("Sumida Corporation") is a Japanese corporation with its principal place of business at Harumi Island Triton Square OfficeOffice Tower X 14/F, 1-8-10 Harumi, Chuo- Ku, Tokyo 104-8547, Japan. Sumida Corporation— directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Relevant Period.

52.    39.Defendant Sumida Electric Co. Ltd. ("Sumida Electric") is a Japanese corporation with its principal place of business located at 3-6, 3-Chome, Ningyo-cho, Nihonbashi, Chuo-ku, Tokyo 103- 8589, Japan. Sumida Electric—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Relevant Period. For example, in 2007, Sumida Electric sold $27 million of one type of Inductors (ceramic chip Inductors) in North America, according

to industry data. Sumida Electric is wholly owned by Sumida Corporation, as

~~reflected~~reflected in the following graphic taken from its website:[96]



23



53.   40. Defendant Sumida America Components Inc. ("Sumida America") is a Delaware corporation with its headquarters at 1251 N Plum Grove Road, Suite 150, Schaumburg, Illinois 60173. It is a wholly owned subsidiary of Sumida Corporation. Sumida America maintains ~~offices~~offices in this District, at 1885 Lundy Avenue, Suite 250, San Jose, California 95131. During the Relevant Period, Sumida America—either directly or through its business units, subsidiaries, agents, or ~~affilintes~~affiliates, which it wholly owned and/or controlled—sold and distributed Inductors manufactured by its business units, subsidiaries, agents, or ~~affiliates~~affiliates or by Sumida Corporation to purchasers in the United States, its

⁶ https://www.sumida.com/about/index.php?categoryId=5&parentId=9&aboutId=9 (last visited January 4, 2019).

territories and the District of Columbia. As seen in the foregoing graphic, Sumida America is wholly owned by Sumida Corporation.

54      41.Defendant Sumida Corporation exerts complete control over the activities of both Sumida Electric and Sumida America, as reflectedreflected in the following "Management Organization Chart of Sumida Group" from its website:107



55      42.e.The webpage containing this graphic explains:

e.The "Management Organization Chart" is to show the company hierarchy on formal reporting channel, chain of command and authority within Sumida Group in day-to-day operation and also in the decision and policy making process. SUMIDA CORPORATION ("Sumida") is a pure holding company and has been [sic] adopted the Company with Committee System. All three

statutory committees (Nomination Committee, Audit Committee and Compensation Committee) are composed of external directors. Executive ~~Officers~~Officers are responsible for the business execution, and the Board of Directors is specialized in the business supervision in Sumida; thus business execution and

[2] *Id.*

supervision function is expressly separated in Sumida. Risk Management Committee is specialized in risk management in Sumida.[18]

[10] *~~Id.~~*

[11] *~~Id.~~*

56.    ~~43.~~Defendants Sumida Corporation, Sumida Electric and Sumida America are hereinafter referred to as "Sumida" or the "Sumida Defendants."

F.    ~~Ke~~The Taiyo Yuden Defendants

57.    ~~44.~~Defendant Taiyo Yuden Co., Ltd. ("Taiyo Yuden Co.") is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan. Taiyo Yuden Co.— directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled— manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Relevant Period. In its 2017 Annual Report, Taiyo Yuden Co. estimated that it sold 41.273 billion yen worth of Inductors.

58.    ~~45.~~Defendant Taiyo Yuden (U.S.A.) Inc. ("Taiyo Yuden USA"), an Illinois corporation, is a wholly owned subsidiary of Taiyo Yuden Co., with its principal place of business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. During the Relevant Period, Taiyo Yuden USA— either directly or through its business units, subsidiaries, agents, or ~~affiliates~~affiliates, which it wholly owned and/or controlled—sold and

distributed to purchasers in the United States, its territories and the District of Columbia Inductors manufactured by business units, subsidiaries, agents, or ~~affiliates~~affiliates of its corporate parent, Taiyo Yuden Co.

59.        46.Based on information and belief, Defendant Taiyo Yuden Co. exerts control over Taiyo Yuden USA. Corporate policies are set by the parent company and govern the activities of the United States subsidiary, as depicted in the following chart taken from Taiyo Yuden Co.'s website:

8 *Id.*





60.   47.Defendants Taiyo Yuden Co. and Taiyo Yuden USA are collectively referred to herein as "Taiyo Yuden" or the "Taiyo Yuden Defendants."

G.   Ke The TDK Defendants

61.   48.Defendant TDK Corporation is a Japanese corporation with its principal place of business at 13-1 Nihonbashi 1-chrome, Chuo-ku, Tokyo 103-8272, Japan. TDK Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled— manufactured, marketed, and/or sold Inductors in the United States, its territories and the District of Columbia during the Relevant Period.

62.   49.Defendant TDK-EPC Corporation ("TDK-EPC") is a Japanese corporation with its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108- 0023, Japan. TDK-EPC was founded on October 1, 2009 from the combination of the passive components businesses of TDK Corporation and non-party EPCOS AG, a German corporation. TDK- EPC—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold

28

Inductors in the United States, its territories and the District of Columbia during the Relevant Period. More ~~specifically~~specifically, TDK-EPC itself develops and

manufactures Inductors, which are sold by the TDK Defendants under the TDK and EPCOS brands.[129] TDK-EPC is a wholly owned subsidiary of the TDK Corporation.

63.    ~~50.~~Defendant TDK U.S.A. Corporation ("TDK USA"), a New York corporation, is a wholly owned subsidiary of TDK Corporation with its principal place of business located at 525 RXR Plaza, Uniondale, New York 11556. TDK USA describes itself as a "group company of TDK Corporation." During the Relevant Period, TDK USA—either directly or through its business units, subsidiaries, agents, or ~~affiliates~~affiliates—sold and distributed Inductors manufactured by business units, subsidiaries, agents, or ~~affiliates~~affiliates of its corporate parents, TDK Corporation and TDK-EPC to purchasers in the United States, its territories and the District of Columbia.

64.    ~~51.~~Defendant TDK Corporation of America ("TDK America") is a wholly owned subsidiary of TDK Corporation with its principal place of business at 475 Half Day Road, Suite 300, Lincolnshire, Illinois 60069. Like TDK USA, TDK America describes itself as a "group company of TDK Corporation." TDK America sold and distributed Inductors manufactured by business units, subsidiaries, agents, or ~~affiliates~~affiliates of its corporate parent, TDK Corporation, to purchasers in the United States, its territories and the District of Columbia.

65.    ~~52.e~~eThe TDK Defendants were the largest manufacturers of Inductors during the Relevant Period. For example, in 2007 TDK sold \$57 million of one type of Inductors, ceramic chip ~~inductors~~Inductors in North America, more than any other manufacturer according to one industry expert. Following the 2009 combination, TDK began to sell TDK and EPCOS-branded Inductors, and does so to this day.

66      53.TDK Corporation owns and controls both TDK USA and TDK America, as reflectedreflected in the following graphic of the "TDK Organization" taken from TDK Corporation's website:1310

---

9 12httpshttps://www.global.tdk.com/corp/en/news_centercenter/press/aah34500.htm (last visited January 4, 2019).

10 13httpshttps://www.global.tdk.com/corp/en/about_tdk/tdk_organizationorganization/index .htm (last visited January 4, 2019).



67.   54.TDK Corporation, TDK America, TDK-EPC, and TDK USA are collectively referred to as "TDK" or the "TDK Defendants."

**H.** **~~Ke~~The Tokin Defendants**

68. ~~55.~~Defendant Tokin Corporation is a Japanese company with its principal place of business at 8-1, Nishi-Kanda 3-chome, Chiyoda-Ku, Tokyo 101-8362, Japan. Tokin Corporation was established in 1938 as Tohuku Metal Industries Company, which changed its name to "Tokin Corporation" in 1988. In 2002, that entity integrated with the electronic components business of NEC Corporation ("NEC") to become NEC Tokin Corporation ("NEC Tokin"). In February of 2013, Kemet Corporation ("Kemet") acquired an interest in NEC Tokin. By February of 2017, Kemet owned 34% of the shares of NEC Tokin and 51% of the voting rights, while NEC held 66% of the shares and 49% of the voting rights. On February 24, 2017, it was announced that NEC had sold its remaining interest in NEC Tokin to Kemet. Tokin Corporation resumed using the name "Tokin Corporation" on April 10, 2017.

69. ~~56.~~Defendant Tokin Corporation is now a separately incorporated subsidiary of Kemet. It is clear that Tokin now operates as the successor in interest to NEC Tokin. It continues to manufacture and sell Inductors, just as NEC Tokin did. Tokin Corporation also takes full responsibility for past antitrust violations by NEC Tokin. On its current website, Tokin Corporation has posted a letter of apology dated March 29, 2016 by Shigenori Oyama (then Representative Director and President of NEC Tokin and now President of Tokin Corporation) for a cease and desist order issued by the Japan

Fair Trade Commission ("JFTC") against it and others for the price-~~fixing~~fixing of certain capacitors.[14][11] In that letter, Mr. Oyama promised that the "entire company will work together to reinforce our compliance regime so that the same event will never happen again in the future. I sincerely apologize for causing such big trouble and concern to our customers, suppliers, and all concerned due to the orders at this time."

70. ~~57.~~NEC Tokin also pled guilty to price-~~fixing~~fixing of capacitors in United

States federal court in January of 2016 and paid a $13.8 million ~~fine.¹⁴~~ fine.[12]

---

[11] ~~¹¹~~ ~~https~~https://www.tokin.com/~~english/files~~english/files/Capacitor20160331e.pdf (last visited January 4, 2019). ~~ee~~
The JFTC's order can be found here: https://www.jftc.go.jp/en/pressreleases/yearly-2016/March/160329_~~files~~files/160329_1.pdf (last visited January 4, 2019).
[12] ~~¹⁵~~*See* ECF No. 9-~~1 in~~1, *United States v. NEC Tokin Corp.*, ~~Case~~ No. 4:15-cr-00426-JD (N.D. Cal.).

---

71.    ~~58.~~During the Relevant Period, Tokin Corporation (then operating as NEC Tokin) sold and distributed Inductors manufactured by it either directly or through its business units, subsidiaries, agents or ~~affiliates~~affiliates, which it wholly owned and/or controlled, to purchasers in the United States, its territories and the District of Columbia.

72.    ~~59.~~Defendant Tokin America Inc. ("Tokin America") is a company headquartered in San Jose, California and is a wholly owned subsidiary of Tokin Corporation. Tokin America is the successor to NEC Tokin America Inc. and occupies an ~~office~~office at the same address in San Jose utilized by that predecessor entity. In the United States, its territories and the District of Columbia, Tokin America sells Inductors made by Tokin Corporation. Tokin America is referred to as part of Tokin Corporation's

"Overseas Network" and one of its "Overseas ~~Offices~~Offices and Subsidiaries."[13]

73.    ~~60.~~Defendants Tokin Corporation and Tokin America are collectively referred to as "Tokin."

### I.    Agents and Co-Conspirators

74.    ~~61.~~Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

75.    ~~62.~~When Flex refers to a corporate family or companies by a single name in

their allegations of participation in the conspiracy, it is to be understood that Flex is alleging that one or more ~~employee~~employees or ~~agent~~agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate ~~affiliation~~affiliation of their counterparts, nor did they distinguish among the entities within a corporate family. ~~e~~eThe individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed products containing Inductors, these ~~subsidiaries played a significant~~

---

[13] ~~14~~ ~~https~~https://www.tokin.com/~~english~~english/contact/otoi.html#a (last visited January 4, 2019).

---

subsidiaries played a significant role in the alleged conspiracy ~~because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. eus,~~ Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

### III.   JURISDICTION AND VENUE

76.   ~~63.~~Flex brings this action under Sections 4 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Flex has ~~suffered~~suffered from the Defendants' violations of Section 1 of the Sherman Act, 15

U.S.C. § 1.

77.    64. ←isThis Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

78.    65.Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C.

§ 1391(b), (c) and (d) because, during the Relevant Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affectedaffected interstate trade and commerce discussed below has been carried out in this District.

79.    66. ←isThis Court has personal jurisdiction over each Defendant, because each Defendant: transacted business throughout the United States, including in this District; sold Inductors throughout the United States, including in this District; had substantial contacts with the United States, including in this District; or committed overt acts in furtherance of their illegal scheme and price-fixingfixing conspiracy in the United States. In addition, the conspiracy was directed at, and had the intended effecteffect of, causing injury to persons – including Flex – residing in, located in, or doing business throughout the United States, including in this District.

80.    67.eeThe Defendants purposefully and knowingly directed the conspiracy alleged herein toward U.S. markets. Each Defendant coordinated prices for Inductors shipped to the U.S. and elsewhere. Each Defendant sold Inductors abroadin the U.S. and elsewhere for inclusion in products shipped to the U.S. and coordinated prices abroad for products shipped toand within the U.S. Each Defendant also maintained U.S. subsidiaries throughout the Relevant Period through which it marketed and sold Inductors to U.S. purchasers.

81.    68.Based on information and belief, the Defendants colluded with each other to coordinate their behavior in U.S. markets and directed their conspiracy at U.S. markets.

## IV.  TRADE AND COMMERCE

82.    During the Relevant Period, the Defendants collectively controlled the vast majority of the market for Inductors, both globally and in the United States, as further described below.

83.    The Defendants sold Inductors (or products containing Inductors) directly to customers located in the United States, including Flex. Substantial quantities of Inductors are shipped from outside the United States into the United States in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

84.    In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors and related products sold by the Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of Inductors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

85.    The Defendants' conduct both within and outside the United States caused direct, substantial, and reasonably foreseeable anticompetitive effects upon interstate and import commerce within the United States.

86.    Defendants manufactured certain Inductors outside the United States that were sold to Flex for inclusion into finished products sent to the United States. Defendants also manufactured certain Inductors outside the U.S. that were sold within the United States. Defendants' sales in the U.S. and elsewhere constitute domestic or import commerce.

87.    Through the unlawful activities alleged herein, Defendants substantially and foreseeably affected commerce throughout the United States, causing injury to Flex. Defendants—directly and through their respective parents, subsidiaries, business units, agents, affiliates, successors, and predecessors— knowingly and intentionally engaged in a conspiracy to fix, raise, maintain and/or stabilize

36

prices in the United States and elsewhere for Inductors that were included in ~~finished~~finished products imported to the U.S. ~~at~~ That conspiracy unreasonably restrained import trade and ~~artificially inflated~~commerce by artificially inflating the prices for Inductors ~~and for~~sold in or imported into the United States and for Inductors sold for incorporation into manufactured products ~~incorporating Inductors~~sold in or imported into the United States.

88. ~~75.~~Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable anticompetitive ~~effects~~effects upon interstate commerce within the United States.

89. ~~76.Specifically~~Specifically, Defendants marketed, sold, or distributed Inductors to be shipped or billed to customers, including Flex, in the U.S. Such sales constitute domestic ~~or~~and import commerce.

90. ~~77.~~ ~~ee~~The Defendants knew or should have known, from sales and billing records, direct communications with Flex, customer negotiations, and market research that a ~~significant~~significant portion of the Inductors sold or distributed to Flex would be incorporated into products manufactured by Flex for Flex's U.S. purchasers and/or shipped to the ~~U.S. A significant~~United States.

91. A significant number of Inductors Flex purchased from Defendants abroad were incorporated into products intended for and shipped to the United States. For example, Flex purchased Inductors from Defendants, including Murata, Taiyo Yuden, and TDK, for incorporation into Dell products some of which were shipped to and sold in the United States.

92. ~~78.~~Defendants knew or should have known that the practical upshot of the alleged conspiracy would be to increase the price of Inductors that Flex purchased for its U.S.-based customers like Dell. ~~ee~~The Defendants' anticompetitive conduct also caused purchasers in the United States to pay supra-competitive prices for manufactured products that

incorporated Inductors that Flex ~~had~~ purchased from the Defendants.

93.   ~~79.Upon information and belief,~~ Defendants and their co-conspirators ~~specifically~~specifically targeted Flex U.S. imports and the price of Inductors purchased by Flex for manufacture into products sold in the U.S.

94.   ~~80.e~~eThe conspiracy alleged herein had a substantial, direct, and reasonably foreseeable ~~effect~~effect on U.S. commerce because it ~~inflated~~inflated the price of Inductors incorporated into manufactured goods sold into the U.S. and ~~inflated~~inflated prices at which Flex's U.S. management authorized Flex, including ~~Flextronics Affiliates~~Flex Affiliates abroad, to purchase Inductors.

95.   ~~81.~~Inductors sold overseas directly to Flex and imported into the United States similarly have a substantial, direct, and reasonably foreseeable ~~effect~~effect on U.S. import commerce.

96.   <u>Defendants' conduct involved import commerce. Defendants reached agreements targeting U.S. purchasers, discussed the U.S. market at conspiratorial meetings, and met with Flex representatives in the United States.</u>

97.   ~~82.~~To the extent any sales of Defendants' Inductors to Flex do not constitute domestic or import commerce, the Defendants' unlawful activities with respect to those sales had a direct, substantial, and reasonably foreseeable ~~effect~~effect on U.S. commerce that gives rise to the claims asserted herein. ~~e~~eThe Defendants' anticompetitive conduct described herein directly, foreseeably, and substantially ~~inflated~~inflated prices at which Flex's management in the United States authorized Flex ~~affiliates~~affiliates outside the United States to purchase Inductors. Defendants' and co-conspirators' ~~conduct~~conduct gave rise to a claim by Flex ~~affiliates~~affiliates outside the U.S. when those ~~affiliates~~affiliates purchased Inductors at prices ~~artificially inflated~~artificially inflated by the alleged conspiracy.

98.    83. ⊖e The anticompetitive conduct described herein, and its substantial and foreseeable ~~effect~~effect on U.S. commerce, proximately caused antitrust injury to Flex, including to its foreign ~~affiliates.  ⊖e~~affiliates. The resulting injuries to Flex amounted to tens of millions of dollars or more. As the natural and predictable consequences of Defendants' anticompetitive conduct, Defendants reasonably anticipated these injuries to Flex.

A.    **~~Ke~~The Defendants' Conduct Involved Import Trade or Import Commerce and Had a Direct, Substantial and Reasonably Foreseeable ~~Effect~~Effect on U.S. Domestic and Import Trade or Commerce that Gave Rise to Flex's Antitrust Claims**

99.    84. ⊖e The Defendants' illegal conduct involved United States import trade or import commerce. ⊖e The Defendants knowingly and intentionally sent price-~~fixed~~fixed Inductors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-~~fixed~~fixed Inductors to enter the United States market and ~~inflating~~inflating the prices of Inductors destined for the United States. Such conduct was meant to produce and did in fact produce a substantial ~~effect~~effect in the United States ~~in the form of higher prices~~.

100.    85. According to one leading analyst, the Inductors market in the United States "was an estimated $280 MM in FY 2018 or 10% of global consumption value." ⊖is This is an increase from $225

million for FY 2016. Demand from private industry (such as smartphone and automobile makers) is fueling this growth.

101.    86. ⊖e The Defendants recognize the importance of sales of Inductors in the United States in their annual reports and other ~~financial~~financial reports. ⊖at That is why they created and invested in entities like MENA, Murata Power, Murata RF, Taiyo Yuden USA, Sagami America, Tokin America, Sumida America, PCNA, TDK America, and TDK USA.

~~e~~The websites of those entities boast about their respective sales networks in the United States.

102.    ~~87. To give one~~For example, MENA's website states that "[w]e serve as the regional and functional headquarters supporting our customers' engineering and procurement activities throughout the Americas. Along with experienced teams of Technical Sales Managers located in several major hubs, including Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo and Boston, we utilize a network of Sales Representatives and Authorized Distributors to service our customers'

requirements for sales and technical support, design expertise, logistics and supply chain initiatives."[17][14]

103.    ~~88.~~Taiyo Yuden's website similarly lists a ~~headquarter~~headquarters for Taiyo Yuden USA in Chicago

and "sales ~~offices~~offices" in Chicago, San Diego, San Jose, Dallas, and Boston.[18][15] Taiyo Yuden USA assisted its corporate parent in marketing and selling Inductors, issuing press releases and disseminating product guides.

