1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6 SAN JOSE DIVISION

7

| | |
|---|---|
| 8 FLEXTRONICS INTERNATIONAL USA, INC., | Case No.  5:19-cv-00078-EJD |
| 9 Plaintiff, | **ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK** |
| 10 v. | **DEFENDANTS' MOTION TO DISMISS; GRANTING THE** |
| 11 MURATA MANUFACTURING CO., LTD., et al., | **PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS' MOTION TO** |
| 12 Defendants. | **DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO** |
| 13 | **COMPEL ARBITRATION** |

14 Re: Dkt. Nos. 96, 97, 105

15      Plaintiff Flextronics International USA, Inc. manufactures electronic products.  Plaintiff

16 alleges that it directly purchased hundreds of millions of dollars of Inductors[1] from Defendants

17 Murata Manufacturing Co., Ltd., Murata Electronics North America, Inc., Murata Power

18 Solutions, Inc., Toko Inc. ("the Murata Defendants"), Panasonic Corporation, Panasonic

19 Corporation of North America, Panasonic Electronic Devices Co. Ltd., Panasonic Industrial

20 Devices Corporation of America ("the Panasonic Defendants"), Sagami Elec Co., Ltd., Sagami

21 America Ltd. ("the Sagami Defendants"), Sumida Corporation, Sumida Electric Co., Ltd., Sumida

22 America Components, Inc. ("the Sumida Defendants"), Taiyo Yuden Co., Ltd., Taiyo Yuden

23

24 ─────────────────────

[1] Inductors are passive electronic components that store and regulate energy by creating magnetic
25 fields when an electrical current passes through the coils of the Inductor.  *See* TAC ¶¶ 137–49.
There are many types of Inductors, including: beads, coils, chokes, "chip inductors," "chip coils,"
26 "wirewound," air core, and multi-layer Inductors.  *Id.* ¶¶ 146–47.

Case No.: 5:19-cv-00078-EJD
27 ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'
28 MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
ARBITRATION

United States District Court
Northern District of California

United States District Court
Northern District of California

1 (USA) Inc. ("the Taiyo Yuden Defendants"), TDK Corporation, TDK-EPC Corporation, TDK

2 Corporation of America, TDK U.S.A. Corporation ("the TDK Defendants"), Tokin Corporation,

3 and Tokin America, Inc. ("the Tokin Defendants") and their co-conspirators throughout the

4 Relevant Period (January 1, 2003 through December 31, 2017). Defendants allegedly conspired

5 with each other to fix, raise, stabilize and maintain the price of Inductors during this period.

6 Specifically, Defendants participated in multilateral meetings and bilateral contacts to exchange

7 commercially sensitive information on future supply, demand, and price to avoid price

8 competition.

9       Before the Court are (1) the Murata, Taiyo Yuden, and TDK Defendants' motion to

10 dismiss Plaintiff's Third Amended Complaint, (2) the Panasonic, Sumida, and Sagami

11 Defendants' motion to dismiss Plaintiff's Third Amended Complaint, and (3) the Tokin

12 Defendants' motion to compel arbitration or, in the alternative, to dismiss Plaintiff's Third

13 Amended Complaint. Having considered the Parties' papers,[2] the Court **GRANTS** the two

14 motions to dismiss and **GRANTS** the Tokin Defendants' motion to compel arbitration.[3]

15 **I.     BACKGROUND**

16       **A.   Factual Background**

17             **1.   Origin of *In re Inductors* and *Flextronics***

18       Two years ago, in January 2018, *mLex* (a publication focused on market insights and

19 regulatory news) reported that the United States Department of Justice ("DOJ") issued subpoenas

20 to unnamed companies that supplied inductors as part of an investigation into the inductors

21 industry. After this publication, a class of direct purchaser plaintiffs ("DPPs") filed a complaint

22

23 

24 [2] Pursuant to N.D. Cal. Civ. L.R. 7-1(b) and General Order 72-5, this Court found this motion suitable for consideration without oral argument. *See* Dkt. 126.

25 [3] This Order contains information subjecting to sealing orders. The Parties have provided the
26 Court a stipulated redacted Order. Information is redacted if it refers to material that the Court has sealed pursuant to a motion to seal.
Case No.: 5:19-cv-00078-EJD
27 ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'
28 MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL ARBITRATION

against Defendants (except Sagami).  The DPPs later consolidated their complaints into a single complaint (adding the Sagami Defendants), and, thereafter, further amended their pleadings.  That action remains pending before this Court and also has pending motions to dismiss.  *See In re Inductors Antitrust Litigation*, Case No. 5:18-cv-00198-EJD (N.D. Cal.)  Plaintiff (Flex) is a direct purchaser of inductors and a member of the putative DPP class.  SAC ¶¶ 32–33.  Plaintiff, however, opted to bring its own individual lawsuit.

When Plaintiff filed its individual complaint, the *In re Inductors* Defendants had already moved to dismiss DPPs' consolidated amended complaint.  Because of the similarities between Plaintiff's and the DPPs' complaints, Plaintiff and Defendants agreed to stay responsive pleadings to the Flex Complaint pending the outcome of the *In re Inductors* Defendants' motion to dismiss.

At argument, DPPs told the Court that they had received a proffer from one Defendant through the Antitrust Criminal Penalty Enhancement & Reform Act ("ACPERA") program, which allows a leniency applicant to reduce its damages in a civil case by providing information to plaintiffs.  This Court granted the *In re Inductors* Defendants' motion to dismiss, but provided DPPs leave to amend their complaint.  *See* Order Granting Motion to Dismiss ("Order"), Dkt. 351 (5:18-cv-00198-EJD).

## 2.  The Court's Dismissal Order

In its Order dismissing DPPs' consolidated amended complaint, the Court found that DPPs failed to allege a Section 1 violation in which "each individual defendant joined the conspiracy and played some role in it."  Order at 6–7.  There were several reasons for this conclusion.

*First*, DPPs relied on average pricing and a "price index" for inductors and other products, but failed to allege the prices charged by any particular defendant.  *Id.* at 6–9.  The Court thus could not evaluate the individual prices at issue.  *Id.*  Because DPPs relied on average, aggregated pricing, rather than "any price charged for any product by any Defendant at any time," DPPs failed to allege parallel conduct.  This was fatal to DPPs' price fixing claim.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Second*, the Court rejected DPPs' attempt to plead a "plus factor" through Defendants'

2    alleged participation in, and information exchanges at, JEITA meetings.  The consolidated

3    amended complaint alleged that the principal means by which Defendants agreed to form a cartel,

4    was through formal JEITA meetings and informal meetings structured around them.  *Id.* at 13.

5    This included meetings of the Passive Components Committee ("PCC") and the PCC Inductors

6    Subcommittee, where Defendants allegedly shared more confidential and detailed corporate

7    information.  *Id.*  The Court could not infer a price-fixing conspiracy from any of these allegations

8    because "participation in trade-organization meetings where information is exchanged and

9    strategies are advocated does not suggest an illegal agreement."  *Id.* at 14.  In contrast to other

10   cases, DPPs' allegations were too general, vague, and conclusory.

11       *Third*, the Court rejected DPPs' argument that "the structure" of the inductors market

12   constituted circumstantial evidence upon which the Court could infer the existence of a

13   conspiracy.  "A market that is conducive to a conspiracy is one that is highly concentrated with

14   very few players, has a commodity-like product with no viable substitutes, and has high barriers to

15   entry."  *Id.* at 10.  The inductors market, as alleged in DPPs' consolidated amended complaint,

16   was not conducive to conspiracy because hundreds of Chinese manufacturers entered the market

17   during the relevant time period and Defendants lost market share.  *Id.* at 11.

18       *Fourth*, the Court held that the DOJ investigation into the inductors industry did not

19   support the alleged conspiracy because "the mere existence of a government investigation into

20   price-fixing in the inductor market does not support an inference of collusion."  *Id.* at 17–18.

21       *Finally*, the Court held that it could not infer a conspiracy as to inductors based on

22   allegations of antitrust violations in other industries.  *Id.* at 19.  This Court explained that DPPs'

23   allegations that some Defendants had engaged in antitrust violations in *other* markets was

24   "insufficient to support an inference of an antitrust violation in the [Inductors] market."  The

25   alleged violations occurred in other markets, in countries, and did not involve all Defendants.  *Id.*

26
27   Case No.: 5:19-cv-00078-EJD
     ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
     TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'
28   MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
     ARBITRATION

at 19.  Further, the Court specifically noted that it was implausible for the Panasonic Defendants to be involved in any inductors conspiracy because they are "marginal producer[s] and sell[ers] of Inductors" and "*massive* purchaser[s] of Inductors."  *Id.* at 20 n.7.  DPPs thus failed to allege sufficient facts to show why it was plausible for Panasonic to facilitate a cartel in a market where it purchases more product than it sells.  *Id.*

For these reasons, the Court granted the *In re Inductors* Defendants' motion to dismiss.[4]

### 3.  Plaintiff's Third Amended Complaint

Plaintiff filed its amended complaint on October 17, 2019 and filed the operative Third Amended Complaint on December 23, 2019.  Third Amended Complaint ("TAC"), Dkt. 92.  Plaintiff maintains that Defendants engaged in a "scheme . . . to fix . . . the price of Inductors."  *Id.* at ¶ 3.  Plaintiff is a California corporation with its principal place of business in San Jose, California.  *Id.* ¶ 31.  Plaintiff and its global affiliates manufacture electronic products and other goods around the world, including in the United States.  *Id.*  Plaintiff purchased hundreds of millions of dollars' worth of inductors from Defendants during the relevant period.  *Id.* ¶¶ 32–33.