104.    ~~89.~~As a third example, TDK America's website states that "TDK Corporation of America (TCA), a group company of TDK Corporation, was established in 1974 in California as the sales and marketing force for electronic components in North America and Latin America. TCA has grown into a sales force of ~~fifteen offices~~fifteen offices in the U.S. and a headquarter ~~office~~office located in Lincolnshire, Illinois. ~~e~~The combined efforts of sales, marketing and technical personnel have built the TDK name as a respected leader in the industry."[16]

[14] [17]~~https~~https://www.murata.com/~~en~~en-us/about/company/muratalocations/americas/mea (last visited January 4, 2019).

[15] [18]~~https~~https://www.yuden.co.jp/ut/company/overseas/ (last visited January 4, 2019).

[16] http://www.component.tdk.com/about-us.php (last visited January 4, 2019).

combined efforts of sales, marketing and technical personnel have built the TDK name as a respected leader in the industry."[19]

105.   90.Murata, Sumida, Sagami, Tokin, and Panasonic likewise tout their worldwide sales networks, which include the United States.

106.   91.ceThe Defendants and others shipped millions of Inductors (and/or products containing Inductors) into the United States during the Relevant Period. In addition, Inductors that were shipped to countries such as Mexico, Taiwan, China, and Canada were billed to United States companies. As a result, a substantial portion of the Defendants' revenues were derived from the United States market. Defendants spent millions of dollars on advertising their products in the United States.

107.   92.Because of the importance of the United States market to the Defendants and their co- conspirators, Inductors intended for importation into and ultimate consumption in the United States were a focus of the Defendants' illegal conduct. ceThe Defendants knowingly and intentionally sent price-fixed fixed Inductors (and/or products containing price fixed Inductors) into a stream of commerce that led directly into the United States. eisThis conduct by the Defendants was meant to produce and did in fact produce a substantial effecteffect in the United States in the form of artificially inflated prices for Inductors.

108.   93.eusThus, when high-level executives within the Defendants' companies agreed on prices for Inductors, they knew that their price-fixedfixed Inductors would be sold in the United States. They also knew Inductors sold abroad would be incorporated into products sold in the United States.

109.   94.For the reasons set forth above, the Defendants' illegal conduct involved import trade or import commerce into the United States.

110.   95.ceThe Defendants' illegal conduct had a direct, substantial, and reasonably

41

foreseeable ~~effect~~effect on United States domestic and import trade or commerce in the form of higher prices for Inductors that Flex and other U.S. purchasers paid. ~~These~~These prices, tainted by collusion, directly and immediately impacted Flex in the United States. In this respect, the United States ~~effects~~effects of the Defendants' illegal conduct gave rise to Flex's antitrust claims and were the proximate cause of the injury that Flex ~~suffered~~suffered.

~~¹⁹http://www.component.tdk.com/about-us.php (last visited January 4, 2019).~~

~~96.A number of facts demonstrate that the Defendants' price-fixing conspiracy had a direct, substantial and reasonably foreseeable effect on domestic commerce.~~

B.    ~~Ke~~**The Defendants Targeted the United States**

111.    ~~97.~~Because of the relatively small size of Inductors, transportation costs are relatively minor and there is substantial international trade in these electronic components.

112.    ~~98.~~During the Relevant Period, the Defendants manufactured and sold substantial quantities of Inductors shipped from outside the United States, its territories, and the District of Columbia in a

continuous and uninterrupted ~~flow~~flow of interstate and foreign trade and commerce. In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors and related products sold by the Defendants, traveled in interstate and foreign trade and commerce. ~~e~~The business activities of the Defendants in connection with the production and sale of Inductors were within the ~~flow~~flow of, and ~~affected~~affected substantially, interstate and foreign trade and commerce.

113.    ~~99.~~During the Relevant Period, the Defendants also manufactured and sold ~~manufactured~~ products in the United States, its territories, and the District of Columbia that incorporated Inductors made by the Defendants. ~~e~~The Defendants also sold substantial

quantities of these products overseas to direct purchasers for importation to the United States, its territories, and the District of Columbia. ~~ee~~The business activities of the Defendants in connection with the production and sale of products containing their Inductors were within the ~~flow~~flow of, and ~~affected~~affected substantially, interstate and foreign trade and commerce. ~~e~~ ~~paragraphs below detail some specific examples of this.~~

114.    ~~100.~~Murata's connections to the United States, its territories, and the District of Columbia are deep and sustained. "In 1971, General Motors (GM) introduced Murata's ceramic ~~filters~~filters to its car radios. ~~eis~~This was the result of ~~efforts~~efforts by Akira Murata, the founder of Murata Manufacturing who traveled to the United States and aggressively pioneered the market. Getting fully involved with the automobile industry was Murata's big dream then. Over 40 years ago, we built a plant in the United States and started production locally. Ceramic resonators were introduced to the automobile industry

about 25 years ago, and their market continues to enjoy steady sales to this day."[~~20~~17]

115.    ~~101.~~On September 3, 2007, Murata announced that it had completed the acquisition of the Power Electronics Division of C&D Technologies ("C&D"), a United States company located in Pennsylvania, for $85 million in cash. After the acquisition, Murata operated C&D's business as "Murata Power Solutions" in the United States and sold Inductors in the United States, its territories, and the District of Columbia that were once ~~offered~~offered by C&D.

[17] https://www.murata.com/en-us/about/newsroom/techmag/metamorphosis17/frontline (last visited January 4, 2019).

116.    ~~102.~~In 2010, 2011, and 2012, Murata received a Preferred Quality Supplier ("PQS") award

from Intel Corporation ("Intel") based in part on its sales of Inductors.[~~11~~18] In 2013, Murata

received a Supplier Continuous Quality Improvement ("SCQI") award from Intel, which is "Intel's highest honor

for its suppliers," based in part on its sales of Inductors.[21][19] In a press release, Tsuneo Murata, President of Murata Manufacturing, said "[w]e would like to express our sincere appreciation to Intel for its tremendous support and assistance to achieve this award. We are committed to make every efforteffort to

meet and exceed Intel's expectation in 2014."[23][20]

117.     As explained below, Murata had also qualified as a supplier of Inductors to Apple, Inc. ("Apple").

118.     As also explained below, Murata engaged in numerous conspiratorial acts relating to Inductors within the United States.

119.     103.Murata has sales representatives across the United States, including in Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo (Indiana), and Boston.

120.     104.Panasonic is a household brand and has been conducting business continually in the United States since at least the 1960s. *See, e.g., Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F.

---

[20] https://www.murata.com/en-us/about/newsroom/techmag/metamorphosis17/frontline (last visited January 4, 2019).

[21] https://www.murata.com/en-us/about/newsroom/news/company/general/2011/0426; https://www.murata.com/en-us/about/newsroom/news/company/general/2012/0412; and https://www.murata.com/en-us/about/newsroom/news/company/general/2013/0410b (last visited January 4, 2019).

[22] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411 (last visited January 4, 2019).

[23] *Id.* Supp. 262, 310 (E.D. Pa. 1975). Panasonic has an English language active website that allows potential customers to contact Panasonic's Japanese sales personnel directly about sales inquiries for Inductors.[24][21]

121.     105.Sagami has had a substantial presence in the United States, its territories,

44

and the District

of Columbia for over twenty years. It opened Sagami America in 1995, and sells directly to distributors

[18] https://www.murata.com/en-us/about/newsroom/news/company/general/2011/0426; https://www.murata.com/en-us/about/newsroom/news/company/general/2012/0412; and https://www.murata.com/en-us/about/newsroom/news/company/general/2013/0410b (last visited January 4, 2019).

[19] https://www.murata.com/en-us/about/newsroom/news/company/general/2014/0411 (last visited January 4, 2019).

[20] *Id.*

[21] https://industrial.panasonic.com/cuif/ww/contact-us?field_contact_group=2304&field_contact__lineup=1392 (last visited January 4, 2019).

and other customers in the United States. For example, Sagami's Inductors are ~~offered~~offered for sale by United States based distributors on their websites.

122.   ~~106.~~Sumida also targeted markets in the United States, its territories, and the District of Columbia. Sumida's quarterly ~~financial~~financial reports report conditions and developments by United States companies such as T-Mobile, and regularly includes reports on business conditions in the United States.

123   ~~107.~~Sumida's   English   language   website   ~~identifies~~identifies   sales representatives for its products in Alabama, Arizona, California, Florida, Illinois, Indiana, Massachusetts, Michigan, New Jersey, New York, Oregon, San Jose, Texas, Washington, and Wisconsin.[~~25~~22]

[~~25~~]~~https://www.sumida.com/about/index.php?categoryId=20&parentId=96&aboutId=99#Southern%20California (last visited January 4, 2019).~~

A. https://www.yuden.co.jp/ut/news/release/pdf_25.pdf (last visited January 4, 2019). ~~e is arrangement continued during the period when Kemet had a financial and ownership stake in NEC Tokin.~~

Case 5:19-cv-00078-EJD   Document 96-1   Filed 01/15/20   Page 49 of 139

124. 108. Taiyo Yuden has focused on markets in the United States, its territories, and the District

of Columbia, on its own and through its relationships with other United States passive electronic components manufacturers, and has customers in the United States, its territories, and the District of Columbia. In 2005, Taiyo Yuden announced that it would sell Inductors in connection with Kemet, through a "comprehensive sales alliance agreement" "to engage in mutual sales of each other's entire

product lines."[26][23] According to Taiyo Yuden, "Taiyo Yuden and Kemet have built up a cooperative relationship

[24] https://industrial.panasonic.com/cuif/ww/contact-us?field_contact_group=2304&field_contact_lineup=1392 (last visited January 4, 2019). since 1997, when the two companies began regular information exchanges on the product technology side. Now the relationship is to be strengthened even more through a comprehensive sales alliance."[27][24]

[25] 109. In April of 2011, Intel gave Taiyo Yuden a PQS award, reflecting reflecting Taiyo Yuden's substantial efforts efforts to sell their products, including Inductors, to U.S. companies. Taiyo Yuden President Yoshiro Kanzaki stated "we shall continue to do our utmost to provide quality advanced products and shall approach our work with the aim of becoming Intel's best partner."[28][25]

126. As explained below, Taiyo Yuden had also qualified as a supplier of Inductors to Apple.

[22] https://www.sumida.com/about/index.php?categoryId=20&parentId=96&aboutId=99#Southern %20California (last visited January 4, 2019).

[23] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf (last visited January 4, 2019). This arrangement continued during the period when Kemet had a financial and ownership stake in NEC Tokin.

46

[24] *Id.* (last visited January 4, 2019).

[25] https://www.yuden.co.jp/ut/news/release/pdf_150.pdf (last visited January 4, 2019).

127   As also explained below, Taiyo Yuden engaged in numerous conspiratorial acts relating to Inductors within the United States.

128   110.   ⊖⊖The United States has also long been central to TDK's global marketing strategy. TDK has a billboard on Times Square in New York City:



129   111.   ⊖isThis billboard has been part of TDK's "global advertising strategy" since 2001.²⁰2001.[26]

130   In July of 2013, TDK revamped its English language website to allow customers to search for Inductors and contact sales agents directly for purchases online: "In recent years, the ratio of information acquisition via the Internet has become extremely high for the departments of customers'

27*Id.* (last visited January 4, 2019).

28https://www.yuden.co.jp/ut/news/release/pdf_150.pdf (last visited January 4, 2019).

26 29httpshttps://www.global.tdk.com/corp/en/news_ceentercenter/press/aah33300.htm   (last visited January 4, 2019). In December of 2011, TDK announced that it had lit up a Christmas tree   on   Times   Square   to   promote   its   brand.   *See* https://www.global.tdk.com/corpcorp/en/news_center/press/aah37600.htm.   (last   visited January 4, 2019). In 2012, TDK promoted its brand in the summer of 2012 by sponsoring a Fourth   of   July   display   on   Times   Square.   *See* httpshttps://www.globalglobal.tdk.com/corp/en/news_center/press/aah   40100.   htm   (last visited January 4, 2019).

112.In July of 2013, TDK revamped its English language website to allow customers to search for Inductors and contact sales agents directly for purchases online: "In recent years, the ratio of information acquisition via the Internet has become extremely high for the departments of customers' In 2014 and 2015, TDK lit the Christmas Tree in Times Square again and advertised the "tallest digital tree in the world" and stated "TDK intends to continue using this opportunity to further enhance its corporate image as a global enterprise." *See* https://www.global.tdk.com/corp/en/news_   center/press/201412191618.htm   (last   visited January       4,       2019);       https://www.global.tdk.com/corp/en/ news_center/press/201512082089.htm (last visited January 4, 2019).

development, design, purchasing, etc. Also, due to the trend of globalization, there is a need to respond quickly whenever you request from any customer. eeThe inductor site to be announced here inherits the same concept as the monolithic ceramic capacitor site which has been popularly released in January 2013. Please use the new website for searching TDK's inductor which is the No. 1 supplier of inductor

by all means."[3027] TDK's website currently has an active feature that allows purchase of Inductors through a search feature that links directly to inventory for certain distributors.

131.   113.For much of the Relevant Period, TDK's American Depositary Receipts Shares ("ADRs") were listed on the New York Stock Exchange. In delisting its ADRs in 2009, TDK explained that "[i]n June 1982, TDK listed its [ADRs] on the NYSE primarily to raise funds, bolster corporate creditworthiness and the TDK brand, and broaden its investor base, as it globalized its business operations and rapidly expanded overseas sales. Ever since, the Company has worked to expand its

operations in the U.S. and elsewhere around the world."[128] Foreign corporations that issue ADRs must register with the Securities and Exchange Commission and are subject to various federal regulations and reporting rules. ~~ese~~These securities allow foreign corporations to ~~profitably~~profitably enter the United States capital markets.

~~In 2014 and 2015, TDK lit the Christmas Tree in Times Square again and advertised the "tallest digital tree in the world" and stated "TDK intends to continue using this opportunity to further enhance its corporate image as a global enterprise." See https://www.global.tdk.com/corp/en/news_center/press/201412191618.htm (last visited January 4, 2019); https://www.global.tdk.com/corp/en/news_center/press/201512082089.htm (last visited January 4, 2019).~~

30~~https://www.tdk.co.jp/corp/ja/news_center/press/20130716587.htm (as translated by Google Translate) (last visited January 4, 2019).~~

31~~https://www.global.tdk.com/corp/en/news_center/press/anh29200.htm (last visited January 3, 2019).~~

132     As explained below, TDK had also qualified as a supplier of Inductors to Apple.

133     As also explained below, TDK engaged in numerous conspiratorial acts relating to Inductors within the United States.

134     ~~114. ~e~~The Defendants thus engaged in conduct both inside and outside the United States, its territories, and the District of Columbia that caused direct, substantial, and reasonably foreseeable and/or intended anticompetitive ~~effects~~effects upon interstate commerce within the United States.

135     ~~115. ~e~~The Defendants, directly and through their wholly owned and/or controlled subsidiaries and agents, engaged in a conspiracy to ~~fix~~fix or ~~inflate~~inflate prices of Inductors that restrained trade unreasonably and ~~affected~~affected adversely the market for Inductors and manufactured products that

[27] https://www.tdk.co.jp/corp/ja/news_center/press/20130716587.htm (as translated by Google Translate) (last visited January 4, 2019).

[28] https://www.global.tdk.com/corp/en/news_center/press/aah29200.htm (last visited January 3, 2019).

incorporated Inductors. ~~ee~~The Defendants ~~affected~~affected commerce, including import commerce, substantially throughout the United States, thereby proximately causing injury Flex.

## V.     FACTUAL ALLEGATIONS

136.     ~~116.~~Flex incorporates by reference the factual allegations made in previous sections.

### A.     Inductors Generally and Types of Inductors

137.     ~~117.~~As noted above, Inductors are passive electronic components that store and regulate energy in a circuit using principles of electromagnetism.

138.     ~~118.~~Inductors work by creating magnetic ~~fields~~fields when current passes through the coils ~~or other inductive material.  ee~~of the Inductor. The magnetic ~~fields~~fields created by the passage of current are measured in terms of "force" and "~~flux~~flux." ~~ee field~~The field force is the amount of "push" that a ~~field~~field exerts over a certain distance, pushing energy through the wire. ~~ee field flux~~The field flux is the total quantity, or ~~effect~~effect, of the ~~field~~field as energy surrounds the core. Force and ~~flux~~flux work ~~off~~off one another. ~~ee~~The amount of ~~field  flux~~field flux that will develop in space is proportional to the amount of ~~field~~field force applied, divided by the amount of opposition to ~~flux~~flux.

139.     ~~119. ee~~The magnetic ~~field~~field also introduces opposition into the circuit, which is a tension that develops within the circuit allowing for storage of energy. Opposition is created by the movement of the magnetic ~~flux~~flux as it opposes or resists any changes in the electrical current ~~flowing~~flowing through it. Energy is stored when the magnetic ~~field flux~~field flux allows for a certain "inertia" to accumulate in the ~~flow~~flow of electrons through the wire

(or other inductive material) producing the ~~field~~field.

140.   ~~120.~~An Inductor also acts as a governor, or regulator, of energy in a circuit. When current increases, an Inductor absorbs energy and drops voltage. When current decreases, it acts as a source of energy, creating voltage as it releases stored energy.

141.   ~~121.~~Inductors are ~~classified~~classified primarily by inductance, the ability of an Inductor to store energy in the form of a magnetic ~~field~~field. Inductance is measured in the unit of the Henry (μH).

142.   ~~122.~~Inductors are sold by ~~specifications~~specifications that relate to inductance, voltage, and size. ~~These~~These measures are standardized. Inductors with the same inductance, core, and size are substantially the same, and fungible with one another.

143.   ~~123.~~Inductors, capacitors, and resistors perform distinct roles in an electric circuit. Inductors store current using magnetic ~~fields~~fields, which also give Inductors the ability to act as resistors. However,

unlike resistors, Inductors can also store energy. Inductors block alternating current ("AC") but allow direct current ("DC") to pass through. Capacitors block DC but allow AC to pass through. Unlike capacitors, Inductors can create energy when needed by use of magnetic ~~fields~~fields. In short, all three of these components work together to form closed circuits that power the products that contain them. ~~Inductors can perform all of the basic functions of capacitors and resistors, but~~Importantly, capacitors and resistors cannot perform all of the functions of an Inductor.

144.   ~~124.~~An Inductor's role in a simple circuit is depicted below:



145.   ~~125.~~Examples of various forms of Inductors are depicted in the following photograph:



146.   ~~126.~~As can be seen, Inductors can be as simple as wrapping a metal wire around some form of a core. Wirewound coil Inductors may also be encased, embedded, or molded in plastic cases or in discrete ~~inductor~~Inductor chips. Wirewound coils can have metallic or ceramic cores (or hybrids of both) and may also have air cores.

147.   ~~127.~~Multilayered Inductors may also vary in composition and alignment, but they, too, perform the same basic function. Multilayered Inductors are usually encased in plastic. Multilayered

Inductors may use ferrite beads, or bead arrays, and may also stack or layer ~~film~~film and various types of coils and electrode materials. ~~The~~The following graphic from TDK's website illustrates some types of chip Inductors:~~33~~29



~~33https://product.tdk.com/info/en/techlibrary/archives/techjournal/vol04_mlg/contents03.html (last visited January 4, 2019).~~

148.   ~~128.~~Inductors are distinguished from one another by the material composing the "core," or the conductor for the magnetic reaction. An Inductor's core material can ~~affect~~affect its performance, as ~~different~~different metals and materials have ~~different~~different magnetic and inductive properties. A core may be made of ceramic, ferrite, copper, or some other metal. ~~Different~~Different cores can provide equivalent standard levels of inductance, even if each type of material provides ~~different~~different levels of power and performance. ~~The~~The key principle of physics that impacts Inductors' ~~specifications~~specifications is that inductance is directly proportional to the available surface area contained in the

53

finished finished Inductor. To achieve added surface area, metallic or ceramic materials can be stacked or wound in an Inductor.

149.   129.At present, the principal type of Inductors are air core Inductors, iron core Inductors, ferrite core Inductors, toroidal core Inductors, and multilayer Inductors. Air core Inductors are the simplest type to make, with a wire wrapped around a ceramic core. case These are the cheapest form of Inductors to manufacture. Iron core Inductors are wrapped around an iron core and can be smaller in size than air core Inductors. Ferrite Inductors use ferrite (including ferrite in bead form), a metal oxide ceramic based around a mixture of ferric oxide, which has a high degree of magnetic permeability. Toroidal core Inductors are made using a coil wrapped around a toroidal (doughnut-shaped) core. ee The

---

[29] https://product.tdk.com/info/en/techlibrary/archives/techjournal/vol04_mlg/contents03.html (last visited January 4, 2019).