Plaintiff alleges a conspiracy "between and among Defendants to fix, raise, stabilize, and maintain the price of Inductors" during the Relevant Period.  *Id.* ¶ 3.  Defendants allegedly acted in furtherance of the conspiracy by participating in: (1) multilateral meetings—under the auspices of the Japan Electronics & Information Technology Association ("JEITA")— at which Defendants exchanged current pricing and production information and specific, confidential, future pricing and production plans; (2) meetings where directional price agreements were reached; and (3) bilateral contacts with individual competitors, including contacts where specific bids to individual large customers were discussed and rigged so as to inflate winning bid prices and allocate winning

---

[4] The Court does not reach many of the issues identified in the September 2019 Order as it finds other deficiencies that prevent the Court from reaching these issues.  The Parties should not take that as a finding that these same deficiencies are not present in Plaintiff's TAC.  For instance, it seems that Plaintiff has not shown why the JEITA meetings are evidence of a conspiracy to set the price of Inductors.

Case No.: 5:19-cv-00078-EJD
ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS' MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL ARBITRATION

5

1    bids among the bidding conspirators.  *See, e.g.*, *id.* ¶¶ 3, 29, 193–300.  JEITA meetings included

2    meetings of the Passive Components Committee ("PCC") and the Inductors Subcommittee.  *Id.*

3    ¶¶ 193–234.

4         At these multilateral meetings, Defendants allegedly exchanged confidential, forward-

5    looking pricing and production forecasts detailing actual and projected sales prices and production

6    volumes.  *Id.* ¶¶ 3, 190–290.  Specific confidential information included: (1) the status and value

7    of orders of specific products (that incorporated Inductors) and of Inductors; (2) the per-unit prices

8    of Inductors; and (3) future price projections.  *Id.* ¶¶ 197, 203–04, 207.  Defendants also discussed

9    their reactions to individual customer price decrease requests and reached directional price

10   agreements regarding increases and decreases to prices.  *See, e.g.*, *id.* ¶¶ 209, 222.

11        Plaintiff maintains JEITA meeting attendees "knew" that these information exchanges

12   were illegal because meeting attendees would re-share information with warnings like: "In North

13   America, these sorts of meetings are completely prohibited."  *Id.* ¶ 201.  Other Defendants later

14   acknowledged that "[JEITA information] would now be acknowledged as a compliance violation"

15   and that participation in JEITA meetings could "put the company at risk of being deemed [as]

16   taking part in antitrust activities."  *Id.* ¶¶ 214, 219.  Moreover, meeting participants took steps to

17   keep the information exchanges confidential.  Recipients of JEITA meeting minutes were

18   instructed to handle the information with care and to limit redistribution of the transmission

19   emails.  *Id.* ¶¶ 212, 227.

20        Defendant TDK is a leniency applicant with the DOJ.  In order to seek leniency from

21   criminal prosecution, TDK was required to admit to a criminal violation of the antitrust laws.

22   TDK has admitted that it conspired with the Murata and Taiyo Yuden Defendants to fix the prices

23   of Inductors sold to "Customer C"[5] in the United States.  *Id.* ¶¶ 15–17.

24

25   ─────────────────
     [5] Customer C is a pseudonym.  The real name of this customer has been redacted pursuant to this
26   Court's sealing orders.

27   ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
     TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'
28   MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
     ARBITRATION

*United States District Court*
*Northern District of California*

The alleged conspiracy proceeded as follows:

1. On November 10, 2003, as part of Defendants' regular JEITA meeting participation, Defendants exchanged Inductors production forecasts. *Id.* ¶¶ 23, 195–96. This exchange included the below chart, which details Defendants' respective production and revenue forecasts.



2. On November 12, 2003, Defendants Sumida, Panasonic, and Toko exchanged confidential information, including current and projected individual per-unit pricing for Inductors, as well as confidential, company-specific information on orders and sales booked. *Id.* ¶ 197.

3. On June 24, 2004, Defendants Sagami, Panasonic, Sumida, and Toko exchanged confidential information about current and projected individual per-unit pricing for Inductors. *Id.* ¶ 200. At this meeting, Defendants also exchanged confidential information about company-specific information on orders and sales. *Id.*

4. In 2004, in the United States, Kevin Umeda of TDK met Hiromi Nagasaka of Murata. Over the years, Mr. Umeda and Mr. Nagasaka would exchange price information and agree upon pricing to be quoted to common customers who disseminated Requests for Quotation ("RFQs") for Inductors, including customers like Skyworks. *Id.* ¶ 237.

5. On February 23, 2005, a United Chemi-Con employee sent his notes from the February 17, 2005 JEITA meeting to his supervisors. Inductors were discussed at the meeting. The employee sent the notes with the cover email: "In North America, these sorts of meetings are completely prohibited, so please take utmost care in the handling of the attached memo." The notes reflect that at least Defendants Panasonic, Taiyo Yuden, Murata, and Toko attended the February 17, 2005 JEITA meeting. *Id.* ¶ 201.

Case No.: 5:19-cv-00078-EJD
ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'
MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
ARBITRATION

6. On November 28, 2005, JEITA personnel distributed the results of an "information exchange."  Allegedly, Defendants shared production forecasts, including their confidential future production estimates for 2005 and 2006, with each other.  This exchange allegedly included company specific production and revenue forecasts.  *Id.* ¶ 202.

| Estimated October-December 2005 | | | | Expected results in 2005 | | | | 2005/9/29 Outlook for 2006 Unit: Quantity / thousand, Amount / thousand yen | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| quantity | % | Amount of money | % | quantity | % | Amount of money | % | quantity | % | Amount of money | % |
| 3,287,001 | 70.2 | 5,923,000 | 79.3 | 16,200,000 | 95.0 | 26,400,000 | 82.0 | 15,500,000 | 95.0 | 22,600,000 | 85.6 |
| 4,307,001 | 102.5 | 6,473,000 | 88.7 | 17,400,000 | 100.0 | 26,950,000 | 83.7 | 16,300,000 | 100.0 | 27,700,000 | 102.0 |
| 1,818,718 | 43.3 | 7,001,403 | 94.8 | 14,911,855 | 98.5 | 27,555,403 | 85.6 | 17,234,123 | 119.0 | 29,025,935 | 105.3 |
| 3,483,001 | 82.9 | 6,743,000 | 90.3 | 16,570,000 | 98.1 | 27,230,000 | 84.6 | 13,200,000 | 80.0 | 19,280,000 | 73.1 |
| 3,222,154 | 76.7 | 6,645,341 | 75.8 | 16,205,003 | 94.6 | 26,122,041 | 81.2 | 15,903,791 | 98.0 | 22,500,257 | 80.5 |
| 4,407,001 | 104.9 | 7,523,000 | 100.8 | 17,500,090 | 101.5 | 23,000,000 | 87.0 | 17,000,002 | 97.1 | 28,000,000 | 92.9 |
| 10,187,001 | 242.4 | 13,843,000 | 102.7 | 23,200,090 | 135.0 | 34,120,000 | 106.0 | 23,900,000 | 103.0 | 33,430,000 | 90.0 |
| 4,307,454 | 104.4 | 7,578,046 | 101.5 | 17,400,303 | 101.4 | 23,053,046 | 87.2 | 17,491,893 | 100.0 | 25,391,885 | 92.3 |
| 10,187,001 | 242.4 | 13,843,000 | 102.7 | 23,200,090 | 135.0 | 34,120,000 | 106.0 | 23,900,000 | 103.0 | 33,430,000 | 90.0 |
| 1,818,718 | 43.3 | 6,645,341 | 75.8 | 14,911,855 | 98.5 | 26,122,041 | 81.2 | 13,200,000 | 80.9 | 19,291,000 | 70.1 |
| 3,741,200 | 89.0 | 6,743,697 | 90.4 | 16,334,219 | 97.6 | 27,225,897 | 84.8 | 17,036,584 | 101.2 | 25,504,430 | 94.0 |
| | 0.0 | | 0.0 | | | | | | | | |
| 4201700 | 130.3 | 7460000 | 116.2 | 17,243,377 | 100.7 | 32,135,000 | 131.2 | | | | |

7. In 2006, at a meeting in Sunnyvale, California, Defendants TDK and Taiyo Yuden shared confidential internal pricing information about a Customer C end product and agreed between themselves that Defendant Taiyo Yuden would not reduce the prices as much as Customer C wanted.  *Id.* ¶ 255.