---

core is often also made of ferrite. Multilayer Inductors consist of two conductive coil patterns that are arranged in two layers in the upper part of a multilayered body and are electrically connected in consecutive manner. ein film Thin film Inductors are a type of multilayer Inductor typically utilizing a ceramic chip that produces a small form factor. ee The Defendants each produce a variety of the various categories of Inductors.

150.   130.Worldwide, the five different five different principal types of Inductors sold, including air core inductors Inductors, iron core inductors Inductors, ferrite core inductors Inductors, toroidal core inductors Inductors, and multilayer inductors Inductors, make up 95% of the market.

151.   131.In automobiles, Inductors are used, for example, in headlight circuitry, transmission systems, electronic control units, fuel systems, navigation systems and ADAS. In consumer applications, they are used in LCD televisions, LED lighting, computer laptops, digital still cameras, smartphones, printers, game consoles, air conditioning systems and home

appliances. ~~ee~~The following chart from the Paumanok Group Consulting depicts the value, volume and pricing of Inductors by end-use segment.~~12~~30



30 http://www.paumanokgroup.com/inductors-beads-and-cores-world-markets-technologies-opportunities-2016-2021-isbn-1-893211-99-1-2016.html (last visited January 4, 2019).



© 2016 Paumanok Group Consulting

152   ~~132.~~As of 2015, it was estimated that the global market for Inductors was worth $2.599 billion and could reach $3.11 billion in 2023. ~~oe~~The North American Inductor market (of which the United States has approximately 71%) was worth approximately $225 million in 2015.

153   Defendants provide product catalogs that include data sheets for some of their Inductors products. These data sheets in product catalogs are available on Defendants' websites while that line of Inductors is being manufactured and sold.[31]

**B.    ~~Ke~~The Structure of the Inductor Market Is Conducive to Collusion**

154   ~~133.oe~~The Inductors market exhibits ~~five~~five characteristics that are conducive to collusion: (1) the Defendants dominate that market; (2) there are high barriers to entry; (3) Inductors are a commoditized

33 http://www.paumanokgroup.com/inductors-beads-and-cores-world-markets-technologies-opportunities-2016-2021-isbn-1-893211-99-1-2016.html (last visited January 4, 2019).
product; (4) Inductors are price inelastic; and (5) there is declining demand and excess capacity. Each of these factors is discussed separately below.

       **1.**     **Market Concentration**

   155.   134.ccThe Inductors market is highly concentrated. As of 2004, Defendants had over 80% of the market in Inductors:



---

³¹ For example, an earlier version of TDK's website allowed data sheets for product lines A-Z to be accessed through a webpage entitled "Search Product Catalog by Category."



156.   135.In 2007, TDK and Murata alone had over 61% of the market for ceramic chip inductorsInductors in North America.

157.   136.In 2016, Defendants TDK, Murata, Taiyo Yuden, Panasonic, and Sumida had two-thirds of the Inductors market:





158      137.The foregoing chart does not fully capture Defendants' collective market power to the extent that certain Defendants – Sagami and Tokin—fall within the "Other" category. Flex estimates that in 2016, Sagami and Tokin had about 3% each of the global market share for a total collective share of at least 73%. Acquisitions within the Inductors market, such as Murata Manufacturing's acquisition of TOKOToko in April of 2015, Murata Manufacturing's acquisition of C&D Technologies' Inductors business, and TDK's successful tender offeroffer for EPCOS AG in October of 2008, have added to this market concentration.

### 2.      Product Commoditization

159      138.Inductors are a commoditized product and are found in the United Nations Commodity Statistics database under a separate reference code (no. 77122). A 2017 market report indicates that product differentiationdifferentiation is "minimal."

160      139.Inductors are marked using standardized values. ce firstThe first two digits marking a standardized Inductor are the value of the inductance, expressed in units of Henry, and the third digit is the multiplier by power of 10. So, "101" = 10*$10^1$µH = 100µH. If there is an R, it acts as a decimal

point and there is no multiplier. ~~Cerefore~~Therefore, "4R7" means 4.7µH. Precision of an Inductor is also expressed in standard terms, using a ~~final~~final letter F, G, J, K, or M, which refers to +/-1%, +/-2%, +/-5%, +/-10%, and +/-20%, respectively.

161.   ~~140.~~ ~~ee~~The International Electrotechnical Commission ("IEC"), an organization that promotes standardization in the electrical ~~fields~~fields, has published standards for testing relating to Inductors. Defendants' products refer to these standards. For example, TDK's product reference guide states that "[a]ll chokes [another name for Inductors] for low-frequency main networks are dimensioned and tested in compliance with applicable EN and IEC standards." Inductors are mass produced pursuant to these standards, making them interchangeable.

162.   ~~141.~~ ~~ee~~The Defendants understand their products are interchangeable. A webpage maintained by TDK relating to Inductors allows users to enter a non-TDK product code so that, "[u]sing the part number of a product of other manufacturers, [TDK's] products with similar ~~specifications~~specifications can be searched."[3432] Other Defendants' websites ~~offer~~offer similar comparison aids.

### 3.   Entry Barriers

163.   ~~142.~~Entry barriers into the Inductor market are high. ~~ee~~The costs of maintaining extensive sales networks, supply chains, production facilities, and a global presence are considerable. Murata, for example, announced in February of 2016 the creation of an expanded 28,000 square foot facility in Carrollton, Texas for the purpose of better integrating its United States operations.

164.   ~~143.~~Barriers to entry also exist because of the resources of the incumbents. ~~ee~~The Inductors market is a mature one dominated by established corporations, most of which have global operations. Panasonic and TDK both manufacture a variety of electronic products, as well as other electronic components. Panasonic reported revenues of over $62

billion in its 2017 ~~fiscal~~fiscal year. TDK reported revenues of over $10 billion in 2017. Both are large and diverse multinational corporations that, like all of the Defendants, can ~~benefit~~benefit from economies of scale. Murata manufactures virtually every electronic component and has yearly revenues that top $5 billion. Taiyo Yuden is a ~~diversified~~diversified manufacturer of passive electronic components with annual net sales in excess of $2 billion, most of

[32] https://product.tdk.com/en/search/inductor/inductor/smd/cross_reference/.

which is attributable to sales of electronic components. Sumida is another international giant, who most recently announced sales of $700 million annually. Sumida has Research & Development ("R&D") ~~offices~~offices in the United States, China, Japan, Germany, and Canada; sales ~~offices~~offices in the United States, China, Japan, Hong Kong,

[34]~~https://product.tdk.com/en/search/inductor/inductor/smd/cross_reference/.~~ Singapore, Taiwan, ~~Tailand~~Thailand, South Korea, and Germany; and factories in China, Japan, Vietnam, ~~Tailand~~Thailand, Mexico, Germany, Romania, and Slovenia.

165.     ~~144.~~ ~~ee~~The Defendants have established reputations with purchasers of Inductors and sellers of the raw materials needed to manufacture Inductors; have access to ~~significant~~significant amounts of capital to fund current operations; have global operations that allow them to specialize functions and meet the needs of customers with global businesses; can weather downturns in the economy due to their size and substantial resources; and have integrated supply chains due to their diverse products.

166.     ~~145.~~During the Relevant Period, there were few significant (if any) new entrants into the market for Inductors and there was significant consolidation of that market. As noted above, during the Relevant Period, the number of leading Inductors manufacturers fell, which is an indication of a mature market with diminishing demand, circumstances that

make the market ripe for collusion.

167.   ~~146.~~It is no surprise that new entry practically came to a halt, and the number of participants contracted. New entrants would need to invest hundreds of millions of dollars in building manufacturing facilities, ~~obtaining patents or licenses for technology,~~ and creating a production line; assembling a workforce, including professionals and executives with industry experience; obtaining a supply network; and investing in ~~R&D,~~ marketing, and transportation capabilities necessary to bring a product to market. And even then, it takes years to demonstrate quality control and establish a customer base to see any return on this investment. In short, a prospective competitor in the Inductors market would face a daunting task in establishing and growing a business. ~~It speaks volumes that the United States hardly has a competitive player in this field.~~

168.   ~~147.~~Further barriers to entry exist because manufacture of Inductors requires an expensive supply chain, including the purchase and in-house processing of raw materials such as metals. Inductors can incorporate iron, nickel, zinc, and sometimes barium, cobalt, and strontium.

169.   ~~148.~~After raw materials are purchased, they must be processed and chemically treated. Leading Inductor manufacturers have facilities for processing and treating the raw materials. Processing and treating raw materials requires large expenditures of capital for nanotechnology.

Nanotechnology, which concerns analysis of materials at the molecular (or very small particle) level, is necessary because of the precision involved in manufacturing small components. Nanotechnology equipment is very expensive.

~~149.A core principle of the physics and economics of manufacturing Inductors is that the performance of the component is directly proportional to the size, or surface area, of the~~

~~Inductor. Accordingly, precision manufacturing and quality control measures are critical.~~

170.    ~~150.~~Manufacture of Inductors involves stacking, winding, and pressing metals and other raw materials, and the technology to imprint and manipulate thin metals and wire. ~~is~~This process requires sophisticated engineering as well as expertise in nanotechnology and process yields.

### 4.    Demand Inelasticity

171.    ~~151.~~A 2017 report on the Inductor market has noted that "demand is considerably inelastic." As the report explains:

> In the inductors market, the consumer base is rather fragmented and product ~~differentiation~~differentiation is minimal, thus lowering the overall bargaining power of customers. But ~~fixed~~fixed costs for suppliers are high thus giving them some power. For a consumer, the switching cost is high and the possibility of backward integration is low since production of inductors involves exclusive expertise and most OEMs ~~find~~find it cheaper to buy it from such suppliers than foray into its manufacturing. ~~e~~The bargaining power of customers is *low*.

(Emphasis in original).

172.    ~~152.~~Several characteristics of Inductors cause demand inelasticity. First, the price of Inductors is low compared to the price of many inputs. ~~eere~~There is less incentive to switch Inductors suppliers under those circumstances. On a per unit basis, prices of most Inductors range from a few to ~~fifty~~fifty cents. Products such as computers and cars may have up to sixty or seventy Inductors, but other products have only a couple dozen.

173.    ~~153.~~Second, there are no substitutes for Inductors. No other passive electronic component can perform all the functions of an Inductor. Its electromagnetic properties distinguish it from a capacitor, as does its operation in relation to DC current. Capacitors can only store current; they cannot increase voltage like an Inductor can by use of magnetic ~~fields~~fields. Resistors ~~perform some of the "blocking" functions of Inductors, but~~ cannot store or generate voltage. If a circuit in a product calls for an Inductor, no other component will do.

174.    ~~154.~~ ~~ird, the fact that~~ Original Equipment Manufacturers ("OEMs") and other manufacturers face periodic deadlines for production reduces the chance that Defendants'

customers will invest the time and resources to ~~find~~find another supplier.

### 5.   Declining Demand and Excess Capacity

175.   ~~155.~~ee The Inductors market was dealt a series of shocks, starting in the 1990s ~~with the ITA~~. Inductors faced declining demand following the 2001 recession at the beginning of the Relevant Period. One industry expert has noted that price erosion was severe in 2001 and 2002 as Inductor manufacturers ~~suffered~~suffered from excess capacity, and leading Inductor manufacturers contemplated selling their production facilities. Indeed, ~~flagging~~flagging demand for electronics products characterized much of the early 2000s.

176.   ~~156.~~In addition to the ~~effects~~effects of the 2001 recession, new technology, such as semiconductor chips and digital circuits, has threatened Inductors. Inductors are not used in digital circuits, which are increasingly used in high-technology products. Inductors are too large to be integrated into semiconductor chips, which are micro-electric circuits that ~~fit~~fit onto a silicon wafer.

177.   ~~157.~~Many consumer electronics have moved to chip technology. In 2007, a leading analyst predicted that the North American sales volume of Inductors would fall by over a billion units from 2007 to 2014, mostly due to a poor outlook for consumer digital electronics. Compact portable devices that rely on digital chip circuits, such as iPhones, have replaced several ~~different~~different personal electronic devices.

178.   ~~158.~~As demand waned, the Defendants faced excess capacity at their Inductors facilities. ~~ee~~They have facilities that specialize in the manufacture of few products. Panasonic, for example, has a plant in Tajima, Japan that at one point during the Relevant Period had 250,000 square feet devoted to manufacturing Inductors. Corporate Defendants that manufacture primarily passive components, such as Taiyo Yuden, Sumida, and Murata, also specialize their manufacturing facilities so that when demand is low, their plants are idle

at lower cost.

179.  159.~~ee~~The remarkably resilient prices following the 2008 Great Recession,
even as demand waned, illustrate cartel activity at play.

180.  160.~~When~~High prices ~~remain high or flat in light of~~that do not decline with
declining demand and excess capacity~~, it becomes clear that~~ are consistent with collusion ~~is~~
~~keeping the prices high~~.

C.  ~~Ke Conduct of Defendants, the Investigation by the DOJ, and the Use of~~
~~Trade Associations Strongly Support Ke Assertion Kat Defendants~~
~~Colluded~~**Defendants' Conspiratorial Conduct**

1.  **Summary of Defendants' Unlawful Conduct**

~~161.As noted above, price erosion in the market for Inductors began with trade~~
~~agreements that eliminated tariffs. In December of 1996, twenty-nine nations agreed to the ITA,~~
~~which eliminated tariffs and import duties on hundreds of billions of dollars worth of high~~
~~technology products, including computers, telecommunication equipment, semiconductors, as~~
~~well as the passive electronic components (such as Inductors) that were used to manufacture~~
~~these products.~~

~~162.Since its inception, the ITA covered "[e]lectrical transformers, static converters (for~~
~~example, rectifiers) and inductors." Once tariffs on Inductors were lifted, manufacturers that~~
~~once had no competition from OEMs who purchased from them suddenly had global~~
~~competition from the signatories to the ITA.~~

~~163.Following the adoption of the ITA by Japan and other Asian countries, the Japanese~~
~~manufacturers began to face competition from manufacturers in Korea and Taiwan, which were~~
~~signatories.~~

~~164.~~ee~~ 2001 recession exerted further downward pressure on prices of Inductors. In~~

Japan, exports of passive electronic components fell from a peak of 781,951 million yen in 2000; to 541,797 million yen in 2001; to 531,859 million yen in 2002.

165. In North America, sales of Inductors dropped from 2001 to 2002, and fell every year until 2005. According to an industry analyst, "[t]he inductor business in [North America] follows suit with capacitor and resistor sales in the region with respect to the value of discrete inductor shipments over time. ₔe market experienced a sharp upturn in FY 2001, followed by a sharp drop in new product shipments."

166. As also noted above, China agreed to the ITA in 2003, which resulted in even more competition. Chinese Inductors manufacturers quickly became the greatest threat to Japanese Inductors manufacturers. By 2004, there were 200 Chinese manufacturers of Inductors, and they sold 80% of their products to Japan. China's chip Inductor business alone was expected to grow 20% annually at the time. Knowledge of the impending threat from Chinese manufacturers provided powerful incentive for Defendants to collude to protect their profit margins.

167. Faced with increased requests by purchasers for price reductions and an overall decline in demand for their Inductors, the Defendants had a keen desire to avoid price competition.

168. ₔe Defendants knew that international competitors (especially those in Taiwan and China), despite their inroads, could not successfully compete with Defendants' advantages in capacity, technology, and resources should the Defendants stabilize or inflate prices of Inductors. Taiwanese and Chinese components were often perceived to be of inferior quality and not as reliable as Japanese products.

169. Before and during the Relevant Period, the Defendants understood that Inductors of similar inductance were interchangeable, and were concerned that purchasers would use that

66

~~knowledge to cause the Defendants to bid against one another for Inductors.~~

~~170.The highly concentrated nature and structure of the Inductors market made it likely that collusion would be possible and profitable. The Defendants comprised over 80% of the market at the beginning of the Relevant Period, and still had two thirds of the market in 2016. Purchasers of Inductors could not substitute other electronic components for Inductors. Furthermore, the Defendants knew that although global competition was eroding the price of Inductors, manufacturers (especially of sophisticated~~

~~and expensive electronics) were unlikely to substitute inferior quality products for the Defendants' Inductors.~~

~~171.Direct purchasers, especially OEMs and contract manufacturers, are committed to preset production or delivery deadlines, and the Defendants wagered that they would rather continue to pay flat or increasing prices for Inductors than look for lower prices elsewhere and risk disruption to their business from delays or production shortfalls.~~

181.    ~~172.The~~The Defendants agreed to operate as a cartel through both oral and written communications among directors, executives, ~~officers~~officers, business unit managers, sales representatives, and employees of the Defendant companies. ~~These communications were organized in part around JEITA meetings and occurred among the Defendants' employees who attended JEITA meetings, as described in further detail below.~~

~~173.The effects of this cartel were felt in the marketplace. As a result of the 2001 recession, prices of some commodity Inductors fell from $0.0452 apiece to $0.0327 from 2000 to 2003. Through their collusion, Defendants ensured that this type of drop, a decrease of 27.6%, would never happen again. It did not.~~

~~174.As reflected in the chart of FRED data shown in the introductory section of this Complaint, prices of Inductors stabilized or grew from 2003 onward, despite the forces (such as~~

competing semiconductor chip technology and increased competition from Chinese and Taiwanese competitors) that should have lowered the competitive prices for Defendants' products.

175.~~e~~ 2008 recession hit the global economy severely. In Japan, exports of passive components fell from 1,130,000 million yen in 2007 to 705,372 million yen in 2009. In the United States, monthly factory output fell 27% from July of 2008 to May of 2009, a decrease valued at $133 billion. Yet the prices of Inductors remained remarkably resilient, as explained above.

176.Collusion is an explanation consistent with the market factors described above and is also consistent with: (1) the subpoenas just issued by DOJ; (2) the involvement of several of the Defendants in

182.    The cartel alleged herein was implemented through conspiratorial acts in the United States and elsewhere. These conspiratorial acts included exchanges of forward-looking production, supply and market information as well specific agreements targeting Flex, its customers and other direct purchasers of Inductors. All of this behavior was intended to and did artificially inflate the price Flex and other purchasers paid for Inductors.

183.    All of the defendants were involved in conspiratorial information exchanges at JEITA meetings and elsewhere. TDK, Taiyo Yuden, Murata, Tokin, and Toko also implemented bid-rigging agreements and specific agreements targeting particular customers, including Flex. Much of this conduct related to price fixing or market allocation targeting United States customers such as Apple, Skyworld Solutions LLC ("Skyworld"), and Microsoft Corporation ("Microsoft"), as described in further detail below.

184.    conspiracies in other markets; and (3) the involvement of the Defendants in trade associations (particularly JEITA) that facilitated collusion.TDK has already admitted to collusion in violation of federal antitrust law and implicated other Defendants.

   2.   **Conspiratorial Acts Conducted ~~Krough~~Through JEITA**

68

185.   177.Defendants used JEITA meetings and associated committee meetings as a forum to agree upon pricing for Inductors and exchange confidentialconfidential business information concerning Inductors from at least 2003 through September of 2014. As described further below, personnel from each Defendant's sales group who attended JEITA meetings reported to the heads of these sales groups, who in turn were responsible for setting prices of Inductors.

186.   178.To understand the role that JEITA played in the formation of the conspiracy, it is first necessary to explain how it operates. JEITA conducts an annual conference described as follows: "[a]ll JEITA member companies gather annually for a conference that serves as the industry's premier decision- making

forum."[35][33] Its Board of Directors "discusses and makes decisions concerning important issues related to JEITA's activities, including items raised at the Annual Conference." *Id.*

187.   179.As of July 17, 2017, the Chairman of JEITA's Executive Board is Shusaku Nagae, Chairman of the Board of Panasonic Corporation. A representative of Murata Manufacturing is also one of the Executive Directors of JEITA. JEITA has created fivefive sector-specificspecific boards, one of which is the Passive Components Committee ("PCC"), which encompasses Inductors, capacitors and resistors. Based on information and belief, the structure of JEITA's Electronic Components Board and its committees is represented in the following chart taken (as translated) from JEITA's Japanese-

language website:[36][34]



[33] [35] http://www.jeita.or.jp/english/about/orga/index.htm (last visited January 4, 2019).

[34] [36] https://home.jeita.or.jp/ecb/aboutus/about_us02.html.