8. In 2006 and 2007, Defendants Sumida and Panasonic provided confidential Inductor-demand forecasting data to JEITA members.  This data included information about Inductors' unit pricing, the number of Inductors used per product, and sales for various Inductors.  *Id.* ¶ 223.

9. From 2007–2014, 23 meetings of the Inductors Subcommittee took place.  Each Defendant had one or more representatives at most of those meetings.  *Id.* ¶ 219.

10. On May 25, 2007, a PCC meeting took place.  There, attendees exchanged information about: (a) the value of Inductor orders received compared to the fourth quarter of 2006; (b) the value of Inductor orders received for the first quarter of 2007 broken down by month and compared to the fourth quarter of 2006; (c) the value of Inductor orders received for the second and third quarters of 2007 compared to the fourth quarter of 2006; (d) the status of orders for particular industries, such as power systems, flat panel and/or LCD televisions, personal computers, automotive, video game equipment, digital amps, slot machine, and mobile machinery and equipment; and (e) the status of orders of particular types of Inductors, like winding and non-winding wire Inductors.  Defendants Toko, Murata, and Sagami participated in this exchange.  The information was distributed and shared with the other Defendants.  Attendees were warned to "be careful in handling the information."  *Id.* ¶¶ 203–04.

11. On July 4, 2007, at a JEITA meeting, Defendants TDK, Murata, Taiyo Yuden, Toko, Panasonic, Sagami, and Tokin exchanged confidential information about sales forecasts and the numbers of Inductors sold for the power supplies sector.  Attendees discussed whether to increase Inductors' prices.  Plaintiff claims to have purchased Inductors for power supplies at or around the time of this meeting.  *Id.* ¶¶ 205–06.

Case No.: 5:19-cv-00078-EJD
ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS' MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL ARBITRATION

United States District Court
Northern District of California

12. On July 10, 2007, Defendants Taiyo Yuden, Toko, Murata, Sumida, Sagami, and Tokin exchanged confidential price and production information, including information about sales prices and sales projections. *Id.* ¶ 207.

13. In November 2007, Mr. Nagasaka of Murata told Mr. Umeda of TDK that Defendant Murata was planning to make a bid in response to a Skyworks' RFQ that it did not want Defendant TDK to undercut. Mr. Umeda reported his discussion to Defendant TDK and provided Mr. Nagasaka with TDK's price range. *Id.* ¶ 238. In this same month, during a PCC meeting, Defendants Sumida, Panasonic, Tokin, and Taiyo Yuden gave presentations discussing their individual confidential sales and pricing forecasts for Inductors. *Id.* ¶ 222.

14. In June 2008, a Panasonic employee shared confidential pricing and production information regarding Inductors with other Panasonic employees. This information was obtained at a JEITA meeting. The employee warned recipients to handle the information with care. *Id.* ¶ 212.

15. In August 2008, Defendants exchanged confidential Inductor orders and information about specific end-use segments with each other. *Id.* ¶ 208.

16. On November 14, 2008, at a JEITA meeting, Defendants discussed prices for Inductors with each other and reached a directional price agreement to not reduce prices. *Id.* ¶ 209.

17. In March 2009, Mr. Oi (a frequent JEITA attendee) of Taiyo Yuden met with the President of Defendant TDK America in Chicago. Around this same time, Mr. Oi also exchanged confidential information with Mr. Hiroki Honma of TDK. *Id.* ¶ 258.

18. In Summer 2009, Mr. Umeda of TDK started communicating with Yoshi Imanishi of Murata. Mr. Umeda and Mr. Imanishi spoke weekly by cell phone and occasionally communicated by text message about Customer C. Defendants TDK and Murata also held quarterly business lunch meetings in California. *Id.* ¶ 240.

19. On October 21, 2009, JEITA members reviewed survey results, which were administered by JEITA to its members at Inductors Subcommittee meetings. The surveys included company-specific figures for demand. *Id.* ¶ 217.

20. In 2009, Customer C requested better discounts. Mr. Umeda of TDK and Mr. Imanishi of Murata agreed to not bid against each other, thereby inflating their respective companies' bids. *Id.* ¶ 242.

21. In January 2010, Customer C solicited bids on ███████████████████████. At the time, Defendant TDK was seeking to be qualified to bid on this RFQ. Mr. Umeda met with his colleagues (Mr. Yohei Tsuda, Mr. Imanishi, and Mr. Nagasaka) to discuss how Defendant TDK would bid once it got qualified. Mr. Umeda was informed that Defendant Murata would not price too low against its competitor (Defendant TDK). *Id.* ¶ 243.

22. In March 2010, TDK executives discussed prices of Inductors sought to be sold to Customer C and discussed reaching an agreement with Defendant Taiyo Yuden to keep prices high. Mr. Umeda told his colleagues that he would seek Defendant Taiyo Yuden's agreement to avoid price competition. *Id.* ¶ 256.

23. In April 2010, Defendants exchanged confidential information in advance of a May 2010 JEITA meeting, including demand forecasts and the status of related industries.  At a social gathering, Defendants Sagami, Toko, and Murata also exchanged confidential pricing and input costs.  Also, in April 2010, Mr. Umeda reported to others at Defendant TDK that an agreement was reached with Defendant Murata to seek higher prices during negotiations with Customer C.  *Id.* ¶¶ 210–11, 244.

24. In June 2010, Mr. Umeda reported to other TDK executives that Defendant Murata was concerned that a competitor might enter the market, causing prices to collapse.  Mr. Umeda told others that he had reached an understanding with Defendant Murata to prevent such a collapse.  *Id.* ¶ 245.

25. In July 2010, TDK and Taiyo Yuden executives attended a meeting at a restaurant in Tokyo and discussed the idea of having regular meetings (these were known as "Nakakabu" meetings).  At least as early as 2012, executives from Murata, TDK, and Taiyo Yuden met regularly in Japan at such Nakakabu meetings.  *Id.* ¶ 261.  These meetings were designed to facilitate the exchange of pricing information.  *Id.* ¶ 262.

26. In 2011, Mr. Umeda and Mr. Imanishi agreed not to wage a price war for the Inductor used by Customer C.  They also shared prices for another Inductor that their companies (TDK and Murata) intended to quote to Customer C.  *Id.* ¶ 246.

27. In March 2011, Defendant Taiyo Yuden told Defendants Murata and TDK that Customer C might want to shift its purchases from TDK to Taiyo Yuden.  This was done so TDK could develop a strategic response.  *Id.* 260.

28. In July 2011, Defendant Murata informed Defendant TDK of a product shortage so that TDK would use its product to fill the shortage and Murata would face less price competition.  *Id.* ¶ 251.

29. In November 2011, a Tokin employee distributed information—which was learned from Defendant Sumida at a JEITA meeting—to the Token sales team regarding a decline in the automotive sector.  *Id.* ¶ 251.

30. In March 2012, Defendant Taiyo Yuden informed Defendant TDK that it would not try to meet Customer C's requested target price for ▉▉▉▉▉▉▉▉▉.  *Id.* ¶ 257.

31. In June 2012 and October 2013, Mr. Umeda met with representatives from Defendant Tokin.  He had the personal and business telephone numbers of at least one Tokin employee.  *Id.* ¶ 269.

32. In November 2012, Panasonic employees discussed the JEITA meetings and "lamented" the recent difficulties in sharing competitively sensitive information about Inductors.  One employee acknowledged that the JEITA information exchanges "would now be acknowledged as a compliance violation" and that fair trade laws made exchanging information more difficult.  *Id.* ¶ 214.

33. In January 2013, Defendants TDK, Murata, and Taiyo Yuden coordinated a response to Customer C's new bidding process.  Customer C instituted a "round robin" bidding process, where bidders were required to submit quotes on the same day at the same time and place.  Mr. Yamaski, a TDK employee that managed Customer C accounts, called Mr.

Case No.: 5:19-cv-00078-EJD
ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS' MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL ARBITRATION

United States District Court
Northern District of California

United States District Court
Northern District of California

Umetani, a Murata employee, to discuss the new bidding format.  Both agreed that Customer C was trying to get lower prices from its suppliers and both agreed (on the companies' behalf) that Defendants TDK and Murata would not compete aggressively.  Mr. Yamasaki then called Mr. Jun Nakajima, a Taiyo Yuden employee, to discuss the new bidding format.  Mr. Nakajima told Mr. Yamasaki that Defendant Taiyo Yuden did not plan to compete aggressively.

Mr. Kamagata of TDK was told to negotiate with Defendants Taiyo Yuden and Murata to establish a price floor.  Mr. Kamagata proposed that Defendant Taiyo Yuden not go below $0.024 for a certain Inductor manufactured for Customer C.  Defendant TDK shared price ranges and proposed pricing floors to Defendants Taiyo Yuden and Murata.  *Id.* ¶¶ 257, 259.