188   180.Two of the current Vice-Chairmen of the Electronic Components Board are Tsuneo Murata, President of Murata Manufacturing, and Takehiro Kamigama, President and CEO of TDK- EPC. JEITA maintains "overseas officesoffices" in Washington, D.C. and Brussels, Belgium.

189   181.From 1989 until 2003, there existed within JEITA separate Committees on

71

Inductors, capacitors and resistors. In 2003, these separate Committees were merged within the PCC and operated as Subcommittees of the PCC. Meetings of the PCC typically occurred three to four times annually at JEITA's ~~offices~~offices in Tokyo, Japan; they occurred typically in May, August, November, and January of each ~~fiscal~~fiscal year. ~~e~~The initial meeting of each ~~fiscal~~fiscal year typically included a General Meeting and a separate social gathering. ~~e~~The January meeting was typically followed by a New Year social gathering.

190.    In addition to the formal meetings of the PCC, there were associated events in locations such as the Yokkaichi Tokyu Golf Club, the Katsuragi Golf Club, the Hikone Country Club, the Iwata Grand Hotel, the Nishikanda location of Dinagyan Restaurant, the Kawamuraya store in Nagoya, the Nagahama Royal Hotel, the Hotel Arrowle, the Hibiki Marinouchi store, and the Otamachi Sankei Palace.

191.    ~~182.~~~~e~~The PCC selected one Chairperson and two Vice-Chairpersons every two years. ~~e~~The Vice- Chairpersons represented the various Subcommittees. ~~e~~The terms of the Vice-Chairpersons were two years, with a maximum of two consecutive terms. Selections as Vice-Chairpersons ~~was~~were done on a rotation system to allow members of each Subcommittee to ~~so~~ serve. In June of 2004, it was observed that with the existence of Subcommittees on resistors and capacitors, attendance at Inductors Subcommittee meetings was starting to wane, with the result that there was less exchange of company-~~specific~~ specific information. It was therefore decided to hold meetings of the Inductors Subcommittee at least four times annually and to encourage more companies to attend, so that a more extensive sharing of ~~confidential~~confidential detailed corporate information could occur. ~~e~~The meetings again took place typically at JEITA's ~~offices~~offices in Tokyo, Japan, or, on occasion, at other venues, such as the Hakata Excel Hotel Tokyu ("Excel Hotel").

192.    ~~183.~~Participants from the Defendants at meetings of either the PCC or the Inductors Subcommittee or both during the Conspiracy Period included:

- Masataka Suzuki (President of Sumida), Teruo Hirota (Sumida Corporate Service IAO ~~Officer~~Officer), Ryuji Teramachi (Sumida's Eastern Japan Sales & Marketing

Manager), Hiromatsu Takashima (Sumida's Director of Sales for the Asia Region), Taeko Matsuoka (part of Sumida's Marketing Communications Center), and Fumio Shikano (Sumida's CSE ~~Officer~~Officer and ADM ~~Officer~~Officer) for Sumida;

- Kazuya Umezawa (Managing Executive ~~Officer~~Officer of Taiyo Yuden), Atsushi Ishinari (Taiyo Yuden's Senior General Manager, Electronic Components Planning Department), Hisashi Oi (Taiyo Yuden's General Manager, Ferrite Application Product Managing Department), Tomonori Endo (Manager of Taito Yuden's Sales Planning Department), Satoru Kaneda (General Manager of Taiyo Yuden's Corporate Headquarters 1, Ferrite Application Division), and Kenichi Hattori (Head of Taiyo Yuden's ~~Office~~Office of the President) for Taiyo Yuden;

- Takashi Oshima, Masahiro Ishida (part of the Inductor Products Team for Panasonic's Circuit Components Group BUPM Marketing 1), Keiji Chikada (Global Industry 3 Team Leader for Panasonic's BUPM Marketing 1), and Hiroshi Itsuki (Product Strategy Team Leader for Panasonic's Transformer BUPM Marketing Group) for Panasonic;

- Jin Kudou (Marketing Department Deputy Manager for Murata), Hiromitsu Aoki (Section Manager of Market External ~~Affairs~~Affairs Division for Murata), Hideaki Morito (Senior Manager, EMI Products Planning for Murata), Tomihiro Fujikawa (executive in the Product Planning Division of the Planning Department of the EMI Division for Murata), Akimasa Yamakawa (Section Manager for Murata's Market External ~~Affairs~~Affairs Division), and Shigeshi Hatada (Director of the Component Group of Murata's EMI Planning Department) for Murata;

- Shinichi Araya (Director and Senior Vice-President General Manager of Technology for TDK), Nobuhiru Ishiguro (Manager of TDK's Magnetics Business Group Products Strategy Promotion Division), Hiroyuki Uemura (Senior Executive Vice- President and Corporate ~~Officer~~Officer for TDK and President and CEO and TDK-EPC), and Takuji Suda (Section Manager of TDK's Magnetics Business Group Product Strategy Presentation Division) for TDK;

- Bunchiro Tsuda (Engineering Group Manager for NEC Tokin's EMC Devices Group), Makoto Soto (General Manager of Sales promotion for NEC Tokin's Functional Devices Division), Yoshihiko Hori, a Director at NEC Tokin), Hidehito Hatakeyama (Group Manager of the Marketing

Division of the Sales Department of NEC Tokin's EMC Group), Yoshinori Sato (Group Manager of the Sales Promotion Department of the Sales Promotion Group of NEC Tokin's EMC Group), Tomohide Date (a Manager of NEC Tokin who has been indicted by the

DOJ for conspiring to ~~fix~~ fix prices of capacitors),[37][35] Hiroshi Ishikawa (Group Manager of the Sales Promotion Department of NEC Tokin's EMC Group), and

[35] *See* ECF No. 15, *United States v. Isawa*, Case No. 4:15-cr-00163-JD (N.D. Cal.). Additionally, Akihiko Igasaki and Takayuki Iizuka of Okaya Corporation ("Okaya") attended JEITA meetings related to Inductors on behalf of Okaya. Cartel meeting minutes reflect that Messrs. Iizuka and Igasaki attended cartel meetings with respect to the film capacitor cartel on behalf of Okaya. *See* ECF Nos. 1563-3 at 2, 1563-6 at 2, *In re Capacitors Antitrust Litig.*, Case No. 3:14-cv-03264-JD (N.D. Cal.).

Masaya (Shinya) Watanabe (Senior Manager of the Sales Promotion Department of NEC Tokin's EMC Group) for NEC Tokin; and

- Dajiro Tsuruga (Division Manager of Sagami's Sales and Marketing Division), Masaki Okada (manager of Sagami's Corporate Planning and Administration ~~Office~~Office), Koichi Ogiso (Section Manager of the Head ~~Office~~Office Sales Department of Sagami's Sales Support Section), Mitsuo Igarashi (Division Manager of Sagami's Sales and Marketing Division). Masayuki Osashi (Section Manager of the Marketing Division of Sagami's Sales Development Section), and Teppei Hashimoto (division Manager of the Marketing Division of Sagami's Sales Promotion Division) for Sagami.

~~37See ECF No. 15 in *United States v. Isawa*, No. 4:15-cr-00163-JD (N.D. Cal.). Additionally, Akihiko Igasaki and Takayuki Iizuka of Okaya Corporation ("Okaya") attended JEITA meetings related to Inductors on behalf of Okaya. Cartel meeting minutes reflect that Messrs. Iizuka and Igasaki attended cartel meetings with respect to the film capacitor cartel on behalf of Okaya. See ECF Nos. 1563-3 at 2, 1563-6 at 2, *Capacitors* (Mar. 17, 2017).~~

- Otaki Eriko of Toko Co., Ltd.

193. ~~184~~At these Inductors Subcommittee meetings during much of the Conspiracy Period, attendees for the Defendants shared company-~~specific~~specific current and forward-

looking information on sales, prices, shipments, product development, and capacity with respect to Inductors, including Inductors sold or shipped to the United States. ~~oe~~The purpose of these exchanges of confidential information ~~exchanges was to fix prices for Inductors, as well as to establish forecasts~~was to coordinate future behavior in order to avoid price competition and to facilitate the implementation of ~~such a fix~~specific price-fixing and market allocation agreements. Attendees for the Defendants also shared confidential information on how best to deal with the business climate for Inductor sales, again in furtherance of the alleged conspiracy.

194. ~~185.~~What follows are just a few ~~specific~~specific examples that ~~illustrated what occurred at~~illustrate conspiratorial activity occurring within and around JEITA Inductor Subcommittee meetings during ~~much of~~ the Conspiracy Period.

195. On November 10, 2003, JEITA personnel distributed to Defendants competitively sensitive information concerning, *inter alia,* the production forecasts of individual Inductor manufacturers for September to December of 2003, the full year of 2003, and 2004, measured in quantity of units and monetary value of those units, and as a percentage compared to the same time period for the previous year. The spreadsheets also contained information concerning 2002 results for comparison.

196. The communication with Defendants also contained similar confidential information for capacitors and resistors, which were also subject to price fixing conspiracies. This information was shared among various personnel at the following Defendants: Toko, NEC Tokin, Sagami, Sumida, Taiyo Yuden, TDK, Panasonic, and Murata.

197. ~~186.For instance~~Shortly thereafter, on November 12, 2003, representatives from ~~TOKO~~Toko (Mr. Tanaka), Matsushita Electronic Components (the predecessor to Panasonic Corporation) (Mr. Itsuki), and Sumida (Messrs. Suzuki and Shikano) met to

exchange confidential information that included their per unit prices for Inductors for 2003, 2003 and projections for prices for 2004. eeThe information exchangedexchange also included detailed company- specificspecific information on quantities sold and sales booked for 2004; the cartel members specificallyspecifically agreed to include information on total orders as well as overall quantities sold. ee

198. The information exchanges were performed with each company submitting confidential information directly to other members and corroborating statistical information. The information was then compiled into extended spreadsheets for use in Inductor Subcommittee meetings. The Defendants used this confidential information to restrain competition and coordinate pricing in the market for Inductors, including those sold in the United States.

199. These exchanges of competitively sensitive business forecasts is prima facie evidence of a conspiracy. Rational competitors would not routinely exchange forward-looking confidential business information in the absence of an agreement to use the information for collective, rather than individual, gain.

200. 187.On June 24, 2004, a meeting of Inductors manufacturers was held through JEITA attended by representatives from TOKOToko (Masaharu Tanaka), Panasonic (Mr. Itsuki), Sagami (Mr. Okada), and Sumida (Messrs. Shikano and Suzuki). At this meeting, the participants exchanged detailed information about the orders they havehad received in the firstfirst three months of 2004, and provided detailed projections about their orders for the rest of the year. eeThe participants discussed projected business conditions in the United States following the 2004 presidential election. At this meeting, it was decided that even more detailed exchanges of confidential information would occur in the future. The confidential information was then compiled into extended spreadsheets for use by Inductor Subcommittee members.

201. Defendants knew that the exchanges of confidential information at JEITA meetings were illegal. On February 23, 2005 a United Chemi-Con employee, Noriaki

Kakizaki, sent his notes of a February 17, 2005 JEITA meeting to his superiors with the cover email: "In North America, these sorts of meetings are completely prohibited, so please take utmost care in the handling of the attached

memo." Mr. Kazikaki's notes reflect that at least Defendants Taiyo Yuden, Murata Manufacturing, Panasonic, and Toko attended the JEITA meeting in question.

202    Two years after JEITA personnel submitted its production forecast survey for 2003/2004, on November 28, 2005, JEITA personnel again distributed the results of an information exchange relating to production forecasts in September of 2005 to representatives at Sumida, NEC Tokin, Sagami, Taiyo Yuden, TDK, Toko, Panasonic, and Murata, among other manufacturers. The individual companies shared confidential information about their future production estimates for the remainder of the year, the year in full, and the following year. The image below is an example of the type of spreadsheets that captured individual company estimates for Inductor products in terms of units, money value of those units, and a percentage compared to the previous year for the same time period:

| Estimated October-December 2005 | | | | Expected results in 2005 | | | | Outlook for 2006 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| quantity | % | Amount of money | % | quantity | % | Amount of money | % | quantity | % | Amount of money | % |
| 3,227,081 | 78.2 | 5,923,000 | 79.3 | 16,380,000 | 95.0 | 26,480,000 | 92.0 | 15,500,000 | 95.0 | 22,500,000 | 95.6 |
| 4,307,081 | 102.5 | 8,473,000 | 86.7 | 17,420,000 | 100.9 | 26,950,000 | 93.7 | 18,800,000 | 108.0 | 27,700,000 | 102.9 |
| 1,818,716 | 43.3 | 7,081,482 | 84.8 | 14,311,856 | 88.5 | 27,558,482 | 88.6 | 17,374,126 | 115.8 | 28,025,525 | 105.3 |
| 3,483,081 | 82.9 | 8,743,000 | 90.3 | 18,578,000 | 98.1 | 27,220,000 | 84.5 | 17,700,000 | 80.0 | 18,861,000 | 73.1 |
| 3,222,154 | 76.7 | 6,445,841 | 76.9 | 16,185,903 | 94.8 | 25,112,841 | 91.2 | 16,348,291 | 98.0 | 22,898,287 | 88.6 |
| 4,407,081 | 104.9 | 9,523,000 | 100.3 | 19,480,000 | 101.6 | 29,000,000 | 97.0 | 17,000,000 | 87.1 | 25,000,000 | 90.8 |
| 10,187,081 | 242.4 | 13,843,000 | 182.7 | 23,280,000 | 136.0 | 34,120,000 | 108.0 | 23,280,000 | 103.0 | 32,420,000 | 88.0 |
| 4,327,454 | 104.4 | 7,576,048 | 101.8 | 17,480,393 | 101.4 | 28,063,048 | 87.2 | 17,483,688 | 100.0 | 26,591,596 | 82.3 |
| 10,187,081 | 242.4 | 13,843,000 | 182.7 | 23,280,000 | 136.0 | 34,120,000 | 108.0 | 23,280,000 | 103.0 | 32,420,000 | 88.0 |
| 1,818,716 | 43.3 | 5,645,841 | 95.8 | 14,311,856 | 80.5 | 28,112,841 | 91.2 | 13,280,000 | 88.9 | 18,861,000 | 70.1 |
| 3,741,298 | 88.0 | 8,748,897 | 90.4 | 18,834,219 | 97.6 | 27,225,817 | 84.6 | 17,076,594 | 101.2 | 25,584,428 | 94.0 |
| | 0.0 | | 0.0 | | | | | | | | |
| 4201789 | 136.8 | 7468000 | 115.8 | 17,243,377 | 100.7 | 32,145,000 | 131.9 | | | | |

Unit: Quantity / thousand, Amount / thousand yen
2005/9/28

The first seven lines are individual company estimates of future projections, while the next four lines represent an average of the reported estimate, the highest reported estimate, the lowest reported estimate, and another type of calculation that is an adjusted average.

respectively. The last line represents results in 2004 to serve as a comparison to the 2005 and 2006 estimates.

203.     Similarly, on May 25, 2007, the Passive Parts Operation Committee of JEITA met to exchange competitively sensitive information, including information concerning: (a) the value of Inductor orders received as compared to the previous year for the fourth quarter of 2006; (b) the value of Inductor orders received for the first quarter of 2007 broken down by month as compared to the fourth quarter of 2006; (c) the value of Inductor orders received for the second and third quarters of 2007 as compared to the fourth quarter of 2006; (d) the status of orders for particular industries, such as power systems, flat panel and/or LCD televisions, personal computers, automotive, video game

equipment, digital amps, slot machines, mobile machinery and equipment; (e) the status of orders of particular types of Inductors, for example, winding and non-winding wire Inductors.

204.     Among the Defendants that participated in this exchange of confidential information were Toko, Sagami, and Murata, but the information was distributed and shared with other Defendants including Panasonic. When distributing the confidential information, the various companies were instructed "to be careful in handling the information."

205.     JEITA members met on or about July 4, 2007, to discuss the capacitors, resistors, and Inductors markets. Topics of discussion included the U.S. market. The competitors exchanged forecasts of Inductors sales for the second half of 2007. These forecasts compared prior year sales to current and forecasted sales. These forecasts were exchanged in order to permit the conspirators to coordinate future behavior in order to avoid price competition.

206.     The attendees at this meeting also discussed "increased in monetary amounts" of Inductors sold for incorporation into power supplies. This reference reflects a discussion of

increasing inductors prices. Attendees at this JEITA meeting included Defendants Murata, NEC Tokin, Panasonic, Sagami, Taiyo Yuden, TDK, and Toko. Flex purchased inductors for power supplies at or around this time.

207.    ~~188.~~On July 10, 2007, representatives from Sumida (Messrs. Suzuki and Hirota), NEC Tokin (Messrs. Date and Hatakeyama), Taiyo Yuden (Mr. Hattori), ~~TOKO~~Toko (a Mr. Oonishi), Sagami (Messrs.~~Ogisa~~ Ogiso and Tsuruga), and Murata (Messrs. Kudo and Hibino) met. ~~ee~~The cartel members exchanged the results of individual company questionnaires that included material non-public information such as average sales price, and quantities projected to be sold. ~~ee~~The cartel members agreed that each company would submit its own summary of business climate and that it would be discussed at future meetings. ~~ee~~The cartel members also discussed the results of a joint study concerning raw material costs faced for Inductor manufacturers. ~~ee~~The cartel members reviewed average unit price forecasts that were based on information previously exchanged, and agreed to further review and revise a World Production Forecast based on exchanged pricing information.

208.    At an August 2008 JEITA passive components business committee meetings, the Defendants shared competitively sensitive information including their Inductor orders as compared to

the previous year for April to June, July, August, September, October, November, December, and January to March, as well as information about specific applications such as cell phones, video games, liquid crystal displays, and personal computers.

209.    Prices for passive components, including Inductors, were discussed at a November 14, 2008 JEITA meeting. An attendee of the meeting specifically noted that "it is not the time to reduce prices." This reflects a directional price agreement among the Defendants at this time. Similar agreements were reached in the capacitors market during the

same time period.

210.    In or around April of 2010, members of the JEITA Passive Components Business Committee were provided surveys to fill out in anticipation of a May 2010 meeting in which the companies would share competitively sensitive information including forecasts of the demand by quarter for the next three quarters for various products, including Inductors (both regular winding and non-winding), the status of related markets, and other hot topics in the industry. This information was exchanged in order to permit the attendees to coordinate future production in order to maintain or increase inductor prices.

211.    In addition to the formal meeting, there was also a social gathering held which was intended to discuss the business climate in general. Matters related to pricing were discussed at the social gathering. Among the Defendants sharing such confidential information concerning Inductors at the meeting were Toko, Sagami, and Murata. Among the information discussed by these companies was the relationship between material and labor costs and product prices, and the status of various markets such as automotive and various television markets.

212.    Competitor information shared at the JEITA meetings was distributed within the Defendants' companies to personnel responsible for setting pricing for Inductors. For example, in June of 2008, Panasonic's Torii Shinichi shared extensive competitor information obtained at a June 18, 2008 meeting with various Panasonic employees, including information obtained from a competitor concerning restrictions that a semiconductor company imposed on manufacturers of Inductors. Mr. Shinichi instructed those employees to handle the information with care.

213.    In November of 2011, NEC Tokin's Tetsuya Karikomi distributed information to the sales team that Defendant Sumida shared at a JEITA passive component committee meeting concerning

the decline in the automotive sector after a promising first quarter. In the fiscal year 2011, there were nine companies that were participating in JEITA Passive Component Business Committees working group for Inductors, including Defendants NEC Tokin, Sagami, Sumida, Taiyo Yuden, TDK, Toko, Panasonic, and Murata.

214.    In November of 2012, Panasonic's Detroit-based Senior Product Specialist responsible for automotive pricing for both resistors and Inductors, Howard (Hitoshi) Takiguchi, lamented recent difficulties in sharing competitively sensitive information about inductors. Mr. Takiguchi told fellow employees at Panasonic that the JEITA information exchanges "would now be acknowledged as a compliance violation" and that fair trade laws had made exchanging the information more difficult. Noting that the information exchanged was decreasing, he noted it "would be better to think of another method" but that the manufacturers "might not be able to hope for the same level" of "information disclosure."