34. In January 2013, Defendant Murata also informed Defendant TDK that Murata controlled Defendant Toko's pricing and that it coordinated bids with Toko.  Indeed, prior to its acquisition of Toko, Defendant Murata passed on information to Defendant TDK about Defendant Toko's bidding and pricing for a project with ███████████ and also reported to TDK that it was submitting bids with Toko for ███████████. *Id.* ¶ 268.

35. On January 30, 2013, Defendants exchanged confidential information at a JEITA PCC meeting concerning the projected growth of various passive components, including Inductors, compared to the previous year.  When discussing the shared information internally, Panasonic employees noted that "some of [the information is] lobby information which is not from the official meeting, so please handle it carefully."  Recipients were instructed to "be careful about re-distributing this email." *Id.* ¶ 215.

36. From July 2013 until August 2015, a series of meetings took place between Defendants TDK and Murata in California.  The meetings were organized around social events and golfing and were referred to as "the MT Cup." *Id.* ¶ 252.  There were at least fifteen MT Cup events.  In August 2014, around the time electronic capacitor manufacturers were raided by antitrust enforcers in Japan, Defendant TDK asked participants not to disclose the latest MT Cup outing outside the company. *Id.* ¶ 253.

37. In February 2014, Defendants TDK and Murata coordinated bids to Customer C.  Murata agreed not to submit a low bid price. *Id.* ¶ 247.  During this coordination, Defendants TDK and Murata allegedly discussed Plaintiff. *Id.* ¶ 248.

38. In July 2014, JEITA's leadership was aware that JEITA's activities violated the antitrust laws.  JEITA informed members that it had been required to submit committee meeting minutes and handouts to competition law enforcement authorities. *Id.* ¶ 231.

39. In July 2014, Defendants TDK and Murata agreed to coordinate Inductor pricing for Customer C concerning bids for TDK's ███████████. *Id.* ¶ 249.

40. In 2016, Defendants TDK and Murata continued to meet and discuss prices for Inductors.  For example, in March 2016, Defendant TDK privately met with Defendant Murata in Cupertino.  And, in September 2016, Defendant TDK bid on prices for a customer using prices obtained from Murata. *Id.* ¶ 267.

Case No.: 5:19-cv-00078-EJD
ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS' MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL ARBITRATION

To summarize—Plaintiff asserts that Defendants were members of JEITA and engaged in information exchanges at JEITA meetings. *Id.* ¶¶ 185–234. Just from this recitation of the facts, the Court identifies several problems. *First*, Plaintiff does not cite a single instance where any Defendant reached an agreement to fix the prices of inductors at any JEITA meeting. *See supra* I.A.2. (Court noted in its earlier dismissal order that "participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement"). *Second*, Plaintiff asserts that the structure of the Inductors market is "conducive" to conspiracy, but simultaneously concedes that from 2004 to 2016, Defendants lost market shares. *See* TAC ¶¶ 154–58; *see also supra* I.A.2. (identifying this as a problem in the 2019 dismissal order). *Third*, Plaintiff does not challenge its prior assertion that the Inductors market saw rampant entry of new, Chinese manufacturers during the relevant time period. Dkt. 1 at ¶ 166. *Fourth*, Plaintiff again asks the Court to infer a conspiracy based on the fact that certain Defendants previously engaged in antitrust violations in other, unrelated industries. TAC ¶¶ 276–87; *see also supra* I.A.2. (identifying this as a problem in the 2019 dismissal order).

Plaintiff has, however, asserted new claims in its TAC. Plaintiff alleges information about Defendant TDK and its leniency application. The TAC describes the information allegedly provided by TDK to the DOJ and Plaintiff. Plaintiff maintains that the Murata, Taiyo Yuden, and TDK Defendants participated in a limited course of bid-rigging conduct that targeted certain customers in the United States. Plaintiff's allegations limit this behavior to these specific Defendants. *See id.* ¶¶ 235–68.

### 4.   2011 Supplier Managed Inventory Agreement ("2011 SMIA")

Effective July 1, 2011, Flextronics International Management Services Ltd. ("FIMSL") entered into a Supplier Managed Inventory Agreement (the "2011 SMIA") with NEC Tokin Corporation. *See* Declaration of Tsuyoshi Okada in Support of Tokin's Motion to Compel Arbitration ("Okada Decl.") ¶ 3, Ex. 1, Dkt. 105.

United States District Court
Northern District of California



. Defendant Tokin maintains that under these provisions, Flex [Plaintiff], TOKIN Corporation, and TOKIN America, Inc. are parties to the SMIA.

Okada Decl., Ex. 1 § 10.6(a) (first emphasis added).

Case No.: 5:19-cv-00078-EJD
ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS' MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL ARBITRATION

United States District Court
Northern District of California

United States District Court
Northern District of California

The current version of the arbitration rules of the Hong Kong International Arbitration Centre (the rules that govern the 2011 SMIA arbitration agreement) became effective on November 1, 2018 (the "HKIAC Rules").  Declaration of Lee Brand in Support of Motion to Compel Arbitration ("Brand Decl.") ¶ 3, Ex. A at 2, Dkt. 106. Although these rules postdate the 2011 SMIA, they "govern arbitrations where an arbitration agreement . . . provides for these Rules to apply" and, "unless the parties have agreed otherwise, . . . in which the Notice of Arbitration is submitted on or after" their effective date.  *Id.*, Ex. A at Arts. 1.1, 1.4.  The HKIAC Rules include the following language delegating all questions of arbitrability to the arbitrator:

### Article 19 – Jurisdiction of the Arbitral Tribunal

> 19.1 The arbitral tribunal may rule on its own jurisdiction under these Rules, including any objections with respect to the existence, validity or scope of the arbitration agreement. . . .

> 19.4 Subject to Article 19.5, if a question arises as to . . . the existence, validity or scope of the arbitration agreement . . . before the constitution of the arbitral tribunal, the arbitration shall proceed and any such question shall be decided by the arbitral tribunal once constituted.

> 19.5 . . . Any question as to the jurisdiction of the arbitral tribunal shall be decided by the arbitral tribunal once constituted, pursuant to Article 19.1.

*Id.* at Art. 19.

### B. Procedural History

On September 24, 2019, this Court granted Defendants' motion to dismiss DPP's First Consolidated Amended Class Action Complaint ("DPP FCAC").  The Court has not considered motions to dismiss in this case.  And, the DPP first amended consolidated complaint that the Court dismissed did not include allegations derived from TDK's proffer or from Plaintiff's independent investigation.  *See* FAC ¶¶ 27, 195–96, 198, 201–06, 208–15, 226–27, 235–70.  Plaintiff (on behalf of itself and all affiliated entities) brings this action for damages under Sections 4 and 16 of the Clayton Act for the Defendants' alleged violation of Section 1 of the Sherman Act, 15 U.S.C.

Case No.: 5:19-cv-00078-EJD
ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS' MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL ARBITRATION

§ 1.

On January 15, 2020, the Murata, TDK, and Taiyo Yuden Defendants filed a motion to dismiss the TAC.  Motion to Dismiss TAC ("MTT MTD"), Dkt. 96.  Plaintiff filed an opposition to this motion on March 16, 2020.  Flextronics International USA Inc.'s Opposition to Taiyo Yuden, TDK, and Murata's Motion to Dismiss ("MTT Opp."), Dkt. 111.  On May 6, 2020, Defendants Murata, TDK, and Taiyo Yuden filed a reply.  Reply in Support of Motion to Dismiss, ("MTT Reply"), Dkt. 120.

On January 15, 2020, Defendants Panasonic, Sagami, and Sumida also filed a motion to dismiss.  Motion to Dismiss Third Amended Complaint ("PSS MTD"), Dkt. 97.  Plaintiff filed an opposition on March 16, 2020.  Flextronics International USA Inc.'s Opposition to Panasonic, Sagami, and Sumida's Motion to Dismiss ("PSS Opp."), Dkt. 112.  PSS Defendants filed a reply. Reply re Motion to Dismiss ("PSS Reply"), Dkt. 121.

On February 19, 2020, the Tokin Defendants filed a motion to compel arbitration or, in the alternative, to dismiss Plaintiff's TAC.  Tokin's Motion to Compel Arbitration or Dismiss ("T Mot."), Dkt. 105.  Plaintiff filed an opposition to this motion on March 24, 2020.  Opposition to Motion to Compel Arbitration ("T Opp."), Dkt. 116.  On May 6, 2020, the Tokin Defendants filed a reply.  Reply re Motion to Compel Arbitration ("T. Reply"), Dkt. 123.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  A plaintiff need only allege "enough facts to state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "In general, the inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff."  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  A complaint alleging an antitrust conspiracy thus must merely present "enough factual matter (taken as true) to suggest that an agreement was

United States District Court
Northern District of California

1  made" in order to "raise a reasonable expectation that discovery will reveal evidence of an illegal

2  agreement." *Twombly*, 550 U.S. at 556.  The touchstone is plausibility.  "Specific facts are not

3  necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and

4  the grounds upon which it rests."  *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1141

5  (N.D. Cal. 2009) (quotation marks and citation omitted).