215.    Because of antitrust compliance concerns, the Defendants often shared confidential information outside the formal meetings in order to conceal their unlawful conduct. For example, on January 30, 2013 the Defendants shared information at a JEITA Passive Parts Operation Committee meeting concerning the projected growth of various passive components, including Inductors, compared to the previous fiscal year. When discussing some of the shared information internally, Panasonic employees noted that "some of it is lobby information which is not from the official meeting, so please handle it carefully" and, when shared by email, warnings were given to "be careful about re- distributing this email."

216.    JEITA members exchanged detailed individual company information at JEITA meetings on prices for Inductors used in various applications. JEITA created spreadsheets that included detailed pricing information for various applications of Inductors based on face-to-face exchanges of information. These were circulated to JEITA members for the purpose of discussing them at JEITA meetings attended by all Defendants.

217.    Throughout the remainder of the Relevant Period, Defendants continued to exchange company-specific information by discussing individual results of surveys administered by JEITA to its members at Inductors Subcommittee meetings. For example, JEITA members reviewed individual

survey results at a meeting on October 21, 2009, and formulated company-specific figures for demand with information exchanged at the meeting.

218.    As another example, from at least January of 2009 through the beginning of 2016, Defendants exchanged material non-public information related to "consumption factors" ("CF"). CF data included forward-looking sales information from Inductors manufacturers, in order to estimate global demand. CF data collection was discussed at Inductor Subcommittee meetings.

219.    189. eereThere are numerous examples of such illegal information exchanges throughout the Relevant Period. At least 23 meetings of the Inductors Subcommittee took place between July of 2007 and September of 2014, mostly at the Tokyo officesoffices of JEITA. Unlawful information exchanges designed to fixfix Inductor prices occurred at these meetings. While not every Defendant had a representative at every meeting, each Defendant had one or more representatives at most meetings. Among others, (a) Murata sent Messrs. Aoki, Hibino, Inoue, Kita, Kumada, Kudo, Oomura, Ootani, Shimokawa, Yamakawa and Yamazaki; (b) Panasonic sent Messrs. Chikada, Ebine, Iishiba, Matsumoto, and Morita; (c) Sagami sent Messrs. Ogiso, Tsuruga, Igarashi, and Oohashi; (d) Sumida sent Messrs. Hirota, Suzuki, and Takeshima; (e) (e) Taiyo Yuden sent Messrs. Hattori, Ishinari, Kanzaki, Murata, and Ooi; (f) TDK sent Messrs. Abe, Ishiru, Ishiguro, Mochizoki, Ogasawara, Saito, and Takano; (g) Tokin sent Messrs. Date, Hatakayama, Kobayashi, Muramatsu, and Okabe; and (h) TOKOToko sent Messrs. Norose, Oonishi, Oosawa, and Shinoda.

220.   ~~190.~~Communications in furtherance of the conspiracy also occurred outside of these formal meetings at social gatherings held in conjunction with the meetings, such as one that occurred in September of 2004 at the Excel Hotel.

221.   ~~191.~~As noted above, the PCC often called upon the Vice-Chairpersons of the Inductors Subcommittee to give reports on industry trends, market conditions, and the like. Information exchanges in furtherance of the alleged conspiracy also occurred at meetings of the PCC during the Conspiracy Period. ~~ee~~The PCC endeavored to deal collectively with issues facing the Inductors industry, such as a period of rising costs for raw materials, and forecasted customer orders for passive electronic components. ~~ee~~The PCC also held roundtables concerning the current business climate and how the Japanese manufacturers (including Defendants) could collectively respond.

222.   For example, at a May 2007 PCC meeting Toko, Sagami, and Murata discussed inductor prices and presented confidential information that included current sales of Inductors, the status of current pricing for Inductors to the PCC, and forecasts on Inductors for the period from August of 2007 to March of 2008. Contemporaneous notes reflect that the attendees discussed customer "cost-down" requests, which were requests by customers for price decreases. Sumida, Panasonic, Tokin, and Taiyo Yuden gave similar presentations at the November 2007 PCC meeting. These types of presentations were routine. The competitors would not have discussed individual customer price decrease request in the absence of an agreement to use the information for their collective rather than individual benefit.

223.   Likewise, in 2006 and 2007, Panasonic and Sumida were responsible for providing global Inductor demand forecasting data to JEITA members for discussion at JEITA meetings. Panasonic and Sumida provided forecasting information for Inductors based on data obtained from JEITA members containing detailed confidential information regarding unit

pricing, numbers of Inductors used per product, volume, and amount of sales for various Inductors.

224.   192.Among the attendees for Defendants at PCC meetings were: (a) Messrs. Fujioka, Hatta, Hibino, Ikeda, Inoue, Kudo, Nobumato, Nozaki, Oomura, Shimokawa, Yamazaki, and Yamakawa for Murata; (b) Messrs. Chikada, Ebine, Iishiba, Itsuki, Kita, Nitta, Ooshima, and Sugitate of Panasonic; (c)

(c)  Messrs. Ogiso, Okada, and Tsuruga for Sagami; (d) Messrs. Hirota, Igarashi, Kawazoe, Suzuki, and Takashima of Sumida; (e) Messrs. Hattori, Ishinari, Kanzaki, Murakami, and Murata of Taiyo Yuden; (f)

(f)  Messrs. Abe, Arima, Ikeda, Ishiguro, Ishizu, Kichiji, Mochizuki, Morikawa, Ogasawara, Saito, Suda, Sudo, Takano, and Ueno of TDK; (g) Messrs. Date, Ishiwaki, Kobayashi, Muramatsu, and Sato for Tokin; and (h) Messrs. Aso, Kitano, Norose, Ogino, Ootaki, Oosawa, Tanaka, Takeda, and Yamaguchi for TOKOToko.

225.   193.Members of the Defendants were also officersofficers in the PCC during the Relevant Period. In 2003, Mr. Yoshiaki Kitano, the President of TOKOToko, became the Chairperson and a Mr. Nozaki of Murata and Mr. Shikano of Sumida became Vice-Chairpersons. ceThe various subgroups within the Committee sometimes gave reports about their respective exchanges of confidential information, sometimes by product and by division.

194.All of this conduct, taken as a whole, constituted antitrust violations. Agreements among competitors to fix prices are illegal per se under Sections 1 and 3 of the Sherman Act. Information exchanges among competitors can facilitate and serve as evidence of such agreements. As the United States government said in 2014: "certain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a 'contract, combination…or conspiracy' that unreasonably restrains trade. ce antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens

226.     During JEITA meetings defendants participated in informal meetings among themselves. Information obtained during these off-the-record meetings was referred to as "lobby information" by one Panasonic employee who attended JEITA meetings. No minutes were kept of these meetings, but topics discussed among competitors included confidential, non-public information related to the marketing and sales of passive components including Inductors.

227.     On January 30, 2013, Panasonic employee Mr. Hiroya Nishimoto reported the discussions at the January 30, 2013 JEITA meeting. He instructed recipients of his report to "be careful about redistributing this email." He noted that some of the information was "lobby information which is not from the official meeting, so please handle it carefully." Mr. Nishimoto's report included Inductors production forecasts. These forecasts were exchanged in order to permit the competitors to coordinate their behavior and maintain artificially inflated prices.

228.     The information exchanges at JEITA meetings facilitated violations of the Sherman Act. The exchange of confidential information at JEITA meetings were designed to, and did, inflict anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. ~~Cus, for example, exchanges on price may lead to illegal price coordination."³⁸ As the government went on to explain, "[i]nformation exchanges can be treated as³⁶~~ The information exchanges at JEITA meetings also are circumstantial evidence of an unlawful price ~~fixing~~fixing or market allocation agreement among ~~competitors, and in such a case are analyzed under the per se rule as a violation of the antitrust laws."³⁹~~ Defendants.³⁷

229.     ~~195.JEITA came to realize that these activities violated antitrust laws. As~~

explained in the unsealed Consolidated Amended Class Action Complaint for Direct Purchaser Plaintiffs filed on June 24, 2016 in *Resistors*, JEITA's PCC was a "focal point" for collusion and that it was utilized for "facilitating coordination of industry behavior…with the aim of reducing output and stabilizing prices."[40] e edefendants in *Resistors* were also accused of providing each other with detailed company specific competitive information. KOA Corporation ("KOA"), one of those defendants in that case (although not named here), noted generally, " '[t]here are many events that are considered normal in Japan but strange from the viewpoints of foreigners. Participating in some of these events can put the company at risk of being deemed taking part in antitrust activities.' "[41] As also noted in paragraph 101 of the *Resistors* Certain JEITA members realized that activities at JEITA violated antitrust laws. KOA Corporation ("KOA") acknowledged that participating in certain aspects of the JEITA meetings "can put the company at risk of being deemed taking part in antitrust activities.' "[38] complaint:

230. By July 2014, JEITA's leadership also had become was aware that its JEITA's activities violated the antitrust

laws. During that month, JEITA distributed a handout to its members (including Panasonic) announcing an internal investigation into creating an antitrust compliance structure. In particular, the Electronic Components Working Group announced plans to look into current antitrust compliance issues arising from its activities.

196. In September of 2014, the PCC presented an explanation of a competition law compliance system that would go into effect the following day.[42] Among the rules that were enacted was the

---

[36] [38] httpshttps://www.justice.gov/sites/default/filesfiles/atr/legacy/2014/09/17/269282.pdf at 1 (footnote omitted) (last visited January 4, 2019).

[37] [39] *Id.* at 3 (last visited January 4, 2019).

[38] [40] ECF No. 140, ¶ 3.10, *In re Resistors*, Case No. 5:15-cv-03820 (June 24, 2016).[41] *Id.*

¶10. Koichi Mukaiyama, President of KOA, served as a Chair of the PCC during the Relevant Period.

12It had been publicly announced that the DOJ commenced its criminal antitrust investigation of capacitor manufacturers in April of 2014.

Components Working Group announced plans to look into current antitrust compliance issues arising from its activities.

231.   Indeed, in 2014, JEITA informed members through a memorandum that there had been cases where JEITA was required to submit its committee meeting minutes and handouts to the competition law enforcement authorities pursuant to requests.

232.   In September of 2014, the PCC presented an explanation of a competition law compliance system that would go into effect the following day.[39] Among the rules that were enacted was the requirement that all information exchanges through JEITA use an independent third party to ensure confidentiality. ceconfidentiality. The guidance explained how to conduct association meetings and exchange competitor information in a way that complied with antitrust and competition laws. Concerns about unlawful information exchanges at social gatherings held in conjunction with JEITA meetings were expressed. On February 5, 2015, the PCC announced for the first time that it would conduct a Competition Law Compliance Seminar on February 15, 2015, at which the law firm Gibson Dunn would make a presentation. PCC members were warned about exchanging confidential corporate information at social gatherings. In September of 2016, consideration was given to creating audio recordings of JEITA meetings. ce proposal was not passed because it was perceived as chilling free communication among JEITA members and because it might create antitrust exposure. expressed.

233.   On February 5, 2015, the PCC announced for the first time that it would conduct a Competition Law Compliance Seminar on February 15, 2015, at which the law firm Gibson Dunn & Crutcher LLP would make a presentation. PCC members were warned about

exchanging confidential corporate information at social gatherings. In September of 2016, consideration was given to creating audio recordings of JEITA meetings. The proposal was not passed because it was perceived as chilling free communication among JEITA members and because it might create antitrust exposure.

234.    Even after all of this, however, antitrust concerns with respect to how JEITA conducted itself remained. For example, in a JEITA Inductor Subcommittee meeting in January of 2016, JEITA members discussed the concerns raised by a German attorney regarding the method for collecting CF data among JEITA members, including that the companies themselves were collecting this information. Thereafter, JEITA decided not to allow (as it had been doing) CF data to be communicated in that fashion. Because CF data included forward-looking non-public information on demand, the exchange of CF data was another way that Defendants were able to fix or inflate prices of Inductors.

---

[39] It had been publicly announced that the DOJ commenced its criminal antitrust investigation of capacitor manufacturers in April of 2014.

### 3.    Conspiratorial Acts Committed in the United States

235.    Conspiratorial acts to fix the price of Inductors occurred in the United States as well as Japan. This conduct included meetings in the United States and discussions in Japan directing such United States meetings to rig bids for Inductors made by TDK, Murata, Toko, Tokin, and Taiyo Yuden ███████████████████████. Panasonic and Tokin's predecessor NEC Tokin were implicated in this conduct as well.

236.    **Contacts And Unlawful Agreements Between KEMET and NEC Tokin.** In early 2014, representatives of Kemet and NEC Tokin, including individuals located in the United States, agreed to allocate certain passive component customers between the two competitors. Kemet and NEC Tokin agreed that neither competitor would solicit capacitor or

Inductor business from current Inductor or capacitor customers of the other competitor. Although the two companies eventually merged in 2017, they were competitors in the market for passive components at the time of the agreement.

237.     **Contacts And Unlawful Agreements Between TDK And Murata.** TDK and Murata reached unlawful agreements targeting U.S. inductor purchasers, including Flex. One person engaged in such activities was Mr. Kevin Umeda, who was part of the Product Marketing Department ("PMD") for TDK from 1999 through 2016 and based in San Jose, California. Mr. Umeda attended various West Coast trade shows and met and talked with representatives of TDK's competitors. At one such show in 2004, he came into contact with Mr. Hiromi Nagasaka, a member of Murata's PMD. Over the years, they communicated often (usually by telephone), exchanging price information and agreeing upon pricing to be quoted to common customers who disseminated Requests for Quotation ("RFQs"), such as Skyworks' requests with respect to ferrite bead Inductors.

238.     One such example occurred in November of 2007, when Mr. Nagasaka told Mr. Umeda that he was under pressure to increase Murata's share and thus Murata would make a bid in response to a Skyworks RFQ that it did not want TDK to undercut. Mr. Umeda reported his discussion to TDK's headquarters in Japan and thereafter provided Mr. Nagasaka with TDK's price range.

239.     Mr. Nagasaka introduced Mr. Umeda to his colleague Mr. Yohei Tsuda, who was also based in San Jose and had responsibility for servicing ▇▇▇ on behalf of Murata. Mr. Tsuda and Mr. Umeda began working together; both TDK and Murata sold various types of Inductors to ▇▇▇ and its

electronic service manufacturers such as Flex. Mr. Tsuda and Mr. Umeda would communicate by cell phone or, on occasion, in face-to-face meetings.

240.    In the summer of 2009, Mr. Tsuda was replaced by Mr. Yoshi Imanishi at Murata. Messrs. Umeda and Imanishi worked closely until Mr. Imanishi returned to Japan in 2014. Messrs. Umeda and Imanishi spoke weekly by cell phone on ▮▮▮ design events, new products, and RFQs. Sometimes Messrs. Umeda and Imanishi would text each other. They also participated in quarterly business lunch meetings at the Hatcho Restaurant in Sunnyvale, California. Various additional persons from TDK and Murata would attend these luncheon meetings as well.

241.    What follows are merely exemplars of conspiratorial agreements between TDK and Murata targeting U.S. customers. TDK and Murata reached additional conspiratorial agreements not discussed herein. Although many of these agreements reference prices to ▮▮▮ the agreements targeted ▮▮▮ entire supply chain, including electronic service manufacturers such as Flex that purchased products for ▮▮▮ at prices set by ▮▮▮ or derived from the ▮▮▮ price.

242.    Around 2009, ▮▮▮ wanted better discounts from its suppliers. Messrs. Umeda and Imanishi agreed not to concede to ▮▮▮ requests on behalf of their companies, but to respond to ▮▮▮ RFQs by not bidding against each other and causing their respective companies to bid higher than ▮▮▮ wanted.

243.    For example, in January of 2010, ▮▮▮ solicited bids on ▮▮▮ ▮▮▮. At the time, TDK was seeking to be qualified to bid on this RFQ. Mr. Umeda met with Messrs. Tsuda, Imanishi, and Nagasaka to discuss how TDK would bid once it got qualified. Mr. Umeda came to understand that Murata would not price too low against its competitor.

244.    In April of 2010, Mr. Umeda reported his progress with respect to reaching agreement with Murata to Messrs. Kiyoshi Mogi, Kazushi Sudo, Junshi Saito, Yukihiro Hayakawa, Mitsuharu Mizutani, and others at TDK. Mr. Umeda reported that there was an agreement with Murata to seek higher prices for negotiations with ▮▮▮.

245.    In June of 2010, Mr. Umeda reported to Messrs. Toshimichi Kamagata (head

of TDK's PMD that included Inductors from 2013 to 2016, who had price-setting authority),
Yoshinobu Sasaki, and Toshihiro Kuroshima of TDK that Murata was concerned that a third
party competitor might enter

the market, causing prices to collapse. Mr. Umeda reassured Messrs. Kamagata, Sasaki, and
Kuroshima that he had reached an understanding with Murata to prevent such a collapse.

246.   A similar situation occurred in 2011 with respect to ███████████████ used
by █████████████. Once again, Murata provided such items to ██████ and TDK had just
gotten qualification. Mr. Umeda of TDK and Imanishi of Murata discussed the matter and
agreed not to engage in a price war for ██████ business. Mr. Umeda was assured that TDK
did not have to price aggressively low and that the TDK and Murata would share ███████
business for this product. Also in 2011, ██████ issued RFQs for common mode filters, another
type of Inductor. TDK had been the sole supplier of this type of Inductor, but ██████ wanted
others to supply competing bids. Mr. Umeda called Mr. Imanishi of Murata, which intended
to bid. Messrs. Umeda and Imanishi shared the price ranges that their companies intended to
quote ██████ so that TDK could avoid having to offer unnecessarily low pricing.

247.   In February of 2014, Mr. Kamagata of TDK directed Mr. Umeda to
communicate to Murata that TDK would not give a low price bid to ██████ for a product where
TDK had recently become an additional source. TDK believed it had an agreement with
Murata with respect to pricing for these common mode filters.

248.   Mr. Kamagata's February 2014 communication with Mr. Umeda discusses
Flex and indicates Flex would be a target of the conspiratorial agreement with Murata.

249.   In July of 2014, Murata and TDK agreed to coordinate pricing for ███████
concerning bids for TDK's ████████████████████.

250.   In 2014, Mr. Imanishi was replaced by Messrs. Kudo and Goto, also in

Murata's PMD for Inductors. Mr. Kudo handled sales to ██████ while Mr. Goto handled sales to ██ As with Mr. Kudo's predecessors at Murata, Mr. Umeda of TDK began communicating directly and often with Mr. Kudo about ██████ either through cell phone calls or text messages. In 2016, when Mr. Umeda returned to Japan, he introduced his replacement, Mr. Asakawa, to Mr. Kudo at Murata.

251.    TDK and Murata also exchanged detailed confidential information about capacity and production, sometimes about specific Inductor products or product lines. In July of 2011, Mr. Koichi Shirai of Murata informed Mr. Kamagata of TDK that for Murata's LQP line of Inductors, Murata would be short hundreds of millions of Inductors a month, with the purpose of ensuring that TDK would

be able to make up the shortfall with its competing product lines so that Murata would face less price competition.

252.    There were other meetings between TDK and Murata as well. From at least July of 2013 until April of 2015, a series of meetings took place in California organized around social events and golfing, known as the "MT Cup." TDK participants included Messrs. Wada, Umeda, Kanashiro, Yohei Yamasaki (TDK's Strategic Account Manager for ██████, Okuyama, and Saito. Murata participants included Messrs. Kurose, Nakayama, Hikita, Miyamura, Imanishi, Ono, and Yamazaki. Outings were held at golf courses in Livermore, Half Moon Bay, Pleasanton, Morgan Hill, Gilroy, San Jose, and San Ramon, California. There were at least fifteen MT Cup events.

253.    In August of 2014, TDK asked participants not to disclose the latest MT Cup outing outside the company. This warning was sent around the time the raid of electronic capacitor manufacturers by antitrust enforcers occurred in Japan.

254.    As discussed above, TDK personnel who attended JEITA meetings were

involved in these discussions concerning use of competitors' pricing and coordination of pricing with competitors. Messrs. Uemura, Araya, Sudo, Sutoh, and Takuji Suda of TDK attended JEITA PCC meetings and were involved in pricing discussions concerning competitors' products. Mr. Suda also attended Inductor Subcommittee meetings. Mr. Ishiguro, a manager in TDK's Sales Promotion group, attended the most Inductor Subcommittee meetings for TDK. The Sales Promotion group head reported to Mr. Kamagata.