6       Courts in this district do not require plaintiffs in complex, multinational, antitrust cases to

7  plead detailed, defendant-by-defendant allegations.  Instead, courts require plaintiffs "to make

8  allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."  *In*

9  *re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1185 (N.D. Cal. 2009) (quoting

10  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal.

11  2008).  In complex, multinational, conspiracy cases, courts in this district review specific

12  allegations in the context of the complaint taken as a whole.  *In re Flash Memory*, 643 F. Supp. 2d

13  at 1144, 1147, 1148.  Although this is not a "pleading standard," this approach is consistent with

14  the Supreme Court's admonition in *Continental Ore Co. v. Union Carbide & Carbon Corp.* that

15  the "'character and effect of a conspiracy are not to be judged by dismembering it and viewing its

16  separate parts, but only by looking at it as a whole.'"  *In re Cathode Ray Tube (CRT) Antitrust*

17  *Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (quoting *Cont'l Ore Co. v. Union Carbide &*

18  *Carbon Corp.*, 370 U.S. 690, 699 (1962)).

19  **III.    DISCUSSION**

20       Plaintiff alleges two distinct types of price-fixing agreements—a "broad directional

21  agreement" between all Defendants to fix current and future pricing levels and a specific price

22  agreement between the Murata, TDK, and Taiyo Yuden Defendants to target Original Equipment

23  Manufacturers' ("OEM") supply chains by rigging bids and implementing specific prices.

24  Plaintiff argues that its allegations about OEM-specific bid-rigging agreements shows direct

25  and/or circumstantial evidence of broad market-wide agreement to fix the prices of Inductors.

26

27  Case No.: 5:19-cv-00078-EJD
ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'

28  MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
ARBITRATION

1   Plaintiff thus argues that it only pleads a "single conspiracy."  MTT Opp. at 11–12.  This

2   overstates the TAC.

3         The TAC alleges that the Murata, TDK, and Taiyo Yuden Defendants "rigged" the OEM

4   supply chain by price fixing Inductors as to **specific** customers.  From this, Plaintiff maintains that

5   the Court should infer a "broad" directional agreement among Defendants to fix the price of

6   Inductors across the industry.  Hence, what Plaintiff argues for is an *inference* of a large

7   conspiracy based off *another* conspiracy.  *See* SAC ¶¶ 3–4 (alleging a "broad directional

8   agreement conspiracy" and alleging distinct "separate price agreement" conspiracy).  Therefore,

9   Plaintiff argues that two conspiracies existed and uses the OEM-conspiracy as evidence of a

10  broader conspiracy.  It is thus illogical to say that the TAC pleads a "single conspiracy."  MTT

11  Opp. at 1.

12        The distinction between the two conspiracies is important.  Plaintiff attempts to collapse

13  the OEM-conspiracy into a broader price-fixing conspiracy.  Plaintiff seemingly does this to show

14  that it suffered harm from the OEM-conspiracy.  In other words, if the OEM-conspiracy shows a

15  "broader" conspiracy, then there is no question that Plaintiff was harmed.  But, if the Court treats

16  the conspiracies separately, then Plaintiff must show that it was (1) particularly affected by the

17  OEM-conspiracy and (2) that a broader conspiracy existed.

18        The Court does not dispute that the allegations about the OEM-conspiracy show that the

19  Murata, Taiyo Yuden, and TDK Defendants conspired to fix the price of Inductors as to Customer

20  C.  Unfortunately for Plaintiff, that is not the relevant inquiry.  The question is whether the OEM-

21  conspiracy evinces a broader, price-fixing conspiracy among all Defendants.  For reasons

22  discussed more below, the Court cannot make the inference that Plaintiff advocates.  Pursuant to

23  Plaintiff's allegations, the OEM-conspiracy involved one customer—Customer C—and only three

24  of Defendants—Murata, Taiyo Yuden, and TDK—and only pertained to specific types of

25  Inductors.  Given the confines of the OEM-conspiracy, the Court cannot use it to infer evidence of

26

27  Case No.: 5:19-cv-00078-EJD
    ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
    TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'
28  MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
    ARBITRATION

United States District Court
Northern District of California

a broader price fixing conspiracy.  *See infra* III.A.1.b.

Because the Court treats the OEM-conspiracy and the broader conspiracy seperately, the inquiry becomes whether the OEM-conspiracy caused Plaintiff to suffer harm *and* whether Plaintiff has alleged sufficient facts to show a broader conspiracy by Defendants to fix the prices of Inductors.  Plaintiff has not met this burden—Plaintiff fails to connect that conspiracy to fix the prices of Inductors as to Customer C to itself or to the Panasonic, Tokin, Sagami, and Sumida Defendants.  Likewise, Plaintiff has failed to plead sufficient facts to demonstrate the existence of a larger conspiracy to set the prices of Inductors.  Hence, as the below analysis shows, MTT Defendants are correct that Plaintiff has failed to establish standing and the existence of a broader conspiracy.  MTT Reply at 2.

### A.  Article III Standing

Federal courts are courts of limited jurisdiction; they are authorized only to exercise jurisdiction pursuant to Article III of the U.S. Constitution and federal laws enacted thereunder. *Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F. Supp. 2d 888, 896 (N.D. Cal. 2011); *see also Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.").  Hence, an Article III federal court must ask whether a plaintiff has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III of the U.S. Constitution.  *In re LinkedIn User Privacy Litig.*, 932 F. Supp. 2d 1089, 1092 (N.D. Cal. 2013).

To satisfy Article III standing, a plaintiff must allege: (1) an injury in fact that is concrete and particularized, as well as actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely (not merely speculative) that injury will be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992).

United States District Court
Northern District of California

1    To establish an injury in fact, a plaintiff must show that he or she suffered "an invasion of a

2    legally protected interest" that is "concrete and particularized" and "actual or imminent, not

3    conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quotation

4    marks and citation omitted).

5         If a plaintiff cannot allege Article III standing, then the federal court lacks jurisdiction over

6    the case and must dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(1).

7    *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 687 (9th Cir. 2003); *Steel Co. v. Citizens for*

8    *a Better Env't*, 523 U.S. 83, 101, 109–10 (1998).  Indeed, "[a]t the pleading stage, the plaintiff

9    must clearly allege facts demonstrating each element."  *In re Apple Processor Litig.*, 366 F. Supp.

10   3d 1103, 1107 (N.D. Cal. 2019) (quoting *Spokeo*, 136 S. Ct. at 1547.  "When '[s]peculative

11   inferences' are necessary . . . to establish either injury or the connection between the alleged injury

12   and the act challenged, standing will not be found."  *Johnson v. Weinberger*, 851 F.2d 233, 235

13   (9th Cir. 1988) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976)).

14            1.  **Analysis**

15                 a.  **The OEM Bid-Rigging Conspiracy**

16        Plaintiff lacks standing to bring claims premised on the alleged agreements aimed at

17   Customer C.  The TAC neither alleges that Plaintiff or its affiliates purchased the parts allegedly

18   affected by OEM-specific bid-rigging agreements nor that Plaintiff was a target of the alleged

19   scheme.  The ***only*** allegation in the TAC to support such an inference is: "Mr. Kamagata's

20   February 2014 communication with Mr. Umeda discusses Flex and indicates Flex would be a

21   target of the conspiratorial agreement with Murata."  SAC ¶ 248.  This recites the elements of

22   harm without actually showing the harm suffered.  Indeed, notably missing from Paragraph 248 is

23   *any* allegation about *how* or *why* Plaintiff would be targeted by an agreement that seemingly only

24   applies to Customer C's bidding process.  *See id.* ¶ 247; *see also Maya v. Centex Corp.*, 658 F.3d

25   1060, 1068 (9th Cir. 2011) ("[P]laintiff may [not] rely on a bare legal conclusion to assert injury-

United States District Court
Northern District of California

1    in-fact.").  The inference that Plaintiff would be affected by the OEM-bid-rigging is, at best,

2    speculative—the TAC fails to allege any facts connecting Plaintiff to Customer C's business and

3    fails to show *why* or *how* Mr. Umeda and Mr. Kamagata would have targeted Plaintiff.  *See*

4    *Johnson*, 851 F.2d at 235 (finding that speculative inferences fail to establish standing).

5          The other paragraphs Plaintiff points to do not show that Plaintiff was impacted by any

6    OEM-specific agreement.  Plaintiff references paragraph 206 to show that it purchased effected

7    parts for Customer C.  *See* MTT Opp. at 17.  But, that paragraph does not even reference

8    Customer C.  To the contrary, it discusses a JEITA Meeting where members allegedly talked

9    about increasing "the monetary amounts of Inductors sold for . . . *power supplies*."  TAC ¶ 206

10   (emphasis added).  This paragraph thus does not contemplate OEM-agreements *or* Customer C.