255.    **Contacts And Unlawful Agreements Between TDK and Taiyo Yuden.** Mr. Umeda of TDK also had regular contacts with members of Taiyo Yuden's PMD for Inductors. Prior to 2003, Mr. Umeda communicated with Mr. Kenchiro Tanahashi of Taiyo Yuden's PMD. Thereafter, Mr. Umeda communicated with Messrs. Hiraoka and Nakamoto of Taiyo Yuden's PMD. Mr. Umeda engaged in discussions with Taiyo Yuden concerning Inductors for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. At a meeting at the Hatcho Restaurant in 2006, Mr. Umeda and Messrs. Hiraoka and Nakamoto shared information about ▮▮▮ third generation of ▮▮ Taiyo Yuden gave advice on how TDK could improve its Inductors for such equipment. Taiyo Yuden and TDK shared Inductor pricing information and agreed that Taiyo Yuden would not reduce prices as much as ▮▮ wanted.

256.    In March of 2010, TDK executives Messrs. Hitoshi Sasaki and Yutaka Matsuura discussed prices of Inductors to be sold to ▮▮▮ Messrs. Umeda, Sasaki, and Matsuura discussed reaching an agreement with Taiyo Yuden to avoid price competition and keep prices high. Mr. Umeda confirmed he would seek Taiyo Yuden's agreement to avoid price competition.

257.    Defendants also reached agreements to establish price floors. For example, in January of 2013, Mr. Kamagata of TDK proposed that Taiyo Yuden would not go below

$0.024 for a certain Inductor manufactured for ▮▮▮▮ In 2008, Mr. Hiraoka of Taiyo Yuden was replaced by Mr. Naoto Yokoyama, and once again, Mr. Umeda communicated with Mr. Yokoyama by telephone. In March of 2012, Mr. Umeda asked Taiyo Yuden if it would start competing with TDK on ▮▮▮▮ business for ▮▮▮▮. Mr. Umeda was told that Taiyo Yuden would not try to meet ▮▮▮▮ requested target price.

258.    Mr. Umeda was not the only TDK representative to have direct discussions with Taiyo Yuden. In March of 2009, Mr. Hisashi Oi (Taiyo Yuden's General Manager, Ferrite Application Product Managing Department, who, as noted above, was a frequent attendee at JEITA meetings and President of Taiyo Yuden U.S.A. at the time), met face-to-face in Chicago with Mr. Jon Nelson, President of TDK America. Around that time, Mr. Oi also exchanged confidential information with TDK's Mr. Hiroki Honma.

259.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ instituted a "round robin" bidding process, where bidders were required to submit quotes on the same day at the same time and place. Mr. Yohei Yamasaki, who was TDK's Strategic Account Officer for ▮▮▮ and located in San Jose at the time, called his counterpart Mr. Yukihiro Umetani at Murata to discuss the new bidding format. Mr. Umetani said ▮▮▮ was trying to get lower prices from its suppliers and he agreed with Mr. Yamasaki that TDK and Murata would not to compete aggressively. Mr. Yamasaki then called Mr. Jun Nakajima at Taiyo Yuden to discuss ▮▮▮ new bidding format. Mr. Nakajima told Mr. Yamasaki that Taiyo Yuden did plan to compete aggressively. Then Mr. Kuroshima of TDK's PMD in Japan asked his colleague Mr. Kamagata to negotiate with Taiyo Yuden and Murata. Mr. Kamagata directed Mr. Umeda to negotiate a three-way agreement among TDK, Taiyo

Yuden, and Murata on discounting pricing to ▮▮▮ Mr. Umeda asked his colleague Mr.

Yamasaki to make the call. Mr. Yamasaki called representatives of both Murata and Taiyo Yuden and shared TDK's pricing range. The representatives from Murata and Taiyo Yuden understood what Mr. Yamasaki of TDK wanted them to do.

260.    Likewise, Mr. Nobumitsu Kanemori of TDK had frequent meetings with representatives from Murata and/or Taiyo Yuden regarding business with ▮▮▮▮▮ At one juncture in March 2011, there were sometimes daily discussions with Murata and Taiyo Yuden involving all members of TDK's San Jose sales office and teleconference participants from Japan. Providers of confidential information to TDK included Mr. Nakajima, a sales manager for Taiyo Yuden. Taiyo Yuden informed TDK that ▮▮▮▮ might want to shift its purchases from TDK to Taiyo Yuden so that TDK could develop a strategic response.

261.    In addition to these discussions and agreements, executives at Murata, TDK, and Taiyo Yuden met regularly in Japan outside the auspices of JEITA meetings. These meetings were known as the "Nakakabu" meetings and commenced at least as early as 2012. The idea for the Nakakabu meetings came from a meeting at a Korean restaurant in Tokyo in July of 2010, which Messrs. Kamagata, Suda, and Ieba of TDK and Messrs. Kasuo Inaba and Tobe of Taiyo Yuden attended. Mr. Kamagata was head of TDK's PMD from 2012 through 2016 and set prices for Inductors.

262.    The Nakakabu meetings were set up by Mr. Kamagata of TDK and Mr. Inaba of Taiyo Yuden. Mr. Kamagata was introduced to Mr. Inaba by Mr. Suda of TDK. The first Nakakabu meeting occurred in March 2012 at the Torafugu Restaurant in Tokyo. Attendees included Mr. Kamagata of TDK, Mr. Kazuo Inaba of Taiyo Yuden, and Messrs. Tatsuyuki Yamada and Masahiro Adachi of Murata. The Nakakabu dinners were designed to facilitate the exchange of pricing information to benefit Defendants to the detriment of their customers. Information exchanged and agreements reached at the Nakakabu dinners permitted Defendants to coordinate their behavior in order to facilitate price increases.

263.    There were at least six Nakakabu meetings that were held. Mr. Kamagata and, on occasion, Mr. Mitsuharu Mizutani, attended for TDK. For Murata, the attendees were

Messrs.

Tatsuyuki Yamada and Masahiro Adachi of Murata's PMD for Inductors. For Taiyo Yuden, the attendees were Mr. Inaba and Mr. Hidetaka Ikari, an application engineer.

264.    The meetings were held at night, in private rooms in restaurants or sometimes in company offices. The companies took turns organizing the meetings. No notes or recordings of the meetings were made. Attendees shared information about capacity utilization rates and how much time it would take to recoup their investment. The attendees also discussed customers purchasing Inductors for sale in the United States, including ██████████ Defendants also discussed Inductors sold for use in the automobile business, including to customers such as ██████████.

265.    Defendants further discussed ██████ policy of seeking multiple suppliers for Inductors — in an attempt to foster price competition — and what to do about it. During one meeting, Mr. Kamagata of TDK told Mr. Inaba of Taiyo Yuden that Taiyo Yuden did not need to price too low on an upcoming "round robin" bid for ██████ because the competitors were not going to bid low and no competitor would follow Taiyo Yuden's price.

266.    TDK's communications with competitors about prices were shared at the highest levels, including with President Takehiro Kamigama, and Executive Directors Araya and Uemura of TDK.

267.    In 2016, TDK and Murata continued to meet and discuss prices for Inductors. In March 2016, Messrs. Umeda and Asakawa of TDK met with two Murata employees at a private room at the restaurant Sushi Kuni in Cupertino. In September 2016, Mr. Komatsu and Asakawa of TDK bid on prices for a customer using prices obtained from Murata.

268.    **Contacts And Unlawful Agreements Among TDK, Murata, And Toko.** Murata began conspiring with Toko well before Murata acquired a controlling interest in

Toko. In August of 2012, TDK had received information from Toko concerning Toko's products that were equivalent to TDK's Inductors. In January of 2013, Murata told TDK that it controlled Toko's pricing and that it coordinated with Toko in submitting bids to certain customers. Prior to its acquisition of Toko, Murata passed on information to TDK about Toko's bidding and pricing for a project with ████████████, and also reported to TDK that it was submitting bids with Toko regarding ████████████

269.   **Contacts Between TDK and Tokin.** Mr. Umeda of TDK, who had met dozens of times with Murata and Taiyo Yuden representatives to discuss pricing for customers and other material non-

public information, met with Mr. Shiratori of Tokin in June of 2012, and met again with Tokin personnel in October of 2013. Mr. Umeda also had the personal and business telephone numbers of Mr. Yoshio Ito of Tokin, who worked in San Jose.

270.   **TDK's Advance Knowledge of Panasonic Pricing.** TDK made pricing decisions for Inductors knowing in advance Panasonic's prices for competing products. In December of 2012, TDK knew Panasonic's price and strategy for competing common mode filters, and took that into account in offering discounts to ████ for its ██████████████. In January of 2013, TDK took Panasonic's prices into account when submitting quotations for ████████████████. In July of 2013, Mr. Umeda of TDK knew ██████████ prices for Inductors that competed with TDK's ████████████ and took that into account when setting prices for ████. The anticompetitive activity included agreements to fix or stabilize prices for Inductors by sharing confidential information on pricing and other matters.

4.   ~~3.~~ Subpoenas Issued by DOJ And Presence of a Leniency Applicant

271.   ~~197.~~ On January 4, 2018, MLex reported:

Electronics manufacturers have been subpoenaed by US antitrust prosecutors as part of a price-~~fixing~~fixing investigation involving the inductor market,

MLex has learned.

Subpoenas were sent out in mid-November, and the San Francisco ~~office~~office at the Department of Justice's antitrust division is overseeing the investigation, it is understood.

~~The~~The inductor subpoenas are part of a long-running investigation, which also includes capacitors and resistors. ~~The~~The components are part of electrical circuits that store and regulate the ~~flow~~flow of electricity, and are ubiquitous in electronic devices.

272.   ~~198.~~The subpoenas were issued by a grand jury empaneled in San Francisco, California. Flex reasonably believes that Taiyo Yuden, TDK, and Murata received such subpoenas. ~~Panasonic and Sumida have asserted that they have not received such subpoenas, but that does not mean they could not become targets of any investigation regarding Inductors once the materials produced in response to the subpoenas are reviewed by DOJ, especially in light of the information about JEITA meetings described above, of which the DOJ may be unaware. Nor does it mean that Panasonic or Sumida might not have placed a marker with DOJ to obtain leniency, which is still in the process of being perfected.~~

273.   ~~199.~~The subpoenas at issue are~~, on information and belief,~~ part of a criminal investigation by the DOJ. ~~The~~The fact that these companies received subpoenas from a federal grand jury is ~~significant~~significant because it indicates that the DOJ is considering a criminal prosecution, as is ~~reflected~~reflected in Chapter 3 of the 2014 edition of the

DOJ's Antitrust Division Manual.[40][40] Section F.1 of that chapter notes that "~~staff~~staff should consider carefully the likelihood that, if a grand jury investigation developed evidence ~~confirming~~confirming the alleged

[40] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf (last visited January 4, 2019).

anticompetitive conduct, the Division would proceed with a criminal prosecution."[41] ~~e~~

~~staff~~[41] The staff request needs to be approved by the relevant ~~field~~field chief and is then sent to the Antitrust Criminal Enforcement

Division.[~~45~~42] "~~ee~~The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys

who will participate in the grand jury investigation."[~~46~~43] "~~ee~~The investigation should be conducted by a grand jury in a judicial district where venue lies for the ~~offense~~offense, such as a district from or to which ~~price-fixed sales were made or where conspiratorial communications occurred."[47] ee fact of the grand jury investigation, taken together with the economic analysis of the Inductors market contained herein, supports the inference of collusion.~~

price-fixed sales were made or where conspiratorial communications occurred."[44]

[78]    As noted above, on May 20, 2019, MLex also revealed that TDK is an applicant for leniency from the DOJ with respect to the DOJ's investigation of Inductors. The significance of a company seeking Type B leniency cannot be understated. According to the DOJ's "Frequently Asked Questions" about the Antitrust Division's Leniency Program (as updated on January 26, 2017), an applicant for Type B leniency must admit to participating in a criminal violation of the antitrust laws:[45]

> 5.   *Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?*
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.[46]

[41] *Id.* at III-82.

[42] *Id.*

[43] *Id.* at III-83.

[44] *Id.*

[45] https://www.justice.gov/atr/page/file/926521/download.

[46] https://www.justice.gov/atr/page/file/926521/download.


275.    As indicated on the same DOJ webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

### 5.    4. Involvement of Some Defendants in Other Conspiracies

276.    200. Collusion is also the most plausible explanation of what occurred in the Inductors market, given that Defendants Panasonic, Tokin (the successor to NEC Tokin), Taiyo Yuden, and TDK are well- known recidivist antitrust violators. That is particularly the case here, where the method for improperly conducting JEITA "information exchanges" concerning competitively sensitive information pertaining to Inductors is the same method used in connection with the resistors and capacitors conspiracies. Indeed, these meetings were scheduled and held in tandem, with similar formats for collecting and sharing confidential information, and the information was often distributed for all passive components (capacitors, resistors, and inductors) in a single communication – strongly supporting the inference that the Inductor conspiracy was executed in parallel and similarly to the capacitor and resistor conspiracies.

277.   Mr. Date of NEC Tokin participated in the exchange of confidential information for both the Inductors and Capacitors subcommittees, making it even more likely that the same unlawful practices were carried out in all these subcommittees. Also, Panasonic's Mr. Takiguchi, who conceded that the JEITA information exchanges were violations of the antitrust laws, was in charge of automotive pricing for both Inductors and resistors. It is highly improbable that the JEITA subcommittees for the various passive components that collected and shared confidential information using the same methods and were coordinated by the same organization were only unlawfully sharing confidential information pertaining to capacitors and resistors and not Inductors.

278.   201.Panasonic, one of the world's leading manufacturers of Inductors, has pled guilty in numerous price-fixingfixing cases, including electronic products.

279.   202.On September 30, 2010, Panasonic agreed to plead guilty and to pay a large criminal finefine for its participation in a conspiracy to price-fixfix refrigerant compressors from October 14, 2004 through December 31, 2007.

280.   203.On July 18, 2013, Panasonic agreed to plead guilty and to pay a $45.8 million criminal finefine for its participation in a conspiracy to price-fixfix switches, steering angle sensors and automotive high intensity discharge ballasts installed in cars sold in the United States and elsewhere from at least as early as September of 2003 until at least February of 2010.

281.   204.⇐atThat same day, Panasonic's subsidiary, SANYO Electric Co., Ltd., agreed to plead guilty and to pay a large criminal finefine for its participation in a conspiracy

101

to ~~fix~~fix the prices of cylindrical lithium- ion battery cells sold worldwide for use in notebook computer battery packs from about April of 2007 until about September of 2008.

282. ~~205.~~In 2008, Panasonic created the "Rules Concerning Activity and Relationship with Competitors" that were supposed to ensure antitrust compliance; a Compliance Committee that meets annually was set up to monitor these ~~efforts~~efforts. ~~ee~~The rules did not solve the problem. In its 2012 corporate "Sustainability Report," Panasonic stated:

> In ~~fiscal~~fiscal 2012, the company reviewed the ~~efforts~~efforts related to the company's compliance activities in the corporate "Compliance Committee" and discussed additional personnel measures. ~~ee~~The top management again strongly restated that it is the company's policy not to engage in cartel activities and requests employees mainly in sales and marketing
> departments to ~~confirm~~confirm whether they encounter suspicious activities or not.[1847]

~~ee~~The same report noted that Panasonic had created a Global & Group Risk Management Committee chaired by the President of the company and including directors and executive ~~officers~~officers in charge of corporate operational functions at the company's headquarters. ~~eat~~That group ~~identified~~identified the "corporate major risks" for

~~48https://www.panasonic.com/global/corporate/sustainability/pdf/sr2012e.pdf (last visited January 4, 2019).~~ the then just-ended ~~fiscal~~fiscal year 2012 and the then upcoming ~~fiscal~~fiscal year 2013. On both lists was "Cartels." Subsequent corporate sustainability reports for 2013, 2014 and 2015 ~~identified~~identified this
same "corporate major risk~~"~~" for the 2013, 2014 and 2015 ~~fiscal~~fiscal years, as well as the 2016 ~~fiscal~~fiscal year.[4948]

283. ~~206.~~~~ee~~The foregoing pattern of anticompetitive practices in various technology-related markets is illustrative of Panasonic's corporate conduct, which has included illegal activity aimed at generating ~~profits~~

---

[47] https://www.panasonic.com/global/corporate/sustainability/pdf/sr2012e.pdf (last visited January 4, 2019).

[48] *Id.*;

http://www.panasonic.com/global/corporate/sustainability/downloads/back_number/pdf/20
14/sr

2014e.pdf (last visited January 4, 2019).

profits at the expense of its customers. It is highly plausible that the same type of conduct occurred in the Inductors market.

207.Faced with an overall decline in demand for their Inductors, and steep price declines after the introduction of the ITA, Panasonic and its colleagues had a keen desire to avoid price competition.

284.    208.As noted above, NEC Tokin, the predecessor of Defendant Tokin, was finedfined by the JFTC and by a federal district court judge for fixingfixing the prices of certain capacitors and one. One of its executives (Mr. Date, who participated in meetings of both the Inductors Subcommittee and the PCC meetings) has been indicted for his involvement in that conspiracy.

285.    209.Likewise, Taiyo Yuden has also been accused of, or investigated for, anticompetitive practices by foreign competition authorities. On June 26, 2018, MLex reported that the Korean Fair Trade Commission ("KFTC") had completed its investigation into cartel activity in the capacitors market in South Korea. According to MLex, Taiyo Yuden was implicated in the KFTC's report, along with Panasonic, NEC Tokin, and other capacitor manufacturers.

286.    210.In 2009, Taiyo Yuden was finedfined two million New Taiwan Dollars (NT$) and ordered to cease its illegal licensing practices by the Taiwanese Fair Trade Commission for violating the Taiwanese

49 Id.;
http://www.panasonic.com/global/corporate/sustainability/downloads/back_number/pdf/2014/sr
2014e.pdf (last visited January 4, 2019). Fair Trade Act in conspiring with Royal Dutch Philips
Electronics, Ltd. and Sony Corporation to abuse their joint monopoly power in the Market for
CD-Recordable discs.[50][49]

287.   211.Similarly, in July of 2016, the JFTC raided the officesoffices of TDK
Corporation and NHK

Spring Co. ("NHK") on suspicion that they created an unlawful cartel concerning suspensions

for hard disk drives ("HDD"). In February of 2018, the JFTC finedfined suspension makers

1076.16 million yen for agreeing to fixfix prices. In April of 2018, CADE—Brazil's

Administrative Council for Economic Defense—announced that it was investigating a cartel

among HDD suspension manufacturers that included TDK and NHK.

288.   212.ceThe highly concentrated nature and structure of the Inductors market

made it likely that collusion would be both possible and profitableprofitable. As shown above,

Defendants comprised over 75% of the market during much of the Relevant Period.

49 https://www.ftc.gov.tw/internet/english/doc/docDetail.aspx?uid=786&docid=1720
(last
visited January 4, 2019).

6.   5. Use of Trade Associations Other than JEITA to Facilitate and
Organize the Conspiracy

289.   213.Trade associations other than JEITA provided opportunities for the

Defendants to meet frequently and exchange confidential information to facilitate collusion.

ceThe Defendants are members of a number of trade associations in the United States, Asia,

and Europe. ceirTheir overlapping membership in various trade associations also provided

incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor and police one another's activities in the Inductors market and punish non-compliance. ~~ce~~The Defendants' participation in trade associations, as described above, helped facilitate their collusion.

290.    ~~214.~~One such organization is the Electronic Components Industry Association ("ECIA"), which is located in Alpharetta, Georgia. Several of the Defendants are members of this organization, including MENA, Sumida America, TDK America, and PCNA (through its division Panasonic Industrial Sales Company of America). ~~ey~~They regularly meet to discuss matters of mutual concern. As the website of the ECIA states:

~~50https://www.fte.gov.tw/internet/english/doc/docDetail.aspx?uid=786&docid=1720 (last visited January 4, 2019).~~

> ECIA provides resources and opportunities for members to improve their business performance while enhancing the industry's overall capacity for growth and ~~profitability~~profitability. From driving critical conversations and process optimization to product authentication and industry advocacy, ECIA is your trusted source for support, insight and action.
>
> Bringing together the talent and experience of broad array of industry leaders and professionals representing all facets of the electronics components supply chain, ECIA is uniquely positioned to enable individual connection as well as industry-wide collaboration. As the supply chain becomes increasingly more complex, ECIA serves
>
> as a vital nexus for ~~refinement~~refinement and progress.[~~51~~50]

291.    ~~215.~~For manufacturers, the ECIA promises access to "[d]ata & statistics for better decision- making (Executive summaries, ~~confidence~~confidence surveys, end market reports, etc.)," the opportunity to "[s]hape opinion and direction by participating on Councils and Committees that design, develop, and publish processes the industry will follow" and "[n]etworking among the industry leaders (…can't have enough professional relationships!)."[~~52~~51]

[50] https://www.ecianow.org/about-ecia/what-we-do/ (last visited January 4, 2019).