11   More confusing, as the above chronology shows, the Customer C's bid-rigging did not occur until

12   2009.  *See id.* ¶¶ 235–70.  Yet, the allegations in paragraph 206 occurred in **2007.**  Additionally,

13   Plaintiff does not connect any harm to these discussions.  Rather, Plaintiff summarily alleges that

14   it "purchased inductors for power supplies at or around this time."  *Id.*  Indeed, Plaintiff does not

15   allege that the Inductors were sold at an increased price following these meetings.

16         Plaintiff also references paragraphs 33–35 and 321 to show that it "directly purchased

17   Inductors from Defendants, often pursuant to prices negotiated by [its] customers."  MTT Opp. at

18   19.  Again, none of these paragraphs show that Plaintiff purchased Inductors from or for Customer

19   C.  To the contrary, as paragraph 321 demonstrates, Plaintiff alleges only that *it* purchased

20   Inductors from Defendants during the relevant time period.  TAC ¶ 321 (alleging that Flex USA

21   purchased a type of "wirewound Inductor" from TDK in 2006 and that "Flex" (one of Flex USA's

22   affiliates) purchased another "wirewound Inductor" from Panasonic in 2006 and 2007).  Notably,

23   Plaintiff does not allege that those purchases were made at prices negotiated by its customers, that

24   it purchased the Inductors through Customer C's supply chain, or the purchases were even the

25   subject of any OEM-specific bid-rigging agreement.  Indeed, these purchases (much like those

26

27   ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
     TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'

28   MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
     ARBITRATION

*(left margin vertical text)* United States District Court  Northern District of California

United States District Court
Northern District of California

discussed in paragraph 206) predated the alleged Customer C bid-rigging agreements by almost two years.  And, these purchases reflect a different type of Inductor all together—the bid-rigging allegations identify products like "common mode filters," not "wirewound Inductors."  *See id.* ¶¶ 246–47.  Plaintiff never alleges that it or its affiliates purchased the "common mode filters." *See id.* ¶ 246, 270.

Perhaps recognizing that it failed to allege that it was particularly harmed by the OEM-conspiracy, Plaintiff argues that it is not required to plead any specific injury tied to unlawful conduct, but can instead rely on "an exemplar pool of conspiratorial incidents to establish injury." MTT Opp. at 17.  Accepting Plaintiff's argument, however, would allow *any* direct purchaser of Inductors during the relevant period to "piggy-back" onto the harm caused to Customer C by the OEM bid-rigging scheme.  This cannot be.  *See Spokeo*, 136 S. Ct. at 1548 (an injury in fact requires a showing of a "concrete and particularized" and "actual or imminent" harm).  Contrary to Plaintiff's argument, in order to show particularized harm, Plaintiff must connect itself to the OEM-conspiracy in some concrete way—either by showing that it purchased Inductors from Customer C or that it was a target of the OEM bid-rigging conspiracy.  *Cf.* MTT Opp. at 17 n.9.

Plaintiff's caselaw to the contrary is unpersuasive.  None of the cases Plaintiff cites address standing.  In each case, the plaintiff adequately alleged a broad conspiracy to set prices across the market.  That type of conspiracy is not at issue; Plaintiff focuses on a *specific* conspiracy to fix prices as to a *specific* customer.  Hence, that the courts in those cases found that a plaintiff need not allege transaction-level allegations is irrelevant.  *See, e.g.*, *In re Resistors Antitrust Litig.*, 2017 WL 3895706, at *2 (N.D. Cal. Sept. 5, 2017) (finding that allegations of price-fixing across the passive component market, without transaction-level allegations, adequate); *accord In re Auto. Parts Antitrust Litig.*, 2014 WL 4272772, at *9–10 (finding plausible complaint's allegations of an overarching "price-fixing conspiracy" that "allocated markets and customers").

1     To summarize, the Murata, TDK, and Taiyo Yuden Defendants' conspiracy to fix the

2  prices of Inductors sold to Customer C does not automatically confer standing on Plaintiff.

3  Speculation that Plaintiff or one of its affiliates *may* have purchased a part affected by the OEM

4  bid-rigging agreement does not show an injury in fact.  The harm alleged is simply too

5  speculative.  Accordingly, because the TAC fails to connect the OEM-conspiracy to Plaintiff,

6  Plaintiff may not use this conspiracy to support its antitrust claims.

7                    **b.  Industry-Wide Conspiracy**

8     Even though Plaintiff cannot show that it was particularly impacted by the OEM-

9  conspiracy, it urges this Court to infer that the OEM-conspiracy is indicative of a larger conspiracy

10  to set the prices of Inductors.  As noted, Plaintiff advocates for a "single conspiracy" and a series

11  of actions taken in furtherance of that conspiracy.  PSS Opp. at 2, 21.  In other words, Plaintiff

12  argues that because the TAC alleges an admitted bid-rigging conspiracy by MTT Defendants, the

13  Court should assume that the Panasonic, Sumida, and Sagami Defendants were also involved in a

14  price-fixing conspiracy.  In this way, Plaintiff can avoid the above standing analysis—it can show

15  a broader market effect and satisfy the injury-in-fact requirement.  As noted above, this argument,

16  however, is misplaced.  Courts cannot infer a broad market conspiracy from a distinct conspiracy,

17  aimed at a single-customer.  Again, allowing this would eradicate the requirement that a plaintiff

18  show a particularized harm.  While the Court must consider a complaint "holistically," it cannot

19  ignore the basic rules of standing.

20     In the alternative, Plaintiff attempts to use the OEM-conspiracy as "direct and

21  circumstantial evidence" of a broad-market conspiracy.  But, Plaintiff must allege that *each*

22  *individual defendant* joined the conspiracy and played some role in it.  *See In re TFT-LCD*, 586 F.

23  Supp. 2d at 1117.  Allegations about the MTT Defendants have nothing to do with the Panasonic,

24  Sumida, and Sagami Defendants.  For this same reason, the OEM-conspiracy is not circumstantial

25  evidence of a broader market conspiracy.  Plaintiff does not cite any case in which a court has

26

Case No.: 5:19-cv-00078-EJD
27  ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'
28  MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
ARBITRATION

United States District Court
Northern District of California

1    inferred from an admission of unlawful conduct by *some* defendants that the *other* defendants,

2    who were not identified as participants in the conduct, were involved in the unlawful conduct.  To

3    the contrary, in both *In re Refrigerant Compressors Antitrust Litigation,* 2012 WL 2114997, at

4    *7–8 (E.D. Mich. June 11, 2012), and *In re Florida Cement & Concrete Antitrust Litigation*, 746

5    F. Supp. 2d 1291, 1319 (S.D. Fla. 2010), the courts refused to allow the plaintiffs to maintain

6    broad conspiracy claims against the moving defendants based on allegations of conduct by other

7    defendants.  For these reasons, the OEM-conspiracy cannot be used to support a broader-market

8    conspiracy and the Court cannot infer (from the OEM-conspiracy) that Plaintiff suffered an injury

9    in fact.

10                    **B.  Plausibility of Direct/Circumstantial Evidence of a Price Fixing Conspiracy**

11                    Having determined that the OEM-conspiracy cannot support a showing of harm, the issue

12    becomes whether Plaintiff has alleged sufficient facts (outside the OEM-conspiracy) that show

13    direct or circumstantial evidence of a broader conspiracy between Defendants to fix the prices of

14    Inductors.

15                    Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract,

16    combination . . . , or conspiracy, in restraint of trade."  To state a claim under Section 1, a plaintiff

17    must allege that "(1) there was an agreement, conspiracy, or combination between two or more

18    entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of

19    reason analysis; and (3) the restraint affected interstate commerce."  *Am. Ad Mgmt. Inc. v. GTE*

20    *Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).  The Supreme Court has stated that a plaintiff must plead

21    "enough factual matter (taken as true) to suggest that an agreement was made."  *Kendall v. VISA*

22    *U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556–57).

23    However, "[a]sking for plausible grounds to infer an agreement does not impose a probability

24    requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable

25    expectation that discovery will reveal evidence of an illegal agreement."  *Id.*  Hence, allegations of

26

27    Case No.: 5:19-cv-00078-EJD
      ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
      TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'
28    MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
      ARBITRATION

United States District Court
Northern District of California

1  parallel conduct and a "bare assertion of conspiracy" will not suffice.  *Id.*

2      Section 4 of the Clayton Act creates a private right of action under the Sherman Act for a

3  plaintiff who has been "injured in his business or property by reason of anything forbidden in the

4  antitrust laws." 15 U.S.C. § 15(a).  Thus, an antitrust plaintiff must have suffered antitrust injury,

5  that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that

6  which makes defendants' acts unlawful." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,* 190 F.3d

7  1051, 1055 (9th Cir.1999).