[51] https://www.ecianow.org/join-ecia/manufacturer/ (last visited January 4, 2019).

292. 216. ~~ee~~The data and statistics mentioned by ECIA are ~~significant~~significant. For the Inductors market, ECIA prepares quarterly sale reports of Inductors sold in North America, as well as indices of monthly

and weekly sales of electronic components.[51] ~~ee[52]~~ The ECIA also has a Statistics and Industry Data Committee, the role of which is ~~defined~~defined as follows:

> ~~ee~~The Statistics and Industry Data Committees oversee several programs that collect and provide unique industry data. ~~eese~~These include commodity and market segment level sales trends as well as discrete passive electronic components market reports. ~~ee~~The primary outputs are the Electronic Component Sales Trends survey (ECST) and the MS Series, a collection of 13 individual reports on capacitors, resistors, and inductors that include world statistics, and distribution sales by product category (semiconductor, passive, electromechanical and display sales).[54][53]

Based on information and belief, among "2014 accomplishments" that the Statistics and Industry Data Committee "[c]ompiled and published more than 100 statistics reports (MS series) on North American

---

51 ~~https://www.ecianow.org/about-ecia/what-we-do/ (last visited January 4, 2019).~~

52 ~~https://www.ecianow.org/join-ecia/manufacturer/ (last visited January 4, 2019).~~

53 ~~https://www.ecianow.org/north-america-sales-booking-reports/ (last visited January 4, 2019).~~

54 ~~https://www.ecianow.org/about-ecia/committees/statistics-industry-data-committee/ (last visited January 4, 2019).~~

Sales and Booking for capacitors, resistors and inductors plus monthly reports on world statistics for capacitors and quarterly reports for world statistics for resistors and inductors." Within the council is the "Passive Components Market Services Working Group," of which TDK America, Panasonic Corporation, and MENA are members.

293. The ECIA, like the European Inductors trade association described below, hosts periodically World Capacitor/Resistor/Inductor Trade Statistics meetings, which are held biannually. Many Defendants named here, as well as defendants sued in the Capacitors and Resistors class actions, attend these meetings. As stated on ECIA's website with respect

to the April 2012 meeting held in Washington DC, "'[t]hese World Meetings demonstrate a unique cooperation among major companies in the international electronic components community,' says Jim Bruorton, KEMET Electronics and WCTS Chairman, The Americas. 'The meetings offer a one of a kind opportunity for the three regions to discuss common goals and issues in the industry. This special session provides a baseline for many

[52] https://www.ecianow.org/north-america-sales-booking-reports/ (last visited January 4, 2019).

[53] https://www.ecianow.org/about-ecia/committees/statistics-industry-data-committee/ (last visited January 4, 2019).

of these discussions.'"[54] JEITA is known to have shared its collected competitor information with the World/Capacitor/Resistor/Inductor Trade Statistics organization.

294.   217.By virtue of their membership in such organizations, the Defendants have the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. ECIA, for example, hosts an annual "Executive Conference." eeThe 2014 conference was held in Chicago, Illinois, and the 2015 conference was held in Chicago on October 25-27, 2015. ECIA also hosts an "EDS Summit" that includes electronic component manufacturers "where valuable idea exchange can happen through high-

level strategic meetings, event functions and informal gatherings."[55] eisThis past year's EDS Summit took place on May 15-18, 2018 in Las Vegas, Nevada.

295.   218.Another trade association to which some of the Defendants belong is the European Passive Components Industry Association ("EPCIA"), which is headquartered in Brussels, Belgium. Its members include Murata and Panasonic entities. eeThe Vice President

of EPCIA is Mr. Reinhard Sperlich of Murata Europe GmBH, which is headquartered in Nürnberg, Germany. EPCIA's goal is "[t]o represent and promote the common interests of the Passive Components Manufacturers active in Europe to ensure an open and transparent market for Passive Components in Europe as part of the global market place"; among its activities are providing members with "general market data," "[f]acilitat[ing] worldwide networking between Passive Component Manufacturers at expert/Management level" and "[r]elat[ing] with similar Industry Associations in other Regions around

the world."[56]

55 https://www.ecianow.org/connection-points/eds/ (last visited January 4, 2019).
56 https://www.eusemiconductors.eu/index.php?option=com_content&view=article&id=57&Itemid=1 49 (last visited January 4, 2019).

### 7.  6. Other Interactions

296.  219. Beyond trade associations, Murata, TDK, and Taiyo Yuden have a history of working closely together. For example, in 2005, they jointly prepared and proposed new recommended dimensions for Ultra-Compact Multilayer Chip Ceramic Capacitors.

54 https://www.ebnonline.com/document.asp?doc_id=239406.
55 https://www.ecianow.org/connection-points/eds/ (last visited January 4, 2019).

297.  220. In Taiyo Yuden's 2013 annual report, Mr. Eiji Watanuke, its President, stated that "we are transforming our business model to accommodate the formation of alliances with other companies. Looking ahead, we intend to proactively enter these markets characterized as being comparatively less susceptible to price competition."

56 https://www.eusemiconductors.eu/index.php?option=com_content&view=article&id=57&Itemid=1 49 (last visited January 4, 2019).

[57] https://www.yuden.co.jp/ut/news/release/pdf_25.pdf (last visited January 4, 2019). This arrangement continued during the period when Kemet had a financial and ownership stake in NEC Tokin.

public. Nor was Flex privy to the conspiratorial acts that occurred at social gatherings of Defendants' executives that occurred in proximity to JEITA meetings, where conspiratorial discussions occurred orally or through other surreptitious means. Nor could Plaintiffs have known of the telephone calls, texts, and secret restaurant meetings in both the United States and Japan that are described above.

304. 227.Defendants' own public statements concealed the existence of the alleged conspiracy. For example, Murata in its Fiscal Year 2004, 2007 and 2008 Annual Reports repeatedly referred to "competition" as being "fiercefierce." Many of TDK's Annual Reports during Relevant Period also refer to the challenges of "competition." Similarly, in its Annual Reports during the Relevant Period (such as those from 2009-11), Taiyo Yuden touted its "social responsibility" charter and how it engaged in "fair, open and free competition" and how it was facing "increased" competition. And Panasonic, despite all its public pronouncements that it was educating its executives and departing from its cartel past, has in fact, not done so.

305. 228.Several of the Defendants have adopted and promulgated a "code" of conduct" that is at odds with their participation in the alleged conspiracy.

306. 229.⟵usFor example, Murata said in its 2007 Code of Conduct that "[w]e will conduct fair business by complying with all applicable laws and regulations regarding antitrust and fair competition and trade."[58]

307. 230.Similarly, TDK's 2005 Code of Conduct states that:

[58]https://www.murata.com/~/media/webrenewal/about/csr/management/compliance/p02.ashx?la=en-

110

(last visited January 4, 2019).

> In general, the purpose of antitrust laws or similar competition laws in many countries is to encourage free competitions or trade and to protect consumer interests. TDK Members must exercise special care to ensure that any business activity with representatives of other companies is not contrary to such antitrust laws or similar anti- competition laws of other countries, where applicable. Each member organization of TDK Group should have its compliance company policy with regard to its respective applicable antitrust laws or similar anti-competition laws, and such policy must be
>
> respected or observed by TDK Members of the member organization.[59]

[58]  https://www.murata.com/~/media/webrenewal/about/csr/management/compliance/p02.ashx?la=en (last visited January 4, 2019).

[308]    231.Likewise, Taiyo Yuden's Code of Conduct states that "[a]ny unfair business practice or suspected act of cartel behavior, abuse of dominant bargaining position, tie-in sales or other acts for improper restriction of trade or unfair transaction shall be never committed."[60]

309.    232.Sumida's "business principles" include the precept that "[w]e respect the manners,

customs and laws of local regions in all our business activities."[61]

310.    233.And Panasonic's 2008 Code of Conduct states that "[w]e will respect free and fair

competition, and abide by all applicable antitrust (competition law) and other laws and regulations."[62]

---

[59]    https https://www.secsec.gov/Archives/edgar/data/203383/000114554907001603/k01416exv11w1.htm (last-visited January 4, 2019).

[60]https://www.yuden.co.jp/es/company/csr/charter/rule.html (January 4, 2019).

[61]https://www.sumida.com/userfiles/INFO_CENTER/COMPANY_INFO/SBP/SBP_EN_201 60222.pdf (last visited January 4, 2019).

[62]httpshttps://www.panasonicpanasonic.com/global/corporate/management/code-of-conduct/pdf/code-of-

111

311.   234.Kemet, which owns Tokin, has a code of conduct that includes the following:

Antitrust laws, sometimes also called competition laws, govern the way that companies interact with their competitors, customers, and suppliers in the market place. ~~ey~~They are designed to encourage competition by prohibiting unreasonable restraints on trade. KEMET and its directors, ~~officers~~officers, and employees are required to comply with the antitrust and unfair competition laws of the many countries in which the company does business. ~~ese~~These laws are complex and vary considerably from country to country. ~~ey~~They generally concern:

- Agreements with competitors that harm customers, including price ~~fixing~~fixing and allocations of customers or contractors,

- Agreements that unduly limit a customer's ability to sell a product, including establishing the resale price of a product or service or conditioning the sale of products on an agreement to buy other company products and services, and/or

- Attempts to monopolize, including pricing a product below cost in order to eliminate competition.

KEMET is committed to competing vigorously but fairly for suppliers and customers in all regions and countries where we do business. Violating antitrust laws is a serious matter, and could place both the company and the individual at risk for substantial criminal penalties.

312.   235.By promulgating these codes of conduct and then not living up to them,

the Defendants engaged in fraudulent concealment.

[60] https://www.yuden.co.jp/cs/company/csr/charter/rule.html (January 4, 2019).

[61] https://www.sumida.com/userfiles/INFO_CENTER/COMPANY_INFO/SBP/SBP_EN_201 60222.
pdf (last visited January 4, 2019).

313.   236.Defendants also began sanitizing the minutes memorializing their meetings

at JEITA in order to cover their tracks, changing the entries on its meeting minutes from

conduct/02_coc2008English.pdf (last visited January 4, 2019).

"information exchange conducive to corporate management" to "information exchange concerning general market conditions," regardless of the actual information exchanged in them.

314.   Likewise, TDK actively sought to conceal conspiratorial activity with respect to the 2014 MT Cup, as described above.

## VII.   EFFECTS OF THE CONSPIRACY

315.   ~~237.~~Because of the Defendants' illegal conspiracy, Flex was injured in its business or property because Flex paid more for Inductors than it otherwise would have paid in a competitive market.

316.   ~~238. ee~~The Defendants' unlawful contract, combination, or conspiracy has had at least the following ~~effects~~effects:

> a.   price competition in the Inductors market was ~~artificially~~artificially restrained;
>
> b.   prices for Inductors sold by the Defendants have been raised, ~~fixed~~fixed, maintained, or stabilized at supra-competitive levels; and
>
> c.   purchasers of Inductors from the Defendants have been deprived of the ~~benefit~~benefit of free and open competition in the Inductors market.

317.   ~~239.~~Flex directly purchased hundreds of millions of dollars' worth of Inductors from the Defendants during the Relevant Period. Flex's global Inductor purchasing is overseen by management employees located in San Jose, California. Flex purchases of Inductors worldwide typically are made in United States dollars.

318.   ~~240.~~Many of the Inductors purchased by Flex were imported into the United States and used at Flex's United States manufacturing facilities, purchased for use in the manufacture of products for United States customers, or assembled into products sold to United States corporations or end-users.

319.   ~~241.~~Electronics and electrical product companies, including many located in

the United States, rely on manufacturers such as Flex to manufacture devices that include electronic and electrical components.

320.   ~~242.~~Flex typically directly purchases the electric and electronic components, including Inductors, necessary to manufacture products for Flex's customers. Flex then uses its global manufacturing, supply chain, and logistical expertise to manufacture and deliver products to Flex's customers worldwide, including businesses and end users in the United States.

~~243.For example, Flex purchased part number ELL5PM4R7N, a wirewound Inductor, from Panasonic in 2006 for delivery to its Charlotte, North Carolina facility.~~

321.   ~~244.~~Flextronics International USA, Inc. purchased Inductors directly from the Defendants during the relevant time period. ~~For~~As one example, Flextronics International USA, Inc. purchased thousands of units of part number NLV32T-6R8J-PF, ~~an~~a wirewound Inductor, from TDK in 2006 for delivery to its Milpitas, California facility. As another example, Flex purchased thousands of units of part number ELL5PM4R7N, a wirewound Inductor, from Panasonic in 2006 and 2007 for delivery to its Charlotte, North Carolina facility.

322.   ~~245.~~ee The overall conspiracy alleged herein: (1) targeted United States companies; and (2) targeted ~~companies producing goods for United States businesses; and (3) targeted~~ Inductors incorporated into products ~~sold to~~for the United States ~~end users directly~~market. As a result, Defendants' conduct substantially and foreseeably impacted United States commerce and gives rise to antitrust and other claims by Flex.

323.   ~~246.~~ee The Defendants' sales of Inductors to Flex for the manufacture of products that were intended for sale to United States customers or end-users involved import commerce, and had a substantial, direct, and reasonably foreseeable ~~effect~~effect on United

States import commerce that gives rise to a claim by Flex under United States law.

324.   247.Certain of the Defendants also collusively allocated sales of Inductors to be used in certain products manufactured by Flex for its United States customers. ~~ee~~The participating Defendants understood when making these agreements that the market allocation would increase prices to United States businesses and customers, and had a substantial, direct, and reasonably foreseeable impact on United States consumers.

325.   248.As a direct and proximate result of the Defendants' anticompetitive and unlawful conduct, Flex was injured in its business and property in that it paid ~~artificially inflated~~artificially inflated prices for the Inductors it purchased directly from the Defendants.

## VIII.   CLAIM FOR RELIEF

### RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT § 1 15 U.S.C. § 1
#### (Alleged against All Defendants)

326.   249.Flex hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

327.   250.Beginning at least as early as January 1, 2003, the exact date being unknown to Flex and exclusively within the knowledge of Defendants, and continuing thereafter, the Defendants, by and through their ~~officers~~officers, directors, employees, agents, or other representatives, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to restrict output and to ~~artificially~~artificially raise, ~~fix~~fix, maintain, or stabilize prices for Inductors in the United States, and entered into a continuing agreement, understanding and conspiracy in restraint of trade to exchange information regarding output and production capacity that had the ~~effect~~effect of restricting output and of ~~fixing~~fixing, raising, maintaining, or stabilizing the

115

prices of Inductors.

328.   251.As a result of Defendants' anticompetitive and unlawful conduct, Flex has been injured in its businesses and property in that it has paid more for the Inductors it purchased during the Relevant Period than it otherwise would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

329.   252.Accordingly, Flex seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## IX.    DEMAND FOR JUDGMENT

330.   253.WHEREFORE, Flex requests the Court enter judgment on its behalf by adjudging and decreeing that:

A.   That the contract, combination, or conspiracy, and the acts done in furtherance thereof by the Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

B.   That judgment be entered for Flex against Defendants for three times the amount of damages sustained by Flex as allowed by law.

C.   That Flex recover pre-judgment and post-judgment interest as permitted by law.

D.   That Flex recover its costs of the suit, including attorneys' fees, as provided by law.

E.   For such other and further relief as is just and proper under the circumstances.

## X.    JURY TRIAL DEMANDED

254.Pursuant to Federal Rule of Civil Procedure 38(b), Flex demands a trial by jury of all the claims asserted in this complaint so triable.

Dated: January 1.December 13, 2019          Respectfully Submitted,

By: _____ /s/ ~~Whitney~~*Charles E. ~~Street Tompkins~~*_____ Charles E. Tompkins (admitted *pro hac vice* ~~motion forthcoming)~~ ~~cet@willmont.com~~)**WILLIAMS MONTGOMERY & JOHN LTD.**
1607 22nd Street, NW, Suite 300 Washington D.C. 20008 Telephone: (202) 791-9951 Facsimile: (312) 630-8586

~~Eric R. Lifvendahl (*pro hac vice* motion forthcoming) erl~~ cet@willmont.com
~~WILLIAMS MONTGOMERY & JOHN LTD.~~
~~233 S. Wacker Drive, Suite 6100 Chicago, IL 60606 Telephone: (312) 443-3200 Facsimile: (312) 630-8500~~

Whitney E. Street (State Bar No. 223870)~~Block~~ **BLOCK** & ~~Leviton~~**LEVITON** LLP~~610 16th~~
**100 Pine** Street, ~~Suites 214-216 Oakland, CA 94612~~Suite 1250 San Francisco, CA 94111 Telephone: (415) 968-~~8999~~1852 Facsimile: (617) 507-6020 whitney@blockesq.com

~~EXHIBIT A~~

~~FLEXTRONICS INTERNATIONAL USA, INC'S AFFILIATES~~

| | ~~Legal Entity Name~~ |
|---|---|
| ~~1.~~ | ~~Advance Mold & Manufacturing, Inc.~~ |
| ~~2.~~ | ~~AGM Automotive Costa Rica S.A.~~ |
| ~~3.~~ | ~~AGM Automotive Mexico, LLC~~ |
| ~~4.~~ | ~~AGM Automotive, LLC~~ |
| ~~5.~~ | ~~AGM Durment Austria GmbH~~ |
| ~~6.~~ | ~~AGM Durment Mexico, S. de R.L. de C.V.~~ |
| ~~7.~~ | ~~AGM Holding GmbH~~ |
| ~~8.~~ | ~~Astron Group Limited~~ |
| ~~9.~~ | ~~Avail Medical Products, Inc.~~ |
| ~~10.~~ | ~~Availmed, S.A. de C.V.~~ |
| ~~11.~~ | ~~BISSELL Asia Development Center (Shenzhen) Limited~~ |

117

| 12. | Centrex Precision Plastics, Inc. |
|---|---|
| 13. | Chatham International Holdings B.V. |
| 14. | Chengdu Flextronics Mechanical Manufacturing Co., Ltd. |
| 15. | Ciii Ltd. |
| 16. | Ciii USA, Inc. |
| 17. | Commercial Company in the form of a limited liability company factory "Flextronics LLC" |
| 18. | Dii International Holdings C.V. |
| 19. | Dongguan Flextronics Precision Metal Co., Ltd. |
| | Legal Entity Name |
| 20. | Devatron Mfg. |
| 21. | Elementum Holding Ltd |
| 22. | Elementum SCM (Cayman) Ltd |
| 23. | Elementum SCM (Deutschland) GmbH |
| 24. | Elementum SCM Argentina S.R.L. |
| 25. | Elementum SCM Europe Ltd. |
| 26. | Elementum SCM Ltd |
| 27. | Elementum SCM, Inc. |
| 28. | Express Cargo Forwarding Limited |
| 29. | Form Design, Inc. |
| 30. | Finchley Trading Limited |
| 31. | Flex Automotive GmbH |