8      Section 16 of the Clayton Act authorizes suits for injunctive relief.  It provides in relevant

9  part:

> Any person, firm, corporation, or association shall be entitled to sue
> for and have injunctive relief, in any court of the United States
> having jurisdiction over the parties, against threatened loss or
> damage by a violation of the antitrust laws, . . . when and under the
> same conditions and principles as injunctive relief against threatened
> conduct that will cause loss or damage is granted by courts of
> equity.

14  Unlike Section 4, which requires proof of loss, Section 16 only requires a threat of loss.  *See*

15  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–111 (1986).  An antitrust plaintiff

16  proceeding under Section 16 must, however, still demonstrate that the injury in question is an

17  "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-*

18  *O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

19  **1.  Direct Evidence**

20      Direct evidence is evidence that establishes, without requiring any inferences, that a

21  defendant participated in an alleged conspiracy.  *In re Citric Acid Litig.*, 191 F.3d 1090, 1093–94

22  (9th Cir. 1999); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) ("[Direct

23  evidence] is the smoking gun in a price-fixing case . . . which would usually take the form of an

24  admission by an employee of one of the conspirators, that officials of the defendants had met and

25  agreed explicitly on the terms of a conspiracy to raise the price.").

26

United States District Court
Northern District of California

1    Plaintiff claims that Defendants in this case "reached broad directional agreements on

2  current and future pricing levels" and "coordinate[d] future behavior in order to avoid price

3  competition."  SAC ¶ 3.  Plaintiff maintains that it has pled "direct evidence" of a price-fixing

4  conspiracy because "Defendants' employees themselves acknowledged the [JEITA] meetings

5  were illegal."  PSS Opp. at 13.  But, statements by two *non-Defendants* that activities about

6  "products" potentially raised antitrust concerns are not "admissions" by a Defendant that it met

7  and agreed with the other Defendants to set the prices of Inductors.  *See* SAC ¶¶ 201, 229.

8  Likewise, the single comment by a Panasonic employee that JEITA meeting exchanges were

9  "compliance violations" is insufficient.  *Id.* ¶ 214.  That the information exchanged may have

10  violated a compliance policy does not show an explicit agreement to fix the prices *of Inductors*.

11  Indeed, first, the compliance policy could be more robust than the Sherman Act.  *See Havensure,*

12  *L.L.C. v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 317 (6th Cir. 2010) (noting "a violation of

13  internal policies" does not "suffice[] to render . . . conduct wrongful"); *In re Urethane Antitrust*

14  *Litig.*, 2016 WL 475339, at *2 (D.N.J. Feb. 8, 2016) ("[W]hether Dow employees believed they

15  violated [internal antitrust policies] is irrelevant.").  And, second, as the Court noted in its last

16  dismissal order, the exchanges could have pertained to *other* antitrust violations.  Order at 18–19.

17    Further, as the above analysis shows, Plaintiff advocates that the Court **infer** broad

18  directional agreements from employees comments about compliance.  That, by itself, shows that

19  Plaintiff's lack direct evidence of a conspiracy to fix the prices across the Inductor market.  *See In*

20  *re Text Messaging*, 630 F.3d at 628; *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d

21  85, 100 (3d Cir. 2010) (finding direct evidence of a conspiracy based on explicit agreement

22  between the defendants to protect each other from competition, not based on one employee's

23  comment that the agreement was "probably illegal").  In contrast to *West Penn*, Plaintiff does not

24  allege facts showing that Defendants had an explicit agreement to fix the prices of Inductors at the

25  JEITA meetings or that Defendants *did* fix the prices of Inductors at such meetings.  Plaintiff thus

26

27  ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION
    TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS'
28  MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL
    ARBITRATION

has not shown direct evidence of a broad conspiracy to set the prices of Inductors.

### 2. Circumstantial Evidence

Without direct evidence of a market-wide conspiracy, Plaintiff must plead circumstantial evidence of a conspiracy that tends to exclude the possibility that defendants acted independently. *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1144 (N.D. Cal. 2017).  However, plaintiffs attempting to plead a conspiracy based on circumstantial evidence must allege both parallel conduct and "plus factors" that demonstrate that the conduct is the result of conspiracy and not independent action.  *See Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 Fed. App'x 389, 390 (9th Cir. 2017) ("Bona Fide's references to 'plus factors' fail to save its Section 1 claims from dismissal.  'Plus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants.  Bona Fide has not plausibly alleged any parallel conduct among the defendants." (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193–94 (9th Cir. 2015)); *Park Irmat Drug Crop. V. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (affirming dismissal of claim that the defendant engaged in a conspiracy because the plaintiff failed to "plausibly plead parallel conduct" and so "no discussion of any 'plus factors' [was] necessary").

Plaintiff does not dispute that it has failed to allege parallel conduct.[6]  *See* MTT Opp. at 14–15.  The TAC fails to allege information that Defendants actually charged higher prices and that they did so in parallel.  *Cf. In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1062 (N.D. Cal. 2015) (noting that the plaintiffs alleged "specific price data" reflecting that the defendants'

---

[6] Plaintiff argues that it need not allege parallel conduct because it asserts a bid-rigging conspiracy.  As noted, that conspiracy cannot support the broad market conspiracy because Plaintiff fails to show that *all* Defendants engaged in a conspiracy to rig the prices of Inductors *across the market.*

The Court also notes that Plaintiff's inclusion of the spreadsheets does not show parallel pricing as they do not show that <u>Defendants</u> provided pricing information *or* fixed pricing to align with each other.  The spreadsheets do not identify Defendants by name.  Likewise, they do not show fixed prices—the prices shown therein are different by company.

United States District Court
Northern District of California

United States District Court
Northern District of California

conduct allowed them "to slow, negate and even reverse the market-driven decline in price for their products, and to fix prices at supra-competitive levels").  Standing alone, Plaintiff's alleged "plus factors"—even if they plausibly allege illegal conduct by Defendants (which the Court is dubious about as they seem to recite verbatim facts that the Court already determined were insufficient)—are irrelevant to determining whether the TAC made out a viable Section 1 claim. Accordingly, the Court must hold that Plaintiff has failed to allege circumstantial evidence of a conspiracy among the Defendants to fix the prices of Inductors.

Because Plaintiff has failed to show that it was (1) particularly affected by the OEM-bid-rigging conspiracy or (2) the existence of a broad conspiracy to fix the prices of Inductors, Plaintiff has not presented a viable Section 1 claim and the Court **GRANTS** the two motions to dismiss.

### C.  Defendant Tokin's Motion to Compel Arbitration

As noted in the fact section, Plaintiff, and its affiliate FIMSL, and Defendant Tokin Corporation, and its affiliates, are parties to a 2011 SMIA arbitration agreement.  The Tokin Defendants request the Court compel arbitration pursuant to the 2011 SMIA arbitration agreement and stay Plaintiff's claims against the Tokin Defendants pending arbitration.

#### 1.  Legal Standard

The Federal Arbitration Act ("FAA") declares "that a written agreement to arbitrate . . . 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract,'" and thereby establishes a "liberal federal policy favoring arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (quoting 9 U.S.C. § 2).  Where parties enter into an arbitration agreement, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218 (1985).  "The Supreme

Court has consistently recognized 'the emphatic federal policy in favor of arbitral dispute resolution,' a policy that 'applies with special force in the field of international commerce.'" *Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 652 (9th Cir. 2009) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

### 2. Analysis

To rebut the 2011 SMIA, Plaintiff's Opposition relies extensively on an agreement between Plaintiff and KEMET—the 2013 Preferred Supplier Program Agreement ("2013 PSPA"). T Opp. at 1.  Plaintiff argues that this agreement is controlling.

The 2013 PSPA ███████████████████████████████████████████████████ ███████. Declaration of Mark Trutna in Support of Opposition ("Trutna Decl."), Ex. 3 at § 3, Dkt. 115. ██████████████████████████████████████ ████████████████████████████████████████████████. *Id.* § 2.  This agreement was executed on April 1, 2013.

The first paragraph of the PSPA defines the parties to the agreement as "FIMSL" and "Seller [KEMET]."  *Id.* at 1.  The final paragraph of the PSPA identifies the signatories as FISML and KEMET.  *Id.* at 4.  Defendant Tokin was not a signatory to the 2013 PSPA.  Nevertheless, Plaintiff's Opposition claims that Defendant Tokin is bound by the PSPA and its arbitration agreement because it is an "affiliate" of KEMET.  T Opp. at 3, 5.