118

| 32. | Flex Digital Health, Inc. |
| 33. | Flex Electronics (Shanghai) Co., Ltd. |
| 34. | Flex Home Product Co Ltd |
| 35. | Flex International s.r.o. |
| 36. | Flex IDES Hong Kong Limited |
| 37. | Flex IDES Manufacturing (Tianjin) Co., Ltd. |
| 38. | Flex Lighting Solutions, Inc. |
| 39. | Flex Ltd. |
| | Legal Entity Name |
| 40. | Flex Luxembourg Holdings S.a.r.l. |
| 41. | Flex Precision Plastics Solutions (Switzerland) AG |
| 42. | Flex Solutions Nordic AB |
| 43. | Flex Solutions Poland sp. z o.o. |
| 44. | FlexMedical Slovakia s. r. o. v likvidácii |
| 45. | Flextronics (Canada) Inc. |
| 46. | Flextronics (China) Electronics Technology Co., Ltd. |
| 47. | Flextronics (Israel) Ltd. |
| 48. | Flextronics (Malaysia) Sdn. Bhd. |
| 49. | Flextronics (Shanghai) Co., Ltd |
| 50. | Flextronics (Shanghai) Electronic Equipment Repair Service Co., Ltd. |
| 51. | Flextronics Aerospace & Defense Services Inc |

| 52. | Flextronics Aichi K.K. |
| 53. | Flextronics America, LLC |
| 54. | Flextronics AP, LLC |
| 55. | Flextronics Asset and Investments LLC Hungary |
| 56. | Flextronics Australia Pty Ltd |
| 57. | Flextronics Automotive (Suzhou) Co., Ltd. |
| 58. | Flextronics Automotive de Juarez, S.A. de C.V. |
| 59. | Flextronics Automotive GmbH & Co. KG |
|  | Legal Entity Name |
| 60. | Flextronics Automotive Inc. |
| 61. | Flextronics Automotive Sales and Marketing, Ltd. |
| 62. | Flextronics Automotive USA (Texas), LLC |
| 63. | Flextronics Automotive USA Design and Development Corporation |
| 64. | Flextronics Automotive USA Manufacturing Co. |
| 65. | Flextronics Automotive USA, Inc. |
| 66. | Flextronics Automotive Verwaltungs GmbH |
| 67. | Flextronics Beerse N.V. |
| 68. | Flextronics Bermuda Ltd. |
| 69. | Flextronics Canada Design Services, Inc. |
| 70. | Flextronics Cayman (SLR) Limited |
| 71. | Flextronics Central Europe B.V. |

| 72. | Flextronics Chateaudun S.N.C. |
|---|---|
| 73. | Flextronics China (Mauritius) Electronics Technology Co., Ltd. |
| 74. | Flextronics China Holding (Singapore) Pte. Ltd. |
| 75. | Flextronics Computing (Suzhou) Co., Ltd |
| 76. | Flextronics Computing Mauritius Limited |
| 77. | Flextronics Computing Sales and Marketing (L) Ltd. |
| 78. | Flextronics Corporation |
| 79. | Flextronics Design Asia Pte. Ltd. |
| | Legal Entity Name |
| 80. | Flextronics Design Consumer Electronics (India) Private Limited |
| 81. | Flextronics Design Korea Ltd. |
| 82. | Flextronics Design S.r.l. |
| 83. | Flextronics Design, s.r.o. |
| 84. | Flextronics Electronics (Mauritius) Limited |
| 85. | Flextronics Electronics Technology (Shenzhen) Co., Ltd. |
| 86. | Flextronics Electronics Technology (Suzhou) Co., Ltd. |
| 87. | Flextronics Enclosure (Zhuhai) Co., Ltd |
| 88. | Flextronics Enclosure Zhuhai (Mauritius) Co., Ltd. |
| 89. | Flextronics Enclosure System (Changzhou) Ltd. |
| 90. | Flextronics Enclosure Systems (Shenzhen) Ltd. |
| 91. | Flextronics Enclosures (Hong Kong) Limited |

| 92. | Flextronics Europe Holdings C.V. |
|---|---|
| 93. | Flextronics Europe Holdings LLC |
| 94. | Flextronics Europe Limited |
| 95. | Flextronics Fabricação de Equipmentes do Brasil Ltda. |
| 96. | Flextronics Foundation |
| 97. | Flextronics Funding LLC |
| 98. | Flextronics Global Enclosures (Shanghai) Co., Ltd. |
| 99. | Flextronics Global Enclosures (Singapore) Pte. Ltd. |
| | Legal Entity Name |
| 100. | Flextronics Global Enclosures Shanghai (Mauritius) Co., Ltd |
| 101. | Flextronics Global Holdings II Ltd. |
| 102. | Flextronics Global Holdings L.P. |
| 103. | Flextronics Global Procurement Ltd. |
| 104. | Flextronics Global Services (Manchester) Limited |
| 105. | Flextronics Global Services (Singapore) Pte. Ltd. |
| 106. | Flextronics Global Services Canada Inc. Services Globaux Flextronics Canada Inc. |
| 107. | Flextronics Global Services Lojistik Hizmetleri Limited Şirketi |
| 108. | Flextronics Guadalajara Group, S. de R.L. de C.V. |
| 109. | Flextronics Holding (Singapore) Pte. Ltd. |
| 110. | Flextronics Holding do Brasil Ltda. |
| 111. | Flextronics Holding Finland Oy |

| 112. | Flextronics Holding France S.A. |
| 113. | Flextronics Holding GmbH |
| 114. | Flextronics Holding USA, Inc. |
| 115. | Flextronics Holdings Mexico Dos, S.A. de C.V. |
| 116. | Flextronics Holdings Mexico, S.A. de C.V. |
| 117. | Flextronics Holdings Spain, S.L.U. |
| 118. | Flextronics Ind. (Malaysia) Sdn. Bhd. |
| 119. | Flextronics Industrial (Shenzhen) Co Ltd |
| | Legal Entity Name |
| 120. | Flextronics Industrial (Suzhou) Co., Ltd. |
| 121. | Flextronics Industrial (Zhuhai) Co., Ltd. |
| 122. | Flextronics Industrial Ltd. |
| 123. | Flextronics Industrial Shenzhen (Mauritius) Co Ltd. |
| 124. | Flextronics Industrial Zhuhai (Mauritius) Co., Ltd. |
| 125. | Flextronics Industries (H.K.) Limited |
| 126. | Flextronics Industries Marketing (L) Ltd. |
| 127. | Flextronics Industries Singapore Ltd. |
| 128. | Flextronics Information Technology (Shen Zhen) Co., Ltd |
| 129. | Flextronics Information Technology Shen Zhen (Mauritius) Co., Ltd. |
| 130. | Flextronics Institute de Tecnologia – FIT |
| 131. | Flextronics Integrated Services Mex, S. de R.L. de C.V. |

| 132. | Flextronics International (Singapore Group) Pte. Ltd. |
|------|------|
| 133. | Flextronics International (Thailand) Ltd. |
| 134. | Flextronics International AB |
| 135. | Flextronics International Asia-Pacific Ltd |
| 136. | Flextronics International Componentes Ltda. |
| 137. | Flextronics International Cork B.V. |
| 138. | Flextronics International Cork B.V. (Irish Branch) |
| 139. | Flextronics International de Amazonia Ltda. |
|      | Legal Entity Name |
| 140. | Flextronics International Denmark A/S |
| 141. | Flextronics International DK |
| 142. | Flextronics International Europe B.V. |
| 143. | Flextronics International Finland Oy |
| 144. | Flextronics International France S.A. |
| 145. | Flextronics International Germany GmbH & Co. KG |
| 146. | Flextronics International Gesellschaft m.b.H. |
| 147. | Flextronics International Holding LLC (CA) |
| 148. | Flextronics International Holding LLC (DE) |
| 149. | Flextronics International Holdings Pte. Ltd. |
| 150. | Flextronics International Ireland Limited |
| 151. | Flextronics International Itatiaia (Xerox) |

| 152. | Flextronics International Japan Co., Ltd |
| 153. | Flextronics International Kft. |
| 154. | Flextronics International L'Aquila SpA |
| 155. | Flextronics International Latin America (L) Ltd. |
| 156. | Flextronics International Lojýstýk Hýzmetler Týcaret Lýmýted Þýrketý |
| 157. | Flextronics International Ltd. |
| 158. | Flextronics International Management Services Ltd. |
| 159. | Flextronics International N.V. |
| | Legal Entity Name |
| 160. | Flextronics International Norway AS |
| 161. | Flextronics International Ostersund AB |
| 162. | Flextronics International Poland Sp. z o.o. |
| 163. | Flextronics International s.r.o. |
| 164. | Flextronics International Sweden AB |
| 165. | Flextronics International Taiwan Ltd. |
| 166. | Flextronics International Technology LLC |
| 167. | Flextronics International Tecnologia Ltda |
| 168. | Flextronics International Termelõ és Szolgáltató Vámszabadterületi Korlátolt Felelõsségû Társaság |
| 169. | Flextronics International UK Ltd. |
| 170. | Flextronics Investment Holding (Singapore) Pte. Ltd. |
| 171. | Flextronics Investment Holding GmbH |

| 172. | Flextronics Italy S.p.A. |
| 173. | Flextronics Laval S.N.C. |
| 174. | Flextronics Lighting Solutions, Inc. |
| 175. | Flextronics Link (HK) Ltd. |
| 176. | Flextronics LLC |
| 177. | Flextronics Logistics (Hong Kong) Limited |
| 178. | Flextronics Logistics (Zhuhai) Co., Ltd. |
| 179. | Flextronics Logistics B.V. |
|  | Legal Entity Name |
| 180. | Flextronics Logistics Poland sp. z o.o. |
| 181. | Flextronics Logistics USA, Inc. |
| 182. | Flextronics Logistics Zhuhai (Mauritius) Co., Limited |
| 183. | Flextronics Manufacturing (H.K.) Limited |
| 184. | Flextronics Manufacturing (Shanghai) Co., Ltd. |
| 185. | Flextronics Manufacturing (Singapore) Pte. Ltd. |
| 186. | Flextronics Manufacturing (Tianjin) Co., Ltd. |
| 187. | Flextronics Manufacturing (Zhuhai) Co., Ltd. |
| 188. | Flextronics Manufacturing Aguascalientes, S.A. de C.V. |
| 189. | Flextronics Manufacturing Europe B.V. |
| 190. | Flextronics Manufacturing Juarez, S. de R.L. de C.V. |
| 191. | Flextronics Manufacturing Mex, S.A. de C.V. |

| 192. | Flextronics Manufacturing Puebla, S. de R.L. de C.V. |
|------|------------------------------------------------------|
| 193. | Flextronics Manufacturing S.r.l. |
| 194. | Flextronics Manufacturing Shanghai (Mauritius) Co., Ltd. |
| 195. | Flextronics Manufacturing Zhuhai (Mauritius) Co., Ltd. |
| 196. | Flextronics Marketing (L) Ltd. |
| 197. | Flextronics Mauritius Holdings Limited |
| 198. | Flextronics Mauritius Limited |
| 199. | Flextronics Mechanicals Marketing (L) Ltd. |
| | Legal Entity Name |
| 200. | Flextronics Mechanicals Singapore Pte. Ltd. |
| 201. | Flextronics Medical Sales and Marketing, Ltd |
| 202. | Flextronics Mexico Holdings II LLC |
| 203. | Flextronics New Zealand Limited |
| 204. | Flextronics ODM Finland Oy |
| 205. | Flextronics ODM Luxembourg S.A. |
| 206. | Flextronics Ostersund AB |
| 207. | Flextronics Photonics FICO, Inc. |
| 208. | Flextronics Photonics PPT, Inc. |
| 209. | Flextronics Plastic (Asia Pacific) Limited |
| 210. | Flextronics Plastic Technology (ShenZhen) Ltd. |
| 211. | Flextronics Plastic Technology ShenZhen (Mauritius) Ltd. |

| 212. | Flextronics Plastics (M) Sdn. Bhd. |
|------|-----------------------------------|
| 213. | Flextronics Plastics (Shenzhen) Co., Ltd |
| 214. | Flextronics Plastics (Singapore) Pte. Ltd. |
| 215. | Flextronics Plastics (Zhuhai) Co., Ltd |
| 216. | Flextronics Plastics Gushu (Mauritius) Co., Ltd |
| 217. | Flextronics Plastics Services, LLC |
| 218. | Flextronics Plastics Zhuhai (Mauritius) Co., Ltd. |
| 219. | Flextronics Plastics, S.A. de C.V. |
|      | Legal Entity Name |
| 220. | Flextronics Power Systems (Dongguan) Co., Ltd. |
| 221. | Flextronics Precision Metal (Hong Kong) Limited |
| 222. | Flextronics Precision Plastics, Inc. |
| 223. | Flextronics Puerto Rico Limited |
| 224. | Flextronics R&D (Shenzhen) Co., Ltd |
| 225. | Flextronics R&D Shenzhen (Mauritius) Co., Ltd |
| 226. | Flextronics Romania S.R.L. |
| 227. | Flextronics S.R.L. |
| 228. | Flextronics Sales & Marketing (A-P) Ltd. |
| 229. | Flextronics Sales & Marketing North Asia (L) Ltd. |
| 230. | Flextronics Sales and Marketing Consumer Digital Ltd. |
| 231. | Flextronics San Jose IPO |

| 232. | Flextronics Sárvár Logistics Korlátolt Felelősségű Társaság |
|------|---|
| 233. | Flextronics Scotland Limited |
| 234. | Flextronics Shah Alam Sdn. Bhd. |
| 235. | Flextronics Shanghai (Mauritius) Co., Ltd. |
| 236. | Flextronics Shanghai Electronic Equipment Repair Service (Mauritius) Co., Ltd. |
| 237. | Flextronics SMI (China) Ltd |
| 238. | Flextronics St Etienne S.N.C. |
| 239. | Flextronics Systems (Penang) Sdn. Bhd. |
|      | Legal Entity Name |
| 240. | Flextronics Systems Texas Ltd. |
| 241. | Flextronics Technologies (India) Private Limited |
| 242. | Flextronics Technologies Luxembourg LLC |
| 243. | Flextronics Technologies Luxembourg S.a r.l. |
| 244. | Flextronics Technologies Mauritius Ltd. |
| 245. | Flextronics Technologies Mexico, S. de R.L. de C.V. |
| 246. | Flextronics Technologies San Luis, S.A. de C.V. |
| 247. | Flextronics Technology (Malaysia) Sdn. Bhd. |
| 248. | Flextronics Technology (Nanjing) Co., Ltd |
| 249. | Flextronics Technology (Penang) Sdn. Bhd. |
| 250. | Flextronics Technology (Shah Alam) Sdn. Bhd. |
| 251. | Flextronics Technology (Shanghai) Co., Ltd. |

| 252. | Flextronics Technology (ShenZhen) Co., Ltd |
|---|---|
| 253. | Flextronics Technology (Singapore) Pte. Ltd. |
| 254. | Flextronics Technology (Suzhou) Co., Ltd. |
| 255. | Flextronics Technology (Switzerland) GmbH |
| 256. | Flextronics Technology (Zhuhai) Co. Ltd. |
| 257. | Flextronics Technology Nanjing (Mauritius) Co., Ltd |
| 258. | Flextronics Technology Shanghai (Mauritius) Co., Ltd. |
| 259. | Flextronics Technology ShenZhen (Mauritius) Co., Ltd |
|  | Legal Entity Name |
| 260. | Flextronics Technology Wujiang (Mauritius) Ltd |
| 261. | Flextronics Technology Zhuhai (Mauritius) Co., Ltd |
| 262. | Flextronics Tecnologia Do Brasil Ltd. |
| 263. | Flextronics Telecom Systems Ltd |
| 264. | Flextronics UK Limited |
| 265. | Flextronics Vagyonkezelő és Befektetési Korlátolt Felelősségű Társaság |
| 266. | Flextronics Verwaltungs GmbH |
| 267. | FlextronicsTullamore |
| 268. | Glouple Ventures 2000 II, LLC |
| 269. | IDE8 Cayman |
| 270. | IDE8 Mauritius Limited |
| 271. | IDE8 Technology (Shanghai) Co., Ltd |

| 272. | I E C Holdings Limited |
| 273. | Instrumentation Engineering, Inc. |
| 274. | International Manufacturing Synergies, Ltd. |
| 275. | Irish Express Cargo Limited |
| 276. | Irumold Group, S.L.U. |
| 277. | Irumold Servicios, S.L.U. |
| 278. | Irumold, S.L.U. |
| 279. | Kiinteisto Oy Flex Finland |
| | Legal Entity Name |
| 280. | Kunshan AGM Automotive Components Co., Ltd. |
| 281. | Kunshan AGM Trading Company Ltd. |
| 282. | Lab IX |
| 283. | Lighting Acquisition LLC |
| 284. | Masa da Amazônia Ltda. |
| 285. | MCi (Mirror Controls International) Asia B.V. |
| 286. | MCi (Mirror Controls International) B.V. |
| 287. | MCi (Mirror Controls International) Holdings B.V. |
| 288. | MCi (Mirror Controls International) Inc. |
| 289. | MCi (Mirror Controls International) Ireland Limited |
| 290. | MCi (Mirror Controls International) Ireland Operations Limited |
| 291. | MCi (Mirror Controls International) Netherlands B.V. |

| 292. | MCi (Mirror Controls International) S. de R.L. de C.V. |
| 293. | MCi (Mirror Controls International) Yuhan Hoesa |
| 294. | MCi Hoogeveen B.V. |
| 295. | MCi Ireland Pension Plan Trustee Limited |
| 296. | MCi Mirror Controls (Suzhou) Co., Ltd. |
| 297. | MICOH B.V. |
| 298. | Multek (FTZ) Limited |
| 299. | Multek Brasil Ltda. |
| | Legal Entity Name |
| 300. | Multek China Limited |
| 301. | Multek Display (Hong Kong) Limited |
| 302. | Multek Display Cayman Ltd. |
| 303. | Multek Electronics Limited |
| 304. | Multek Flexible Circuits, Inc. |
| 305. | Multek Hong Kong Limited |
| 306. | Multek Industries Limited |
| 307. | Multek Technologies Limited |
| 308. | Multek Technology (Zhuhai) Co Limited |
| 309. | Multek Zhuhai Limited |
| 310. | Multilayer Technology Geschäftsführungs GmbH |
| 311. | Multilayer Technology GmbH & Co. KG |

| 312. | Nanjing Flextronics Panda Mobile Terminals Co., Ltd |
|------|------|
| 313. | NEXTracker Australia Pty. Ltd. |
| 314. | NEXTracker Chile SpA |
| 315. | NEXTracker, Inc. |
| 316. | NEXTRACKER Mexico, S. de R.L. de C.V. |
| 317. | Pacific Device, Inc. |
| 318. | Parque de Tecnologia Electronica, S.A. de C.V. |
| 319. | Power Systems R&D (Singapore) Pte. Ltd. |
|      | Legal Entity Name |
| 320. | Power Systems R&D Philippines, Inc. |
| 321. | Power Systems Technologies (Beijing) Company Limited |
| 322. | Power Systems Technologies (Ganzhou) Co., Ltd. |
| 323. | Power Systems Technologies (Shenzhen) Company Limited |
| 324. | Power Systems Technologies Far East Limited |
| 325. | Power Systems Technologies GmbH |
| 326. | Power Systems Technologies Ltd. |
| 327. | Private Joint Stock Company "Flextronics Service UA" |
| 328. | PT. Flextronics Technology Indonesia |
| 329. | Saturn Electronics de Monterrey, S.A. de C.V. |
| 330. | Shiant Resource Service Co., Ltd |
| 331. | SLR Europe B.V. |

| 332. | SLR GmbH |
| 333. | Solectron (Shanghai) Technology Co., Ltd. |
| 334. | Solectron Australia Pty Limited |
| 335. | Solectron France SAS |
| 336. | Solectron Holding Deutschland GmbH |
| 337. | Solectron Phillipines Inc. |
| 338. | Solectron Sweden AB |
| 339. | Solectron Turkey |
| | Legal Entity Name |
| 340. | Solectron USA, LLC |
| 341. | Sønderborg Værktøjsfabrik A/S |
| 342. | Stellar Microelectronics, Inc. |
| 343. | Suzhou AGM Durmont Automotive Components Co., Ltd. |
| 344. | Swedform Enclosure Systems AB |
| 345. | The DII Group (BVI) Co. Limited |
| 346. | The DII Group Asia Limited |
| 347. | ThermoMend B.V. |
| 348. | ThermoMend International Ltd. |
| 349. | Vastbright PCB (Holding) Limited |
| 350. | Vista Point Electronic Technologies (Zhuhai) Co., Ltd. |
| 351. | Vim Technologies Ltd |

| 352. | Wink Labs, Inc. | |
|------|-----------------|---|
| 353. | Z124 | |

Document comparison by Workshare 9.5 on Friday, December 20, 2019 6:03:07 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\esd2022\Desktop\(2)2019-01-04 001 Complaint_(US_164512821_1).PDF |
| Description | (2)2019-01-04 001 Complaint_(US_164512821_1) |
| Document 2 ID | file://C:\Users\esd2022\Desktop\(2)Flex Inductors Proposed Third Amended Complaint.pdf |
| Description | (2)Flex Inductors Proposed Third Amended Complaint |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 1278 |
| Deletions | 1703 |
| Moved from | 87 |
| Moved to | 87 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 3155 |