The PSPA does not define the term "affiliates."  Plaintiff argues that the Tokin Defendants became KEMET affiliates on February 1, 2013 because (1) KEMET completed the purchase of a "34% economic interest" (51% of the common stock) in Tokin on that date and (2) the stock purchase agreement governing that purchase defined KEMET's Affiliates to include Defendant Tokin.  T Opp. at 3.  Notably, the PSPA does not include any provision incorporating the stock agreement into its definition of "affiliate."  Moreover, as Defendant Tokin notes, Plaintiff does not explain how KEMET's partial ownership stake in Defendant TOKIN created the type of control

United States District Court
Northern District of California

United States District Court
Northern District of California

1  relationship generally associated with affiliate status.  An "affiliate" is defined as a "corporation

2  that is related to another corporation by shareholdings *or other means of control*; a subsidiary,

3  parent, or sibling corporation."  *See Affiliate*, Black's Law Dictionary (11th ed. 2019) (emphasis

4  added).  As KEMET Corporation's 2013 10-K states, even after its Tokin stock acquisition, it still

5  "[did] not have the *power to direct significant activities of NEC TOKIN*."  Dkt. 116-6 at 4

6  (emphasis added).  Hence, by KEMET's own admission, it did not have the power to control

7  Defendant Tokin.  Accordingly, Defendant Tokin was not an "affiliate" of KEMET within the

8  meaning of the 2013 PSPA agreement and is thus not bound by its provisions.[7]

9      The 2011 SMIA is thus controlling.  Plaintiff does not dispute that it (and Defendant

10  Tokin) are both parties and signatories of the SMIA and the arbitration agreement therein.

11  Likewise, Plaintiff does not identify any basis—other than the existence of the 2013 PSPA—that

12  would impact the effectiveness of the SMIA's arbitration clause.  Instead, Plaintiff argues that this

13  Court, rather than the arbitrator, must address questions of arbitrability.  Specifically, Plaintiff

---

[7] Defendant Tokin notes that Plaintiff may be making a third-party beneficiary argument in its opposition.  T Reply at 5.  Plaintiff does not explicitly make this argument; rather, Plaintiff only states that ██████████.  T Opp. at 5.

Under Colorado law (the applicable law governing the 2013 PSPA), a nonsignatory may be bound to an arbitration agreement based on: (1) incorporation of an arbitration provision by reference in another agreement; (2) assumption of the arbitration obligation by the nonsignatory; (3) agency; (4) veil-piercing/alter ego; (5) estoppel; (6) successor-in-interest; and (7) third-party beneficiary.  *N.A. Rugby Union LLC v. U.S.A. Rugby Football Union*, 442 P.3d 859, 863–64 (Colo. 2019).

To the extent Plaintiff is making a third party beneficiary argument (and to the extent Plaintiff has even properly presented that argument to the Court), the Court does not read Plaintiff's opposition as presenting a sufficient showing that "the underlying agreement manifested an intent to confer *specific legal rights* upon [the nonsignatory]."  *N.A. Rugby Union*, 442 P.3d at 865–66.  Plaintiff does not identify any specific legal right conferred on Defendant Tokin by the PSPA.  Rather, Plaintiff indicates ██████████.  Thus, Plaintiff has failed to show that it and KEMET intended to confer a specific legal right on Defendant Tokin.  This is confirmed by the Tokin Defendants' declaration, which states that ██████████.  Reply Declaration of Tsuyoshi Okada ¶¶ 2–4.  Moreover, KEMET did not intend to bind or benefit Defendant Tokin when it executed the PSPA, and KEMET has never understood its obligations under the PSPA ██████████.  Reply Declaration of R. James Assaf ¶ 4.

Case No.: 5:19-cv-00078-EJD
ORDER GRANTING THE MURATA, TAIYO YUDEN, AND TDK DEFENDANTS' MOTION TO DISMISS; GRANTING THE PANASONIC, SAGAMI, AND SUMIDA DEFENDANTS' MOTION TO DISMISS; GRANTING THE TOKIN DEFENDANTS' MOTION TO COMPEL ARBITRATION

29

argues that the Court must decide whether this dispute falls within the scope of the SMIA's arbitration agreement. However, because the 2011 SMIA incorporates the rules of the HKIAC, it delegates all arbitrability questions to the arbitrator. *See* Okada Decl., Ex. 1 § 10.6(a); Brand Decl., Ex. A at Arts. 19.1, 19.4–19.5; *see also supra* III.C.1.

"[T]he Ninth Circuit has held that the incorporation of arbitral rules that delegate to the arbitrator the authority to decide their own jurisdiction constitutes a 'clear and unmistakable' delegation, at least with respect to sophisticated parties." *In re Lithium Ion Batteries Antitrust Litig.*, 2016 WL 5791357, at *3 (N.D. Cal. Oct. 4, 2016) (citations omitted); *see also Townsend Ventures, LLC v. Hybrid Kinetic Grp. Ltd.*, 2017 WL 3730345, at *4–5 (D. Md. Aug. 30, 2017) (where arbitration provision called for arbitration in accordance with HKIAC rules it "clearly and unmistakably committed the determination of arbitrability to the HKIAC"). The Parties have thus clearly committed the determination of arbitrability to the HKIAC and the Court need not address whether Plaintiff's claims are subject to arbitration.

Before compelling arbitration, however, the Court must ensure that the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") allows the Court to compel arbitration. Chapter 2 of the FAA, which codifies the Convention, governs arbitration agreements involving foreign corporations. 9 U.S.C. §§ 201–02. The chapter grants federal district courts original jurisdiction over "action[s] or proceeding[s] falling under the Convention," *id.* § 203, as well as authority to compel arbitration "in accordance with the agreement," *id.* § 206. It also incorporates Chapter 1 of the FAA "to the extent that chapter is not in conflict with this chapter or the Convention." *Id.* § 208.

In the Ninth Circuit, a four-part test is used to determine whether an arbitration agreement is governed by the Convention. The Court asks whether: "(1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of legal relationship, whether

United States District Court
Northern District of California

1   contractual or not, which is considered commercial; and (4) a party to the agreement is not an

2   American citizen, or that the commercial relationship has some reasonable relation with one or

3   more foreign states." *Gilbert v. Bank of Am.*, 2015 WL 1738017, at *3 (N.D. Cal. Apr. 8, 2015)

4   (quoting *Balen*, 583 F.3d at 654–55).  If these questions are answered in the affirmative, a court is

5   required to order arbitration unless the court finds the agreement to be null and void, inoperative,

6   or incapable of being performed." *Apple Inc. v. BYD Co. Ltd.*, 2016 WL 1212638, at *7 (N.D.

7   Cal. Mar. 2, 2016).

8          Here, all four questions are answered affirmatively.  *First*, there is an "agreement in

9   writing"—the 2011 SMIA—with an arbitration provision.  *Second*, the arbitration provision calls

10  for arbitration in Hong Kong, which is a territory within a signatory of the convention.  *See*

11  *Townsend Ventures*, 2017 WL 3730345, at *5 n.5.  *Third*, the SMIA involves a commercial

12  relationship, as it relates to "business transactions between FIMSL and its Affiliates and Supplier

13  and its Affiliates."  Okada Decl., Ex. 1 § 1.1.  Finally, Defendant Tokin is a Japanese company,

14  with its principal place of business in Japan—it is thus not an American citizen.  *See* TAC ¶ 68;

15  9 U.S.C. § 202 ("For the purposes of this section a corporation is a citizen of the United States if it

16  is incorporated or has its principal place of business in the United States).

17         The 2011 SMIA is thus governed by the Convention and is enforceable unless the "said

18  agreement is null and void, inoperative, or incapable of being performed."  *Gilbert*, 2015 WL

19  1738017, at *2, *4.  Plaintiff does not argue the agreement is void.  Accordingly, the Tokin

20  Defendants' motion to compel arbitration is **GRANTED** and the Court **STAYS** Plaintiff's claims

21  against the Tokin Defendants pending arbitration.  The Parties shall notify the Court within **seven**

22  **days** of an arbitration ruling.

23    **IV.    CONCLUSION**

24         For the foregoing reasons, the Court **GRANTS** (1) the Murata, Taiyo Yuden, and TDK

25  Defendants' motion to dismiss and (2) the Panasonic, Sagami, and Sumida Defendants' motion to

26

dismiss.  When dismissing a complaint for failure to state a claim, a court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  Although the Court has determined that Plaintiff fails to state a claim and fails to allege standing, it is possible Plaintiff can cure its allegations by alleging, among other things, that it was particularly harmed by the OEM-conspiracy and by alleging parallel activity.  Accordingly, because Plaintiff may salvage its Complaint, the Court finds amendment would not be futile.  Plaintiff's claims are therefore dismissed with leave to amend.  Should Plaintiff choose to file an amended complaint, it must do so by **October 7, 2020**.  Failure to do so, or failure to cure the deficiencies addressed in this Order, will result in dismissal of Plaintiff's claims with prejudice.  Plaintiff may not add new claims or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

The Court **GRANTS** the Tokin Defendants' motion to compel arbitration.  The Court **STAYS** Plaintiff's claims against the Tokin Defendants pending arbitration.  The Parties shall notify the Court within **seven days** of an arbitration ruling.

**IT IS SO ORDERED.**

Dated: August 31, 2020

EDWARD J. DAVILA
United States District Judge